1  **LAW OFFICES OF DALE K. GALIPO**
Dale K. Galipo (SBN 144074)
2  dalekgalipo@yahoo.com
Cooper Alison-Mayne (SBN 343169)
3  cmayne@galipolaw.com
21800 Burbank Boulevard, Suite 310
4  Woodland Hills, CA 91367
Phone: (818) 347-3333
5

6  *Attorneys for Plaintiff Dorothey Heimbach*

7

8  ### UNITED STATES DISTRICT COURT

9  ### EASTERN DISTRICT OF CALIFORNIA

10

11  DOROTHEY HEIMBACH,                    2:23-cv-01887-DJC-CSK

12                 Plaintiff,            *Assigned to:*
District Judge Daniel J. Calabretta
13        vs.
**PLAINTIFF'S MOTION IN LIMINE**
14  STANISLAUS COUNTY, JUSTIN            **#1 TO EXCLUDE CERTAIN**
CAMARA, and ZA XIONG,                **OPINIONS OF ROBERT BUX**
15                                       **UNDER DAUBERT**
16                 Defendants.          FPTC Date:   December 18, 2025
Time:        1:30 PM
17                                       Location:    Courtroom 7
18

19

20        PLEASE TAKE NOTICE that on December 18, 2025, in Courtroom 7 of the

21  United States District Court for the Eastern District of California, at 501 I Street,

22  Sacramento, CA 95814, Plaintiff, DOROTHEY HEIMBACH, hereby moves in

23  limine for an order excluding, at the trial of the above-referenced matter:

24        1) Any testimony or opinions from Dr. Bux regarding Anthony Silva's pain

25            and suffering;

26        2) Any testimony or opinions from Dr. Bux regarding the standard of care

27            for nurses and doctors or that their negligence caused Mr. Silva's death;

28            and

1

3) Any testimony or opinions from Dr. Bux that Anthony Silva caused or contributed to his own death by refusing to comply with medical directives.

This Motion is based on this Notice of Motion, the attached Memorandum of Points and Authorities, the records and files of this Court, and upon such other oral and documentary evidence as may be presented at the time of the hearing.

Dated: December 11, 2025          **LAW OFFICES OF DALE K. GALIPO**

By:    */s/    Cooper Alison-Mayne*
Dale K. Galipo
Cooper Alison-Mayne
*Attorneys for Plaintiff Dorothey Heimbach*

## MEMORANDUM OF POINTS AND AUTHORITIES

## I.     INTRODUCTION

Plaintiffs respectfully move this Court to exclude certain opinions of Defendant's retained expert, Dr. Robert C. Bux. Many of Dr. Bux's proffered opinions fail to meet the standards of Federal Rule of Evidence 702 and *Daubert v. Merrell Dow Pharmaceuticals, Inc*., 509 U.S. 579 (1993), and should therefore be excluded. Specifically, this motion seeks to exclude Dr. Bux's opinions regarding: (1) Anthony Silva's pain and suffering; (2) the standard of care for nurses and doctors, or that their negligent conduct caused Mr. Silva's death; and (3) the claim that Mr. Silva caused his own death through noncompliance with medical directives.

## II.     LEGAL STANDARD

Federal Rule of Evidence 702 permits expert testimony only when the proponent demonstrates to the Court by a preponderance of evidence that: (1) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (2) the testimony is based on sufficient facts or data; (3) the testimony is the product of reliable principles and methods; and (4) the expert has reliably applied the principles and methods to the facts of the case. Fed. R. Evid. 702.

Under *Daubert*, the trial court serves as a gatekeeper to ensure that expert testimony is both reliable and relevant. *Daubert*, 509 U.S. at 589. The proponent of the expert testimony bears the burden of establishing admissibility by a preponderance of the evidence. *Lust v. Merrell Dow Pharms., Inc.*, 89 F.3d 594, 598 (9th Cir. 1996). An expert's opinion must be based on "more than subjective belief or unsupported speculation." *Daubert*, 509 U.S. at 590.

1    **III.    ARGUMENT**

2        **A.    Dr. Bux Should Not Be Permitted to Opine About Pain and**

3            **Suffering**

4        Dr. Bux admitted in his deposition that he does not intend to offer any

5    opinions regarding Mr. Silva's pain and discomfort. When asked directly whether

6    he planned to give opinions on this subject, he responded unequivocally:

7            Q.    Are you planning on giving any opinions as to his

8                pain and discomfort during all of these

9                complications that he was having?

10            A.    No.

11    Bux Depo. 30:23–31:1 (*See* "Exhibit A" to the Declaration of Cooper Alison-

12    Mayne in Support of Plaintiff's Motion in Limine No. 1, herein after "Mayne

13    Decl.") portions of the Deposition Transcript of Robert Charles Bux, MD) Because

14    Dr. Bux has disclaimed any intent to offer such opinions, any testimony on pain

15    and suffering should be precluded.

16        **B.    Dr. Bux Should Not Be Permitted to Opine About Standard of**

17            **Care for Nurses, Doctors, or the Hospital**

18        Dr. Bux is a board-certified anatomical and forensic pathologist. Bux Depo.

19    8:18–20 (Exhibit A to Mayne Decl). He is not qualified to testify regarding the

20    standard of care for nurses, physicians, or hospitals—particularly in the context of

21    rehabilitative care for a quadriplegic patient.

22        When asked whether a patient with Mr. Silva's type of injury generally

23    needs lifetime care, Dr. Bux candidly admitted he lacks the relevant expertise:

24            Q. Does someone with that type of injury generally need

25                lifetime care?

26            MR. WHITEFLEET: Objection. It's outside the scope.

27            THE WITNESS: Yeah, I don't—I don't have a practice

28                taking care of those kind of injuries. I never did when I

1        was in practice in the Army and I never did in terms of—

2        of when I interned, so I—it's out of my scope of

3        understanding and knowledge.

4    Bux Depo. 8:8–16 (Exhibit A to Mayne Decl". Similarly, when asked about what

5    activities he expected a quadriplegic patient to perform, Dr. Bux acknowledged his

6    lack of qualifications: "Well, I'm not—I'm not an occupational therapist." Bux

7    Depo. 62:4–7 (Exhibit A to Mayne Decl).

8        Dr. Bux further confirmed he would not opine on whether Mr. Silva's

9    medical treatment was reasonable or necessary:

10        Q. Okay. Are you going to give any opinions as to

11        whether any of the treatment was not reasonable or

12        necessary?

13        A. No.

14    Bux Depo. 16:19–22 (Exhibit A to Mayne Decl).

15        The Ninth Circuit has squarely addressed this issue. In *Trujillo v. County of*

16    *Los Angeles*, 751 F. App'x 968 (9th Cir. 2018), the court found the district court

17    abused its discretion by allowing two doctors to testify about the standard of care

18    of a nurse and nurse practitioner. *Id.* at 972. The court held that doctors generally

19    are not permitted to testify about the standard of care for nurses "absent some

20    special certification, expertise, or relevant knowledge." *Id.*

21        The *Trujillo* court cited *Lattimore v. Dickey*, 239 Cal. App. 4th 959 (2015),

22    for the proposition that "where a medical specialist is alleged to have acted

23    negligently, the 'specialist must possess and use the learning, care and skill

24    normally possessed and exercised by practitioners of that specialty under the same

25    or similar circumstances.'" *Id.* (citation omitted).

26        As a forensic pathologist, Dr. Bux lacks the specialized expertise to opine on

27    the standard of care for nurses or treating physicians in providing rehabilitative

28

care to a quadriplegic patient. His own testimony confirms as much. Any opinions on these topics should be excluded.

**C.     Dr. Bux's Opinion That Mr. Silva Caused His Own Death by Refusing to Comply with Medical Directives Is Outside of his Expertise and Speculative**

Dr. Bux's opinion that Mr. Silva's alleged noncompliance contributed to his death is pure speculation unsupported by the evidence. Dr. Bux himself admitted that the medical records do not provide a clear picture of what Mr. Silva's alleged noncompliance actually entailed:

> Q. And I noticed in your review there's multiple times you noted he was compliant and other times non-compliant. Would that be fair?
>
> A. Right. But it's not clear to me—it's not clear to me exactly what that included. You know, if you want to get the best view, you need to talk to one of the doctors that took care of him over that—over that time period when he was in Central Valley Specialty Hospital, because the notes are not real good about that.

Bux Depo. 28:17–29:2 (Exhibit A to Mayne Decl.).

When asked about Mr. Silva's ability to prevent his own pressure ulcers given his quadriplegia, Dr. Bux acknowledged that the nursing staff bore responsibility for repositioning him:

> THE WITNESS: He could move somewhat. And how much of that would have been enough, should have been able to prevent ulcers that were on his arms, on his shoulders, on his upper back. How far down he would be able to do that, I don't know. That's what the nurses are there for, and needed to do, and I don't think it—it didn't

6

happen or he wouldn't have had the—the depth and size

of the decubitus ulcers in this short—relative short period

of time in which they developed.

Q. Right. But I guess what I'm getting at is, given his

condition, would you agree that he was reliant on the

nursing staff to move him?

THE WITNESS: Yeah, he was reliant on the nursing

staff to do his nursing care, and in terms of moving him

every two hours, they failed.

Bux Depo. 26:3–27:20 (Exhibit A to Mayne Decl).

Notably, Defendants' own expert, Robert Shavelle, considered whether "non-compliant" behavior was a relevant factor in adjusting Mr. Silva's life-expectancy calculation and determined that no adjustment was necessary. (*See* "Exhibit C" to Mayne Decl, portions of Dr. Robert Shavelle, Rule 26 Report) This is further indication that Dr. Bux is speculating when he opines that Mr. Silva's alleged noncompliance caused his death. Without a foundation in the record establishing what specific conduct constituted "noncompliance," how frequently it occurred, and how it causally contributed to Mr. Silva's death, Dr. Bux's opinion amounts to nothing more than "subjective belief or unsupported speculation" that *Daubert* forbids. 509 U.S. at 590.

Additionally, Dr. Bux's opinion regarding Mr. Silva's alleged noncompliance is irrelevant to the issues before the jury because it fails to consider Mr. Silva's capacity to comply with medical directives given his physical and mental limitations.

California law is clear that an injured person's duty to mitigate damages must be evaluated from the perspective of a reasonable person in his situation—not an able-bodied, mentally healthy individual. "The correct rule is that an injured person must use reasonable diligence in caring for his injuries. What is reasonable

7

diligence depends upon all the facts and circumstances of each case." *Christiansen v. Hollings*, 44 Cal. App. 2d 332, 346 (1941).

Dr. Bux's opinions fail to account for several critical factors affecting Mr. Silva's ability to comply.

*Physical Limitations.* Mr. Silva was a quadriplegic, paralyzed from C6-C7 down. Dr. Bux admitted that Mr. Silva "was reliant on the nursing staff to do his nursing care, and in terms of moving him every two hours, they failed." Bux Depo. 27:18–20(Exhibit A to Mayne Decl). When asked what activities he expected a quadriplegic to perform, Dr. Bux acknowledged: "Well, I'm not—I'm not an occupational therapist." Bux Depo. 62:4–7 (Exhibit A to Mayne Decl). By his own admission, Dr. Bux lacks both the expertise and the specific facts necessary to opine on what was functionally possible for someone in Mr. Silva's condition. His testimony therefore amounts to speculation about what he imagines Mr. Silva should have done, untethered from the actual circumstances Mr. Silva faced. Such speculation is irrelevant to the question before the jury, which requires an individualized analysis of what was reasonable for this individual.

*Mental State.* Dr. Bux failed to consider Mr. Silva's mental state and how that affected his ability to comply with medical directives. When asked whether someone who becomes quadriplegic may experience depression, Dr. Bux responded: "I think anybody can if it's—if it's right. I don't know whether he did or he didn't." Bux Depo. 47:2–10 (Exhibit A to Mayne Decl). Depression and suicidal ideation are well-documented consequences of spinal cord injury, as explained in the defense's own expert's report. (*See* Exhibit C to Mayne Decl.) In considering whether Mr. Silva's actions or inactions amounted to a failure to mitigate damages, the inquiry must be based on Mr. Silva's perspective, including his mental state.

As a forensic pathologist, Dr. Bux lacks the expertise to testify regarding what is functionally possible for a quadriplegic, how depression affects medical

compliance, or what constitutes "reasonable" self-care for someone in Mr. Silva's circumstances.

For the reasons above, Dr. Bux's opinions…

**D.     Dr. Bux's Testimony Is Misleading and Not Helpful to the Jury**

Dr. Bux's proffered testimony fails to meet Rule 702's requirement that expert testimony "help the trier of fact." His testimony is misleading for two reasons.

*First*, to the extent Dr. Bux opines about the negligence of the nurses, doctors, and hospital in treating Mr. Silva, such testimony is irrelevant to the jury's determination of damages. Under California law, as reflected in CACI No. 3929:

> If you decide that [Defendants are] legally responsible
> for [Plaintiff's] harm, [they are] also responsible for any
> additional harm resulting from the acts of others in
> providing medical treatment or other aid that [Plaintiff's]
> injury reasonably required, even if those acts were
> negligently performed.

Thus, even if the hospital or its staff negligently cared for Mr. Silva, Defendants remain responsible for the resulting harm. Testimony about the hospital's negligence is irrelevant to any issue the jury must decide and serves only to confuse and mislead.

*Second*, Dr. Bux's testimony appears designed to shift blame for Mr. Silva's death onto the victim himself. But as discussed above, Dr. Bux lacks foundation for these opinions and lacks the expertise to evaluate what Mr. Silva could reasonably have been expected to do given his condition. Further, his opinion fails to take consideration of what would a reasonable person would do in the circumstances faced by Mr. Silva, as he takes no account of his physical limitations or possible mental limitations that both were directly relevant to what Mr. Silva could do to mitigate his damages.

Mr. Bux's testimony on the challenged topics will not be helpful to a jury and will only serve to mislead and confuse the jury. Therefore, it should be excluded.

**IV.    CONCLUSION**

For the foregoing reasons, Plaintiffs respectfully request that this Court exclude Dr. Bux's testimony regarding: (1) Mr. Silva's pain and suffering; (2) the standard of care for nurses and doctors, or that their negligent care caused Mr. Silva's death; and (3) any opinion that Mr. Silva caused or contributed to his own death through noncompliance with medical directives.

Dated: December 11, 2025                    **LAW OFFICES OF DALE K. GALIPO**

By:    */s/    Cooper Alison-Mayne*
Dale K. Galipo
Cooper Alison-Mayne
*Attorneys for Plaintiff Dorothey Heimbach*