**P O R T E R  |  S C O T T**

A PROFESSIONAL CORPORATION
John R. Whitefleet, SBN 213301
jwhitefleet@porterscott.com
Colin J. Nystrom, SBN 354503
cnystrom@porterscott.com
2180 Harvard Street, Suite 500
Sacramento, California 95815
TEL: 916.929.1481
FAX: 916.927.3706

Attorneys for Defendants STANISLAUS COUNTY, JUSTIN CAMARA, ZA XIONG
*(Exempt from Filing Fees Pursuant to Government Code § 6103)*

UNITED STATES DISTRICT COURT EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| DOROTHEY HEIMBACH, individually and as successor in interest to Anthony Silva,<br><br>Plaintiff,<br><br>v.<br><br>STANISLAUS COUNTY; and JUSTIN CAMARA, ZA XIONG, and ERIC BAVARO, in their individual capacities,<br><br>Defendants.<br>_____/ | Case No.  2:23-cv-01887-DJC-CSK<br><br>**DECLARATION OF JOHN R. WHITEFLEET IN SUPPORT OF DEFENDANTS MOTIONS IN LIMINE** |

I, John R. Whitefleet, declare as follows:

1.      I am an attorney at law licensed to practice before all the courts of the State of California. I am a shareholder with the law firm of Porter Scott, attorney of record for Defendants ("Defendants") in the in the above-entitled matter

2.      I make this Declaration on my own personal knowledge except to the facts stated on information and belief.  As to such facts, I believe them to be true.  If called upon to do so, I could and would competently testify about the matters asserted herein.

3.      Attached hereto as Exhibit A is the report produced by Plaintiff of Scott Defoe

4.      Attached hereto as Exhibit B is the report produced by Plaintiff of Dr. Omalu

5.      Attached hereto as Exhibit C is Plaintiff's Third Supplemental Initial Disclosure dated January 23, 2025 in the above matter.

6.      Attached hereto as Exhibit D is Plaintiff's Fourth Supplemental Initial Disclosure dated January 24, 2025 in the above matter.

I declare under penalty of perjury under the laws of the State of California and the United States that the foregoing is true and correct, executed this December 11, 2025, at Sacramento, California.


Dated:  December 11, 2025                    By __/s/ John R. Whitefleet_____
                                                        John R. Whitefleet

DECLARATION OF JOHN R. WHITEFLEET IN SUPPORT OF DEFENDANTS MOTIONS IN LIMINE

EXHIBIT A

**LAW OFFICES OF DALE K. GALIPO**
Dale K. Galipo, Esq. (SBN 144074)
dalekgalipo@yahoo.com
Cooper Alison-Mayne (SBN 343169)
cmayne@galipolaw.com
21800 Burbank Boulevard, Suite 310
Woodland Hills, CA 91367
Phone: (818) 347-3333

**LAW OFFICES OF DEAN PETRULAKIS**
Dean Petrulakis, Esq. (Bar No. 192185)
1600 G Street, Suite 202
Modesto, CA 95354
Tel: (209) 522-6600

# UNITED STATES DISTRICT COURT

# EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| DOROTHEY HEIMBACH, individually and as successor in interest to Anthony Silva,<br><br>      Plaintiff,<br><br>vs.<br><br>STANISLAUS COUNTY; and JUSTIN CAMARA, ZA XIONG, and ERIC BAVARO, in their individual capacities,<br><br>      Defendants. | Case No. 2:23-cv-01887-DJC-KJN<br><br>**PLAINTIFF'S RULE 26 INITIAL EXPERT DISCLOSURES**<br><br>Judge: Hon. Daniel J. Calabretta<br>Magistrate Judge: Kendall J. Newman |

**TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD:**

Plaintiff hereby designates the following retained and non-retained expert witnesses who may be called upon to give expert testimony at trial pursuant to Rule 26(a)(2)(A) of the Federal Rules of Civil Procedure. Plaintiff reserves his right to supplement and/or amend this disclosure, including if and when additional information becomes available in this case.

**RETAINED EXPERT:**

1.    Scott DeFoe – Police Practices and Security Practices Expert. P.O. Box 4456, Huntington Beach, CA 92605-4456; (714) 655-4280.

2.    Bennett Omalu, M.D. – Forensic Pathologist. 3031 West March Lane, #323, Stockton, CA 95219; (916) 513-5253.

3.    Alex Helm – Video Editor. 500 N. Rossmore Ave, Los Angeles, CA 90004; (484) 553-4449.


**NON-RETAINED EXPERTS:**

Plaintiff further identifies expert witnesses who may present evidence pursuant to Rules 702, 703, or 705 of the Federal Rules of Evidence, but who are not retained by Plaintiff, to provide expert testimony. Plaintiff hereby discloses the following witnesses and submit the following summaries of the witness' expected testimony pursuant to Rule 26(a)(2)(A) and (C), while reserving his right to supplement this disclosure if and when additional information and/or details become available:

**1. Marco Virgen**

**Employer:** American Medical Response

**Contact Info:** 4846 Stratos Way, Modesto, CA 95356 | (800) 913-9142

Marco Virgen, an EMT with American Medical Response, responded to the scene and provided emergency medical care to Mr. Silva before transporting him to the hospital. He will testify about Mr. Silva's condition upon arrival,

his observations of Mr. Silva's injuries, including his broken neck and paralysis, the medical aid he provided at the scene and during transport, any statements made by Mr. Silva or others at the scene, and the reasonableness and necessity of the emergency medical response.

**2. Arnold Blagg**

**Employer:** American Medical Response

**Contact Info:** 4846 Stratos Way, Modesto, CA 95356 | (800) 913-9142

Arnold Blagg, an EMT with American Medical Response, responded to the scene and provided emergency medical care to Mr. Silva before transporting him to the hospital. He will testify about Mr. Silva's condition upon arrival, his observations of Mr. Silva's injuries, including his broken neck and paralysis, the medical aid he provided at the scene and during transport, any statements made by Mr. Silva or others at the scene, and the reasonableness and necessity of the emergency medical response.

**3. Personnel at Central Valley Specialty Hospital**

**Employer:** Central Valley Specialty Hospital

**Contact Info:** 730 17th St, Modesto, CA 95354

Doctors and nurses at Central Valley Specialty Hospital provided medical treatment to Mr. Silva for injuries resulting from the incident, including a broken neck and paralysis. They will testify about the nature and extent of his injuries, his condition upon arrival, the medical treatment provided, and the reasonableness and necessity of the care given.

**4. Personnel at Memorial Medical Center**

**Employer:** Memorial Medical Center

**Contact Info:** 1700 Coffee Rd, Modesto, CA 95355 | (209) 526-4500

Doctors and nurses at Memorial Medical Center provided medical treatment to Mr. Silva for injuries resulting from the incident, including a broken neck and paralysis. They will testify about the nature and extent of his injuries, his

condition upon arrival, the medical treatment provided, and the reasonableness and necessity of the care given.

**5. Dr. Bryan James Beattie**

    **Employer:** Memorial Medical Center

    **Contact Info:** 1700 Coffee Rd, Modesto, CA 95355

    Dr. Beattie treated Mr. Silva following the incident and will testify about his medical condition, ongoing complications, and overall health in the year leading up to his death.

**6. Dr. Jahoon Koo**

    **Employer:** Memorial Medical Center

    **Contact Info:** 1700 Coffee Rd, Modesto, CA 95355

    Dr. Koo treated Mr. Silva following the incident and will testify about his medical condition, ongoing complications, and overall health in the year leading up to his death.

**7. Dr. Deependra Mahato**

    **Employer:** Private Practice

    **Contact Info:** 1401 Spanos Ct #121, Modesto, CA 95355

    Dr. Mahato treated Mr. Silva following the incident and will testify about his medical condition, ongoing complications, and overall health in the year leading up to his death.

**8. Christina Marie Haro**

    **Employer:** Private Practice

    **Contact Info:** 1401 Spanos Ct #121, Modesto, CA 95355

    Christina Haro treated Mr. Silva following the incident and will testify about his medical condition, ongoing complications, and overall health in the year leading up to his death.

**9. Sandra Ann Richhart**

    **Employer:** Sutter Health

**Contact Info:** 3612 Dale Rd, Modesto, CA 95356 | (209) 522-0146

Sandra Richhart treated Mr. Silva following the incident and will testify about his medical condition, ongoing complications, and overall health in the year leading up to his death.

**10. Joshua Caleb Edwards**

**Employer:** Sutter Health

**Contact Info:** 3612 Dale Rd, Modesto, CA 95356 | (209) 522-0146

Joshua Edwards treated Mr. Silva following the incident and will testify about his medical condition, ongoing complications, and overall health in the year leading up to his death.

**11. Javier Ramirez**

**Employer:** Sutter Health

**Contact Info:** 3612 Dale Rd, Modesto, CA 95356 | (209) 522-0146

Javier Ramirez treated Mr. Silva following the incident and will testify about his medical condition, ongoing complications, and overall health in the year leading up to his death.

**12. Dr. Raman Moradkhan**

**Employer:** Sutter Health

**Contact Info:** 3612 Dale Rd, Modesto, CA 95356 | (209) 522-0146

Dr. Moradkhan treated Mr. Silva following the incident and will testify about his medical condition, ongoing complications, and overall health in the year leading up to his death.

**13. Dr. Henry M. Andoh**

**Employer:** Sutter Health

**Contact Info:** 3612 Dale Rd, Modesto, CA 95356 | (209) 522-0146

Dr. Andoh treated Mr. Silva following the incident and will testify about his medical condition, ongoing complications, and overall health in the year leading up to his death.

1
2
3  DATED: February 21, 2025                  LAW OFFICES OF DALE K. GALIPO
4
5                                    By: _____
6                                         Cooper Alison-Mayne
                                          Dale K. Galipo
7                                         *Attorneys for Plaintiff*
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

1
2
## PROOF OF SERVICE
3
### STATE OF CALIFORNIA, COUNTY OF LOS ANGELES
4    I, Stefany Anderson, am employed in the County of Los Angeles, State of California and am over the age of eighteen years and not a party to the within action.
5 My business address is 21800 Burbank Boulevard, Suite 310, Woodland Hills, California 91367.
6
On February 21, 2025, I served the foregoing document described as:
7
**PLAINTIFF'S THIRD SUPPLEMENTAL RULE 26(A) DISCLOSURES**
8
on all interested parties, through their respective attorneys of record in this action by placing a true copy thereof enclosed in a sealed envelope addressed as indicated on
9 the attached service list.
10    METHOD OF SERVICE
11    ☐    (BY MAIL)  I enclosed the documents in a sealed envelope or package and addressed to the parties at the addresses as indicated on the attached service
12        list.
13            ☐    I deposited the sealed envelope or package with the United States Postal Service, with the postage fully prepaid thereon.
14
15            ☐    I placed the envelope or package for collection and mailing, following our ordinary business practices.  I am readily familiar with the practice of this office for the collection, processing and
16                mailing of documents.  On the same day that documents are placed for collection and mailing, it is deposited in the ordinary
17                course of business with the United States Postal Service, in a sealed envelope with postage fully prepaid.
18
19    ☒    (BY ELECTRONIC SERVICE)  I caused the foregoing document(s) to be sent via electronic transmittal to the notification addresses listed below as registered with this court's case management/electronic court filing system.
20
21    ☐    (BY FEDERAL EXPRESS)  I enclosed the documents in an envelope or package provided by an overnight delivery carrier and addressed to the persons at the addresses as indicated on the attached service list.  I placed the
22        envelope or package for collection and overnight delivery at an office or regularly utilized drop box of the overnight delivery carrier.
23
24    I declare that I am employed in the office of a member of the bar of this Court at whose direction the service was made.
25
Executed on February 21, 2025, at Woodland Hills, California.
26
27        */s/Stefany Anderson*
        _____
28            Stefany Anderson

1

2

## **SERVICE LIST**

3

John Robert Whitefleet
Porter Scott
2180 Harvard Suite 500
Sacramento, CA 95815
Fax: (916) 927-3706
*Email: Service@porterscott.com; jwhitefleet@porterscott.com*

4

5

6

7

Law Offices of Dean Petrulakis
1600 G Street, Suite 202
Modesto, CA 95354
Facsimile:(209) 522-6604
*Email: dean@deanpetrulakislaw.com*

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

PLAINTIFF'S FOURTH SUPPLEMENTAL RULE 26(A) DISCLOSURES

On-Scene Consulting

February 28, 2025

Mr. Dale K. Galipo, Esq.
Law Offices of Dale K. Galipo
21800 Burbank Boulevard, Suite 310
Woodland, Hills, California 91367

### Federal Rules of Civil Procedure 26 (a) (2) (B) Report

**DOROTHY HEIMBACH, individually and as successor in interest to Anthony Silva, Plaintiff,**
**vs.**
**STANISLAUS COUNTY; JUSTIN CAMARA, ZA XIONG and ERIC BAVARO, in their individual capacities, Defendants.**
**(Case No. 2:23-cv-01887-DCJ-KJN).**

Dear Mr. Galipo,

Thank you for retaining me to analyze and render opinions regarding the October 8, 2022, incident involving Mr. Anthony Silva at 3600 Sierra Street, Riverbank, California 95367. Pursuant to the requirements of Rule 26, I have studied reports, videos, Stanislaus County Sheriff's Department documents and other material (as listed under Materials Reviewed) provided to me thus far regarding this case.

Please be advised that if additional documents related to this matter are provided, it may be necessary to write a supplemental report in order to refine or express additional opinions. It is also necessary to state at the beginning of this report that I do not make credibility determinations in expressing my opinions.

Scott A. DeFoe
Principal
On-Scene Consulting, LLC

On-Scene Consulting

**Materials Reviewed:**

1. Second Amended Complaint, Case No. 2:23-cv-01887-DJC-KJN.

2. Photograph of Mr. Anthony Silva's spine after surgery.

3. Photograph of Mr. Anthony Silva's broken spine.

4. Screenshot the moment Mr. Anthony Silva's neck is broken.

5. Slow Motion Clip, Alec Helm, 50% Speed, (0:40).

6. Stanislaus County Sheriff's Department, Policy Manual, 10/17/22.

7. Frame by Frame, PDF Photographs, Axon Frame 360.

8. Camera Frames with Time Code.

9. Xiong Frames with Time Code, 360.

10. Axon Body 3, X60334264, 10/8/22, VLC-Record-2024-08-06-16h, 09 m, 53s, Bavaro.mp4, (DEF 00029).

11. Axon Body 3, X60A1310B, 10/8/22, VLC-Record-2024-08-06-16h, 10m, 41s. Camara .mp4, (DEF 00028).

12. Axon Body 3, X60A11709, 10/8/22, VLC-Record-2024-08-06-16h, 11m, 32s, (DEF 00027).

13. Screenshots from Videos, (Camara 0957, 1008, 1011-2, 1011, 2244).

14. Axon Body 3, X60A125B, (7:04), (DEF 00026), Babbit.

15. Axon Body 3, X60A11709, Bike Officer Xiong, (1:03:42).

16. Axon Body 3, X60A1310B, (62:30), Camara, (DEF 00028).

17. Axon Body 3, <u>X60334264</u>, (<u>28:27</u>), Bavaro, (<u>DEF 00029</u>).

18. Axon Body 3, <u>X60A12629,</u> (<u>12:02</u>), Hickman, (<u>DEF 00030</u>).

19. Axon Body 3, <u>X60334268</u>, Bavaro, (<u>18:21</u>), (<u>DEF 00031</u>).

20. Deposition Transcript and Exhibits of Bret Babbitt taken on September 20, 2024.

21. Deposition Transcript and Exhibits of David Hickman taken on October 2, 2024.

22. Subject to Protective Order/ Deposition of Ed Ridenour taken on November 5, 2024.

23. Deposition Transcript and Exhibits of Eric Bavaro taken on August 1, 2024.

24. Deposition Transcript of Justin Camara taken on July 31, 2024.

25. Deposition Transcript of Lauren Romero taken on September 26, 2024.

26. Deposition Transcript of Za Xiong taken on August 1, 2024.

27. Stanislaus County Sheriffs-Controlled Document, <u>Case No. R22008565,</u>
(<u>DEF 00002-13</u>).

**<u>California POST Basic Learning Domains as Follows:</u>**
1. #1: "Leadership, Professionalism and Ethics."
2. #2: "Criminal Justice System."
3. #3: "Policing in the Community."
4. #20: "Use of Force."
5. #21: "Patrol Techniques."
6. #33: "Arrest and Control."
7. #34: "First Aid, CPR, and AED."
8. #35: "Firearms/Chemical Agents."
9. #37: "People with Disabilities."

**<u>Summary</u>**

The following statement summaries represent documents/statements that were used in part during my review but are in no way meant to be exhaustive. The documents listed in the Materials Reviewed Section of this report represent the full library of documents reviewed thus far and used as a basis for my opinions.

**The listed below information is verbatim from Second Amended Complaint, Case No. 2:23-cv-01887-DJC-KJN:**

- On the afternoon of October 8, 2022, Mr. Silva was outside the Riverbank Community Center at 3600 Santa Fe Street, Riverbank, CA 95367, near a gazebo that is a public facility.
- At the time of the incident, Mr. Silva was a 39-year-old man.
- Mr. Silva is a high school graduate.
- For several years before the incident, he had been experiencing housing instability.
- Deputies CAMARA and XIONG approached Mr. Silva and immediately executed a forceful takedown and arrest, though Mr. Silva offered no resistance, was not suspected of a serious crime, and was not a threat to anyone.
- Deputies CAMARA and XIONG detained Mr. Silva without reasonable suspicion that he had committed any crime.
- Deputies CAMARA and XIONG led Mr. Silva to the nearby gazebo and Deputy BAVARO met them there.
- During their conversation with Mr. Silva, Deputy CAMARA became angry and forcefully slammed Mr. Silva head-first into the ground with help from Deputies XIONG and BAVARO.
- The forceful takedown of Mr. Silva resulted in cervical fractures of his C6 and C7 vertebrae. In layman's terms, Mr. Silva's neck was broken.
- Due to his broken neck, Mr. Silva could not get back to his feet. Mr. Silva immediately told the deputies, "I'm paralyzed."
- Although Mr. Silva was clearly suffering from a severe injury, the Defendant Deputies did not promptly call paramedics.
- Instead, as Mr. Silva lay on the ground, Deputies CAMARA and XIONG began to move his injured body. Without giving his neck any support, they carried his limp body to a nearby picnic table and sat him upright.
- Moving, Mr. Silva multiple times exacerbated his neck injury, resulting in permanent quadriplegia.
- The Defendant Deputies caused a delay in Mr. Silva's receipt of medical care, despite the obvious and urgent need.
- At all relevant times, Mr. Silva complied with the Defendant Deputies' commands and did not resist arrest.
- At all relevant times, the Defendant Deputies had no information that Mr. Silva posed any threat of injury to anyone, nor did they have information that Mr. Silva had injured anyone.

On-Scene Consulting

- Mr. Silva had, in fact, not hurt anyone at any relevant time.
- Before breaking his neck, the deputies did not warn Mr. Silva that they would begin using force against him, despite it being feasible to do so, and despite Mr. Silva's compliance with the Defendant Deputies' commands.
- At all relevant times, Mr. Silva posed no imminent threat of bodily harm to the Defendant Deputies or anyone else.
- At all relevant times, Mr. Silva made no verbal threats to any officer or anyone else.
- At all relevant times, the Defendant Deputies could observe that Mr. Silva was unarmed and had no weapons in his possession.
- At all relevant times, the Defendant Deputies had no information that Mr. Silva had committed a crime unrelated to the alleged shoulder-check the officer claimed to have experienced.
- At all relevant times, the Defendant Deputies failed to make any effort to ascertain whether Mr. Silva was suffering from a medical problem or crisis requiring urgent treatment, as was obvious and in fact the case at the time.
- At all relevant times, the Defendant Deputies failed to take steps to de-escalate the situation or give Mr. Silva the opportunity to cooperate with their instructions or comply with their orders prior to assaulting him.
- As a result of the Defendant Deputies' forceful takedown, restraint, and subsequent movement of his injured body, Mr. Silva suffered significant injuries, including a C6, C7 cervical fracture leading to permanent quadriplegia, skin abrasions on his arms, and various complications including pneumonia in both lower lobes of his lungs and blood clots.
- After the incident, Mr. Silva never left the hospital. After suffering from his injuries for nearly a year, Mr. Silva died on September 10, 2023.

**Opinions:**

Note: None of my opinions are intended to usurp the province of the jury and are not stated as ultimate issues.  I hold the opinions below a reasonable degree of professional certainty.  The basis and reasons for my opinions are premised upon my education, training and experience in law enforcement, my knowledge of law enforcement standards, analysis and study; my familiarity with generally accepted police practices and the professional and academic literature in the field; my review of relevant actions, policies and procedures; and my understanding of the facts of this case based on my review of the comprehensive materials listed on Pages 2-3 of this report.  My opinions and testimony regarding police procedure are relevant topics concerning issues of which

lay jurors are unaware or frequently have misconceptions. My testimony on these topics is relevant and would assist a jury in understanding the evidence presented to them.

### Opinion Number 1

It is my opinion based on my review of the videos, facts and testimony in this matter, the Stanislaus County Sheriff's Department Deputy Sheriffs Justin Camara, Za Xiong and Eric Bavaro, <u>failed</u> to initially determine that Mr. Anthony Silva was mentally ill, experiencing a mental crisis, and act accordingly. Throughout the United States and in California, law enforcement agencies have recognized and trained their officers in multiple ways to safely interact with subjects such as Mr. Anthony Silva who are suffering from a mental illness and or experiencing a mental crisis. The objective is to avoid unnecessary injury and or death. The underlying principle is reverence for human life. Law Enforcement Officers should be trained to recognize cues and other indicators in order to make appropriate decisions regarding intervention strategies, time to assess and calm the situation, request additional equipment, provide reassurance that the officers are there to help, give the person time to calm down, move slowly, and reduce environmental distractions.

In addition, it is my opinion based on my review of the videos, facts and testimony in this matter, the Stanislaus County Sheriff's Department Deputy Sheriffs Justin Camara, Za Xiong and Eric Bavaro <u>failed</u> to initially appreciate that Mr. Anthony Silva was mentally ill or experiencing a mental crisis and then act accordingly.

In addition, it is my opinion based on my review of the videos, facts and testimony in this matter, the Stanislaus County Sheriff's Department Deputy Sheriffs Justin Camara, Za Xiong and Eric Bavaro clearly failed to respond as trained and delineated in the <u>California Commission on Peace Officers Standards and Training, Basic Course Workbook Series Student Materials Learning Domain 37</u>, "<u>People with Disabilities</u>" <u>Volume 4-4</u>: Law enforcement routinely encounters persons with mental illness in a variety of settings. How peace officers respond to persons living with a mental disorder can have tremendous impact on how these encounters will be resolved. The basic philosophy of any law enforcement officer should be to respond in a manner that is humane, compassionate, and supportive.

In addition, I base my opinion on <u>California Commission on Peace Officers Standards and Training, Basic Course Workbook Series Student Materials Learning Domain 37</u>, "<u>People with Disabilities</u>" <u>Volume 4-16</u>: <u>Appropriate Tactical Options</u>:

On-Scene Consulting

**<u>Calm the Situation:</u>**

- Take time to assess the situation.
- Provide reassurance that the officers are there to help.
- If possible, give the person time to calm down.
- Move slowly.
- If possible, avoid physical contact if no violence or destructive acts have taken place.
- If possible, explain intended actions before taking action.

In addition, I base my opinion on my twenty-eight years of law enforcement experience where I responded to thousands of calls for service and have effectively utilized defusing techniques, de-escalation techniques, verbal strategies and active listening skills to reduce the potential for violence and bring the emotional level of the incident to a manageable level by recognizing that an individual may be mentally ill and or experiencing a mental crisis.

Lastly, I base my opinion on my twenty-eight-year law enforcement career whereas a Supervisor, I have investigated over 100 Use of Force Incidents as well as being personally involved in the use of lethal and less than lethal force incidents.

## <u>Opinion Number 2</u>

It is my opinion based on my review of the facts, testimony and videos in this money, the Stanislaus County Sheriff's Department Deputy Sheriffs Justin Camara, Za Xiong and Eric Bavaro, <u>failed</u> to use de-escalation and defusing techniques during their interaction with Mr. Anthony Silva.  Defusing is a process of reducing the potential for violence and bringing emotional level to a manageable level to restore order. The primary objective is to calm the person so that a conversation can take place, and the use of force can be avoided.

I base my opinion on my review of the facts, video and testimony in this matter that Mr. Anthony Silva was mentally ill and or experiencing a mental crisis.

In addition, it is my opinion based on the facts, videos and testimony in this matter, Stanislaus County Sheriff's Department Deputy Sheriffs Justin Camara, Za Xiong and Eric Bavaro, <u>violated</u> <u>Stanislaus County Sheriff's Department Policy Manual, Policy 300,</u> <u>Use of Force</u>:

300.3.4 ALTERNATIVE TACTICS-DE-ESCALATION:

As time and circumstances reasonably permit, and when community and officer safety would not be compromised, deputies should consider actions that may increase deputy safety and may decrease the need for using force:

(a). Summoning additional resources that are able to respond in a reasonably timely manner.

(b). Formulating a plan with responding with responding deputies before entering an unstable situation that does not reasonably appear to require immediate intervention.

Such alternatives may include but are not limited to:

(a). Attempts to de-escalate a situation.

(b). If reasonably available, the use of crisis intervention techniques by improperly trained personnel.

In addition, I base my opinion on California Police Officer Standards and Training (POST), Learning Domain No. 20-Chapter 2: Force Options, Communication, 2-11: Effective communication may enable a peace officer to gain cooperation and voluntary compliance in stressful situations.

The vast majority of law enforcement responsibilities involve effective communication. Communication involves both command presence and words resulting in improved safety. Effective communication can:

- Provides skills that reduce the likelihood of physical confrontation.
- Can result in a reduction of injuries.
- Renders more effective public service and improves community relations.
- Decreases public complaints and internal affairs investigations.
- Decreases civil liability.
- Lessen personal and professional stress.

In addition, I base my opinion on my twenty-eight years of law enforcement experience where I responded to thousands of calls for service and have effectively utilized defusing techniques, de-escalation techniques, verbal strategies and active listening skills to reduce the potential for violence and bring the emotional level of the incident to a manageable level.

Lastly, I base my opinion on my twenty- eight-year law enforcement career whereas a Supervisor, I have investigated over 100 Use of Force Incidents as well as being personally involved in the use of lethal and less than lethal force incidents.

On-Scene Consulting

**Opinion Number 3**

It is my opinion that a reasonable Deputy Sheriff acting consistent with standard police practices <u>would not</u> have detained Mr. Anthony Silva. Mr. Anthony Silva did not commit a crime that would necessitate a detention.

In addition, it is my opinion based on my review of the facts, testimony and videos in this matter, the Stanislaus County Sheriff's Department Deputy Sheriffs Justin Camara, Za Xiong and Eric Bavaro did not have legal justification to detain Mr. Anthony Silva. Mr. Anthony Silva did not commit a crime that would necessitate a detention.
.
In addition, I base my opinion on <u>California Police Officer Standards and Training (POST), Learning Domain 15-Laws of Arrest, Chapter 3 (Detentions)</u>. <u>A lawful Detention</u> requires reasonable suspicion of criminal activity. A temporary detention or stop is an assertion of authority by a peace officer that would cause a reasonable person to believe that they are not free to leave. Such a belief may result from physical restraint, unequivocal verbal commands, or other conduct by an officer. A detention of a person is limited in scope, intensity, and duration. It is less than an arrest and more substantial than a consensual encounter. A detention must be temporary and last no longer than is necessary to resolve the reason for the stop. A legal detention at its beginning can become an illegal arrest if extended beyond what is reasonably necessary under the circumstances.

In addition, I base my decision on <u>California Police Officer Standards and Training (POST), Learning Domain No. 15, Chapter 2, Consensual Encounters, (2-2)</u>:

A **<u>consensual encounter</u>** is a face-to-face contact with a person under circumstances which would cause a reasonable person to believe they are free to leave or otherwise not cooperate. Peace officers must be vigilant when contacting the public to ensure their actions do not elevate a consensual encounter into a detention.

Peace officers will ensure they do not violate a person's Fourth Amendment rights during a consensual encounter by elevating it into a detention or arrest without legal justification.

In addition, I base my decision on <u>California Police Officer Standards and Training (POST), Learning Domain No. 1, Chapter 2, Professionalism and Ethics in Policing that states</u>, Unethical/unprofessional conduct, or breaches in ethical conduct can occur in any profession. The negative effects of such behavior are particularly detrimental to the

policing profession.  Any indiscretion severely damages the credibility of peace officers and their agencies and compromises public trust and support. Unethical/unprofessional conduct directly affects the officer in addition to affecting the image and effectiveness of law enforcement in the community.

Consequences for the officer range from mild to severe and may include the following:
- Disciplinary action up to and including termination.
- Civil and/or criminal liability (personal and agency).
- Embarrassment to stakeholders.
- Eroding the image of the profession.
- Reinforcement of negative stereotypes.
- Reduction of effectiveness.
- Diminishing public trust and cooperation.
- Compromise officer safety.

In addition, I base my decision on California Police Officer Standards and Training (POST), Learning Domain No. 15, Chapter 1, Constitutional Protections, and the Role of a Peace Officer, (1-13):

U.S. Code, Title 18, Section 242: Deprivation of rights under the color of law.  Whoever, under the color of any law, statute, ordinance, regulation, or custom, willfully subjects any inhabitant of any State, Territory, or District to the deprivation of any rights, privileges, or immunities secured or protected by the Constitution or laws of the United States, or to different punishments, pains, or penalties, on account of such inhabitant being an alien, or by reason of his color, or race, than are prescribed for the punishment of citizens, shall be fined under this title or imprisoned not more than one year, or both…

**Summary of Section 242**: This law makes it a federal crime, punishable by a fine or imprisonment up to one year, or both:
- For any person, acting under color of any law.
- To willfully deprive any person of any legal right.
- Or to subject any person to a different punishment or penalty.
- Based on that person's color, race, or citizenship status.

In addition, I base my opinion on, California Police Officer Standards and Training (POST), Learning Domain No. 1, Chapter 2, Professionalism and Ethics in Policing that states, "The Law Enforcement Code of Ethics was adopted as a uniform code of ethics to

guide the peace officer. By adhering to the code, officers demonstrate to the community and to their peers that they are honorable and trustworthy."

California Peace Officer Standards and Training (POST), Learning Domain No. 1, Chapter 2-Professionalism and Ethics in Policing: The Code of Ethics of any profession details the standard of conduct that identifies specific principles of desired behavior required of its practitioners. The profession of policy requires its members to adhere to specific standards in order to maintain the trust and respect of those who are served. Adherence to a Code of Ethics is required to build and maintain morale, a sense of duty, effective standards of performance and community support. Peace Officers are held to higher standards than others in the community. Although policing shares ideals with other professions, only peace officers are given the authority and power to detain and arrest others and to deprive them of their liberty while awaiting adjudication of their offense. It is essential that officers understand the importance of professional behavior.

To embody the spirit of professionalism, ethical conduct must be a way for those in policing. To maintain the community's trust, peace officers must maintain consistently high- standards of ethical conduct. Officers must model and live as examples of the behavior that they are charged to enforce. The policing community is only strong as its weakest link. Unethical conduct affects the image and morale of the entire profession, and it offends officers and society throughout the country.

In addition, I base my opinion on my twenty-eight years of law enforcement experience where I have conducted thousands of investigations and have effectively utilized defusing techniques, de-escalation techniques, verbal strategies, and active listening skills to reduce the potential for violence and bring the emotional level of the incident to a manageable level.

Lastly, I base my opinion on my twenty-eight-year law enforcement career where I have conducted thousands of investigations and made hundreds of arrests.

## Opinion Number 4

It is my opinion that a reasonable Deputy Sheriff acting consistent with standard police practices would not have searched Mr. Anthony Silva.

In addition, it is my opinion based on my review of the facts, testimony and videos in this matter, the Stanislaus County Sheriff's Department Deputy Sheriffs Justin Camara, Za Xiong and Eric Bavaro did not have legal justification to search Mr. Anthony Silva.

On-Scene Consulting

In addition, I base my opinion on <u>California Police Officer Standards and Training (POST), Learning Domain 15-Laws of Arrest, Chapter 3 (Detentions)</u>: Usually, searches are not permitted during a detention. If officers have a factual basis to suspect that the person is carrying a concealed weapon, dangerous instrument or an object that can be used as a weapon, the officers are justified in conducting a cursory/pat search to protect the officers from assault.  Peace officers must be able to articulate specific facts which caused them to reasonably believe the person might be carrying a weapon or dangerous instrument.

Based on my review of the facts, the Mr. Anthony Silva did not commit a crime or threaten any of the Defendants in this matter that would have necessitated the Defendants to conduct a cursory/pat search.

In addition, I base my opinion on <u>California Police Officer Standards and Training (POST), Learning Domain 16-Search and Seizure, Chapter 3, Warrantless Searches and Seizures</u>:

An officer need not be absolutely certain that the person is armed or potentially dangerous.  However, the officer's suspicion must be reasonable and based on specific facts.  <u>The following factors have been recognized as contributing to the suspicion that the person(s) may be carrying a weapon or pose a danger:</u>
<u>Clothing</u>, (***Does not apply to the facts in this matter***)
- Bulge in clothing that is the size of a potential weapon.
- Wearing a heavy coat when the weather is warm.

<u>Actions</u>, (***Does not apply to the facts in this matter***)
- Trying to hide something.
- Appearing overly nervous.
- Acting in a threatening manner.

<u>Prior Knowledge</u>, (***Does not apply to the facts in this matter***)
- History of carrying weapons or violent behavior.

<u>Reason for Detention</u>, (***Does not apply to the facts in this matter***)
- Stopped in order to investigate a serious, violent, or armed offense.

<u>Companions</u>, (***Does not apply to the facts in this matter***)
- Lawful search of companions revealed a weapon or potential weapon.

On-Scene Consulting

Location, (*Does not apply to the facts in this matter*)
- Stopped in an area known for violence, or where the officer is unlikely to receive immediate aid if attacked.

Time of day/amount of light, (*Does not apply to the facts in this matter*)
- Stopped during nighttime.
- Stopped in an area with little or no lighting.

Ratio, (*Does not apply to the facts in this matter*)
- Detainees outnumbered officers.

Lastly, I base my opinion on my twenty-eight-year law enforcement career where I have conducted thousands of investigations and made hundreds of arrests.

## Opinion Number 5

It is my opinion based on my review of the facts, testimony and videos in this matter, Stanislaus County Sheriff's Department Deputy Sheriffs Justin Camara, Za Xiong and Eric Bavaro <u>failed</u> to warn Mr. Anthony Silva that they were going to use force (<u>Less Lethal and Lethal</u>) and provide Mr. Anthony Silva with a reasonable opportunity to comply prior to using force.

In addition, it is my opinion based on the facts, videos and testimony in this matter, Stanislaus County Sheriff's Department Deputy Sheriffs Justin Camara, Za Xiong and Eric Bavaro, <u>violated</u> <u>Stanislaus County Sheriff's Department Policy Manual, Policy 300, Use of Force</u>:

<u>300.4</u> <u>DEADLY FORCE APPLICATIONS</u>: Where feasible, the deputy shall, prior to the use of deadly force, make reasonable efforts to identify him/herself as a peace officer and to warn that deadly force may be used, unless the deputy has objectively reasonable grounds to believe the person is aware of those facts, (<u>Penal Code 835a</u>).

Lastly, I base my opinion on my twenty-eight-year law enforcement career as a Supervisor, I have investigated over 100 Use of Force Incidents as well as being personally involved in the use of lethal and less than lethal force incidents.

## Opinion Number 6

It is my opinion based on my review of the facts, testimony and videos in this matter, Stanislaus County Sheriff's Department Deputy Sheriffs Justin Camara, Za Xiong and Eric Bavaro used unnecessary, unreasonable, inappropriate force to include deadly force

when they slammed Mr. Anthony Silva who was handcuffed at the time to the cement unnecessarily breaking his neck.

It is my opinion based on my review of the facts, testimony and videos in this matter, Stanislaus County Sheriff's Department Deputy Sheriffs Justin Camara, Za Xiong and Eric Bavaro, <u>failed</u> in their duty to intercede.

In addition, it is my opinion based on the facts, videos and testimony in this matter, Stanislaus County Sheriff's Department Deputy Sheriffs Justin Camara, Za Xiong and Eric Bavaro, <u>violated</u> <u>Stanislaus County Sheriff's Department Policy Manual, Policy 300, Use of Force</u>:

**<u>300.2 POLICY:</u>**
The use of force by law enforcement personnel is a matter of critical concern, both to the public and to law enforcement community. Deputies are involved on a daily basis in numerous and varied interactions and, when warranted, may use reasonable force in carrying out their duties.

**<u>300.3.2 FACTORS USED TO DETERMINE THE REASONABLENESS OF FORCE:</u>** When determining whether to apply force and evaluating whether a deputy has used reasonable force, a number of factors should be taken into consideration, as time and circumstances permit. <u>These factors include, but are not limited to</u>:

(a). The apparent immediacy and severity of the threat to deputies or others, (<u>Penal Code 835a</u>).

(b). The conduct of the individual being confronted, as reasonably perceived by the deputy at the time.

(c). Deputy/subject factors (<u>age, size, relative strength, skill level, injuries sustained, level of exhaustion or fatigue, the number of deputies available vs. subjects, etc</u>.).

(d). The conduct of the involved deputy leading to the use of force, (<u>Penal Code 835a</u>).

(e). The effects of drugs or alcohol.

(f). The individual's apparent mental state or capacity, (<u>Penal Code 835a</u>).

(g). The individual's apparent mental state or capacity, (Penal Code 835a).

(h).  Proximity of weapons or dangerous improvised devices.

(i).  The degree to which the subject has been restrained and his/her ability to resist despite being restrained.

(j).  The availability of other reasonable and feasible options and their possible effectiveness.

(k).  Seriousness of the suspected offense or reason for contact with the individual prior to and the time force is used.

(l).  Training and experience of the deputy.

(m).  Potential for injury to deputies, suspects, and others.

(n).  Whether the person appears to be resisting, attempting to evade arrest by flight or is attacking the deputy.

(o).  The risk and reasonably foreseeable consequence of escape.

(p).  The apparent need for immediate control of the subject or a prompt resolution of the situation.

(q).  Whether the conduct of the individual being confronted no longer reasonably appears to pose an imminent threat to the deputy or others.

(r).  Prior contacts with the subject or awareness of any propensity for violence.

(s).  Any other exigent circumstances.

On-Scene Consulting

**300.4 DEADLY FORCE APPLICATIONS**:

Use of deadly force is only justified when the deputy reasonably believes it is necessary in the following circumstances, (Penal Code Section 835a):

(a).  A deputy may use deadly force to protect him/herself or others from what he/she reasonably believes would be an imminent threat of death or serious bodily injury.

In addition, I base my opinion on California Police Officer Standards and Training (POST), Learning Domain No. 20-Use of Force.

Officers are trained at the POST Basic academy that the use of force must meet an "*Objectively Reasonable"* standard.  The following quote from POST typifies the training (emphasis added):*"A reasonable officer* is defined as an officer with similar training, experience, and background in a similar set of circumstances, who will react in a similar manner"(Learning Domain #20; "Introduction to the Use of Force," Pages 1-4).

Further, POST teaches in the basic curriculum regarding the legislative and community expectations regarding their powers of arrest and use of force by POST certified police officers:

"The criminal justice system gives law enforcement two extraordinary powers:"
1. The power of arrest and
2. The power to use deadly force.

"The authority to do so does not come from the rule of an authoritarian dictator.  Rather it comes from the will and consent of the people who *put their trust in law enforcement to use that power with the utmost care and restraint.*  Therefore, it is important to emphasize that peace officers do with the utmost care and restraint, *not confer* "*police powers*" *on themselves.*  These powers come to the criminal justice system from the people they serve.  (Learning Domain #2: "Criminal Justice System," Page's 1-4, Emphasis added).

Additionally, an entire chapter in POST Learning Domain #20 is devoted to the "Consequences of Unreasonable Force."

**"Unreasonable force** occurs when the type, degree and duration of force employed was not necessary or appropriate." Also, POST specifies that there are a number of key

factors that can affect which force option is approved and appropriate under the concept of the "totality of the circumstances," (<u>Learning Domain #20</u> "<u>Use of Force</u>," <u>Chapter 2</u>).

POST training specifies that the use of force under the "totality of the circumstances" be only justified on the basis of an "objectively reasonable" standard.  In other words, per the POST requirements, officers are not justified in any use of force based upon "subjective" fear.  The requirements are taught in detail throughout the POST Basic Curriculum (<u>as required by law</u>).

The POST standard of "Reasonable Fear" is defined as: *A controlled and legitimate fear or mechanism that is necessary for officer safety based on actually perceived circumstances.*  POST defines "Unreasonable Fear" as: *Generated in the officer's mind with no direct correlation to facts and situations.* (<u>Learning Domain #20</u>, Chapter 5, Emphasis added).  Officers are also taught that POST requires that any use of deadly force must be based on an "objective" rather than "subjective" "reasonable necessity" of action to "imminent danger." (<u>Learning Domain #20</u>, <u>Chapter 3</u>).

In addition, I base my opinion on <u>Stanislaus County Sheriff's Department Policy Manual, Policy 300, Use of Force</u>:

<u>300.2.1 DUTY TO INTERCEDE</u>:
Any deputy present and observing another deputy using force that is clearly beyond that which is objectively reasonable under the circumstances shall, when in a position to do so, intercede, (<u>as defined by Government Code 7286</u>), to prevent the use of unreasonable force.  A deputy who observes another employee use force that exceeds the degree of force permitted by law should promptly report these observations to a supervisor.

In addition, I base my opinion <u>California Police Officer Standards and Training (POST), Learning Domain No. 20: Chapter 6-Consequences of Unreasonable Force</u>: Intervention may involve the application of techniques for restoring or maintaining professional control.  In some situations, it may be necessary to intervene immediately.

**Intervention:** An officer is guilty of having failed to intervene and prevent other officers from violating anyone's rights while having reason to know:
- Unreasonable force was being used,
- Any constitutional violation has been committed by any law enforcement officer,
- The officer had a reasonable opportunity to prevent harm from occurring, (<u>Yang v. Hardin, 7th Cir. 1994</u>),

- Other unlawful, unethical, or inappropriate behavior occurred.

Verbal Intervention: Verbally offering to take over or assist the situation or reminding fellow officer of appropriate behavior.
Physical Intervention: May include Touching, Stepping In and or Restraining.

Peace officers have a legal and ethical obligation to uphold the law no matter who is breaking it.  It does not matter whether the violator is considered an average citizen, prominent community or corporate leader, or another peace officer.  Minding your own business is never a valid excuse for remaining silent.  If peace officers disregard unlawful or unethical acts by another officer, they can be as responsible as the offender and as unworthy of wearing the badge.  Such officers are equally responsible for embarrassing their agency and the policing profession.

It is my opinion that Stanislaus County Sheriff's Department Deputies at scene should have intervened immediately, either verbally, physically, or both.

Verbal Intervention: Verbally offering to take over or assist the situation or reminding fellow officer of appropriate behavior.

Physical Intervention:

I.  Touching: Touching the officer on the shoulder or arm and offering a tactful reminder to calm down or to take over.

II.  Stepping In: Stepping In and immediately advise the law enforcement officers to immediately roll Mr. Alejandro Sanchez over on his side in a recumbent position, or place Mr. Alejandro Sanchez in a seated position or stand Mr. Mr. Alejandro Sanchez up on to his feet and to take the weight and pressure off of his back.

III. Restraining: Physical restraint of the officer may be necessary if the officer is using unreasonable physical force.

Lastly, I base my opinion on my twenty- eight-year law enforcement career where, as a Supervisor, I have investigated over 100 Use of Force Incidents as well as being personally involved in the use of lethal and less lethal force incidents.

## **Opinion Number 7**

It is my opinion based on my review of the facts, video and testimony, Stanislaus County Sheriff's Deputy Sheriffs Justin Camara, Za Xiong and Eric Bavaro use of lethal force violated Peace Officer Standards and Training and caused the unnecessary death of Mr. Anthony Silva, including but not limited to for the following reasons:

- Deputy Sheriffs are trained that deadly force is the highest level of force a Police Officer can use.
- This was not an immediate Defense of Life situation.
- Deputy Sheriffs are trained that deadly force can only be used as a last resort.
- Deputy Sheriffs are trained that deadly force can only be used in the direst of circumstances.
- Deputy Sheriffs are trained that deadly force is likely to cause great bodily injury or death.
- Deputy Sheriffs are trained that they must show a reverence for human life.
- There were other reasonable measures available.
- All other reasonable measures were not exhausted.
- A verbal warning should be given, when feasible, that deadly force will be used. Here, no warning was given, even though it would have been feasible to do so.
- Deputy Sheriffs are trained that they are responsible for justifying every shot.
- Subjective Fear is insufficient to justify using deadly force.
- Deputy Sheriffs are trained that an overreaction in using deadly force is excessive force.

Lastly, I base my opinion on my twenty-eight-year law enforcement career where, as a Supervisor, I have investigated over 100 Use of Force Incidents as well as being personally involved in the use of lethal and less than lethal force incidents.

## **Opinion Number 8**

It is my opinion Stanislaus County Sheriff's Deputy Sheriffs Justin Camara, Za Xiong and Eric Bavaro _failed_ to provide Mr. Anthony Silva proper medical assistance but rather physically moved him _after_ they fractured his neck.

On-Scene Consulting

In addition, I base my opinion on <u>Stanislaus County Sheriff's Department Policy Manual,</u>
<u>Policy 300, Use of Force</u>:

**300.6 MEDICAL CONSIDERATION:** Once it is reasonably safe to do so, properly
trained deputies should promptly provide or procure medical assistance for any person
injured or claiming to have been injured in a use of force incident, (<u>Government Code</u>
<u>7286(b)</u>).

In addition, I base my opinion <u>California Police Officer Standards and Training (POST),</u>
<u>Learning Domain No. 34-Chapter 3: Basis Life Support</u>:

Head Injuries: The extent of a head injury may not always be obvious.  Whenever a
victim has suffered a traumatic head or neck injury, brain and spinal cord damage should
always be assumed.

<u>First Aid Measures:</u>
<u>Position:</u>
- Do not move the victim's head or neck.
- Have the victim remain in the position in which found.

<u>Assessment</u>:
- Determine level of consciousness.
- Conduct a primary and secondary assessment.

Lastly, I base my opinion on my twenty-eight-year law enforcement career where, as a
Supervisor, I have investigated over 100 Use of Force Incidents as well as being
personally involved in the use of lethal and less than lethal force incidents.

## <u>Opinion Number 9</u>

It is my opinion that the Stanislaus County Sheriff's Department failed to determine
through their investigation and review process that there was a failure to effectively de-
escalate the situation and that the force (<u>less lethal and lethal</u>) used in this matter was
inappropriate and unreasonable.  In addition, it is my opinion that there was a gross lack
of situational awareness and fundamental tactical errors in this incident.  It is also my
opinion that there was a failure by the Stanislaus County Sheriff's Department to provide
training to the Defendant Officers <u>or</u> a departure from training by the Defendant Officers
in <u>the following subject matters</u>: Proper Response and Interaction with the Mentally Ill,
Working as a Team, Verbal Strategies, Active Listening Skills, Crisis Intervention

On-Scene Consulting

Training, Defusing and De-Escalation Techniques, medical treatment, Less Lethal Force, and Lethal Force.

In addition, it is my opinion that ratification of the use of deadly force and the Defendants conduct prior to the use of deadly force can be seen as endorsing and perpetuating inadequate training and failure to enforce written polices and established standards.

<u>In addition, I base my opinion on the following facts and testimony</u>:

- According to Sergeant David Hickman, he does not recall receiving training that a neck injury is a very serious injury, (<u>Deposition Transcript of David Hickman, Page 47</u>).
- According to Sergeant David Hickman, the First Aid training he received that if someone has a broken neck, you should minimize the movements of the neck and the rest of the body, (<u>Deposition Transcript of David Hickman, Page 48</u>).
- According to Sergeant David Hickman, he was not interviewed by Internal Affairs about this incident, (<u>Deposition Transcript of David Hickman, Page 62</u>).
- According to Chief Ed Ridenour, he is not familiar with California Government <u>Civil Code Section 12525.2(a)(3</u>), which requires that when a suspect dies as a result of a use of force incident, the incident has to be reported to California DOJ, (<u>Deposition Transcript of Chief Ed Ridenour, Page 22</u>).
- According to Chief Ed Ridenour, he did not direct Internal Affairs to investigate this incident, (<u>Deposition Transcript of Chief Ed Ridenour, Page 23</u>).
- According to Chief Ed Ridenour, he did not request that Deputy Camara and Deputy Xiong get additional training as a result of this incident, (<u>Deposition Transcript of Chief Ed Ridenour, Page 26</u>).
- According to Chief Ed Ridenour, he did not make any recommendations for changes to Department training or policy related to the takedown in this incident, (<u>Deposition Transcript of Chief Ed Ridenour, Page 26</u>).
- According to Chief Ed Ridenour, he has not taken any steps since this incident to prevent similar incidents from occurring, (<u>Deposition Transcript of Chief Ed Ridenour, Pages 26-27</u>).
- According to Deputy Eric Bavaro, he did not see Mr. Silva try to run away from the Deputies, strike any Deputies, or verbally threaten any Deputies, (<u>Deposition Transcript of Eric Bavaro, Pages 10-11</u>).
- According to Deputy Eric Bavaro, he did not see Mr. Silva try to run away from the Deputies, strike any Deputies, or verbally threaten any Deputies, (<u>Deposition Transcript of Eric Bavaro, Pages 10-11</u>).

On-Scene Consulting

- According to Deputy Eric Bavaro, he was present when Mr. Silva was taken down to the cement, (Deposition Transcript of Eric Bavaro, Page 14).
- According to Deputy Eric Bavaro, he did not see Mr. Silva commit a 69PC against the Deputies, (Deposition Transcript of Eric Bavaro, Page 20).
- According to Deputy Eric Bavaro, he thought that by putting his leg in front of Mr. Silva's leg would help Deputies get him to the ground, (Deposition Transcript of Eric Bavaro, Page 25).
- According to Deputy Eric Bavaro, he found out later that one of the Deputies used a leg sweep, (Deposition Transcript of Eric Bavaro, Page 29).
- According to Deputy Eric Bavaro, he heard the "thud" of Mr. Silva's head hitting the cement, (Deposition Transcript of Eric Bavaro, Page 30).
- According to Deputy Eric Bavaro, he heard the word paralyzed after Mr. Silva hit the ground, (Deposition Transcript of Eric Bavaro, Page 32).
- According to Deputy Eric Bavaro, while watching the BWC video, he observed Deputy Xiong's right hand in the area of Mr. Silva's neck, (Deposition Transcript of Eric Bavaro, Page 44).
- According to Deputy Justin Camara, before Mr. Silva was handcuffed, he did not punch, kick, verbally threaten or have any weapons, (Deposition Transcript of Justin Camara, Pages 16-17).
- According to Deputy Justin Camara, he did not tell Mr. Silva why he was being handcuffed, (Deposition Transcript of Justin Camara, Pages 17-18).
- According to Deputy Justin Camara, Mr. Silva was kind of rambling, (Deposition Transcript of Justin Camara, Page 18).
- According to Deputy Justin Camara, after the use of force, they had Mr. Silva take a seat on the benches, (Deposition Transcript of Justin Camara, Page 19).
- According to Deputy Justin Camara, he and Deputy Xiong were not injured, (Deposition Transcript of Justin Camara, Page 19).
- According to Deputy Justin Camara, he did not tell Mr. Silva what he was being arrested for, (Deposition Transcript of Justin Camara, Page 20).
- According to Deputy Justin Camara, he agrees that if you take somebody down to the ground on a hard surface, there is a possibility of a head injury, (Deposition Transcript of Justin Camara, Pages 37-38).
- According to Deputy Justin Camara, he was trained that you should be trained that he should be particularly careful if you are taking someone to the ground who is handcuffed behind their back because they will be unable to break their fall, (Deposition Transcript of Justin Camara, Page 38).

On-Scene Consulting

- According to Deputy Justin Camara, Deputy Xiong was the one that performed the leg sweep, (Deposition Transcript of Justin Camara, Page 39).
- According to Deputy Justin Camara, when Mr. Silva was taken down a 2nd time, his head hit the concrete, (Deposition Transcript of Justin Camara, Page 43).
- According to Deputy Justin Camara, he heard Mr. Silva's head hit the cement while he was holding his left arm, (Deposition Transcript of Justin Camara, Pages 49-50).
- According to Deputy Justin Camara, after Mr. Silva hit the ground, Mr. silva stated, "I'm paralyzed," (Deposition Transcript of Justin Camara, Page 52).
- According to Deputy Justin Camara, he doesn't recall giving Mr. Silva commands before taking him to the ground the 2nd time, (Deposition Transcript of Justin Camara, Pages 54-55).
- According to Deputy Justin Camara, after Mr. Silva said he was paralyzed and Deputies Camara and Xiong moved him from the ground to the bench, (Deposition Transcript of Justin Camara, Page 64).
- According to Deputy Justin Camara, he heard Mr. Silva state he can't breathe, (Deposition Transcript of Justin Camara, Page 66).
- According to Deputy Za Xiong, when he responded to the incident, he did not have any information that anyone had been injured, (Deposition Transcript of Za Xiong, Page 11).
- According to Deputy Za Xiong, he has never seen Mr. Silva injure anyone in the past, (Deposition Transcript of Za Xiong, Page 14).
- According to Deputy Za Xiong, he does not know why Deputy Camara detained Mr. Silva, (Deposition Transcript of Za Xiong, Page 21).
- According to Deputy Za Xiong, he did not see Mr. Silva threaten anyone and did not see a weapon in his hands, (Deposition Transcript of Za Xiong, Pages 23-24).
- According to Deputy Za Xiong, he was trained if someone forcefully hits their head on the cement that could potentially cause serious injury, (Deposition Transcript of Za Xiong, Page 27).
- According to Deputy Za Xiong, he does not recall if he put either one of his hands on the back of Mr. Silva's neck as he was going to the ground, (Deposition Transcript of Za Xiong, Page 40).
- According to Deputy Za Xiong, he did a leg sweep after he saw Mr. Silva's head and body leaning forward, (Deposition Transcript of Za Xiong, Page 53).
- According to Deputy Za Xiong, he did not see Mr. Silva's body move after Mr. Silva stated he was paralyzed, (Deposition Transcript of Za Xiong, Page 55).

- According to Deputy Za Xiong, he heard a thud when Mr. Silva's head hit the concrete, (Deposition Transcript of Za Xiong, Page 56).
- According to Deputy Za Xiong, he and Deputy Camara moved Mr. Silva after he said that he was paralyzed, (Deposition Transcript of Za Xiong, Page 58).
- According to Deputy Za Xiong, when he looked at his BWC video, he saw the blue glove on the back of Mr. Silva's neck, (Deposition Transcript of Za Xiong, Page 86).

Lastly, I base my opinion on my twenty- eight-year law enforcement career whereas a Supervisor, I have investigated over 100 Use of Force Incidents as well as being personally involved in the use of lethal and less than lethal force incidents.

**My Qualifications for Reviewing this Case:**

My opinions are based on my education, training, and experience.  Upon my graduation in June 1988 from Northeastern University in Boston with a Bachelor's Degree in Criminal Justice, I was hired as Criminal Investigator/Special Agent GS-1811.  Upon completion of Criminal Investigator/Basic Agent School at the Federal Law Enforcement Training Center (FLETC)-6-month academy, I was assigned to the Organized Crime Drug Task Force where I functioned as an agent and undercover operative. The investigations focused on targeting criminal organizations that were involved in large scale narcotic smuggling and money laundering operations.

I was assigned to the Office of the Special Agent In-Charge, in San Francisco from August 1988 until I joined the Los Angeles Police Department in November of 1989. While in the academy, I was selected by the staff to be my Recruit Class Leader.  Upon my graduation from the LAPD Academy, I was assigned to 77th Division.  In addition to being assigned to 77th Division, I was assigned to Northeast Division (Patrol), Northeast Division (Special Projects Unit-SPU), Northeast Division C.R.A.S.H (Gang Detail).  I was selected to be transferred to Operations Central Bureau C.R.A.S.H., where I worked a plain clothes detail targeting specific gangs throughout Operations Central Bureau.

I applied and was selected to be a Police Officer III at Wilshire Area Vice where I functioned as an undercover operative targeting prostitution, gambling, bookmaking, and other Vice related offenses. While working Wilshire Vice, I was ambushed and received two gunshot wounds.  I received the Purple Heart in 2010.  Upon return from my injuries, I attended mandated Field Training Officer School and was assigned as a Field Training Officer at Wilshire Division.  I trained recruits upon their graduation from the Los Angeles Police Academy in tactics, use of force, report writing, vehicle stops, calls for

On-Scene Consulting

service, court testimony, emergency procedures, pursuit policy, accident investigations, perimeters, Department policies and procedures, and effective communication skills. While assigned as a Field Training Officer, I was involved in an In-Policy Lethal Use of Force incident, while working with a Probationary Police Officer who had recently graduated from the Los Angeles Police Academy.

I was promoted to the rank of Detective and attended Basis Detective School.  Upon completion of Basic Detective School, I was assigned to Wilshire Area Narcotics, Field Enforcement Section, where I functioned in an undercover capacity.

I was promoted to the rank of Sergeant I and assigned to Hollenbeck Division.  Prior to my assignment, I attended mandated Basic Supervisor School.  In conjunction with Supervisor School, I was selected to attend the West Point Leadership Academy Supervisor Training.  The training focused on team building, leadership, and decision making.  While assigned to Hollenbeck Division,  I conducted roll call training on a daily basis on numerous subject matters to include: Use of Force Options (Non-Lethal and Lethal), Tactics, Calls for Service, Calls for Service involving the Mentally Ill, Vehicle Pursuit Policy, LAPD Policies and Procedures, Use of Force Policy, Updated Legal Bulletins, Training Directives, and other Standardized Roll Call Training.  I directly supervised a Watch of Officers and provided supervisory oversight during calls for service, tactical situations, perimeter tactics, containment and control issues and use of force incidents.  I conducted audits, personnel investigations, Standard Based Assessments (Ratings), Use of Force Investigations, Administrative Projects, and prepared commendations for officer's field performance.  While assigned to Hollenbeck Division, I was selected as the Officer-In-Charge of Hollenbeck Division's Special Enforcement Group.  I directly supervised (14) Police Officers and Detectives assigned to the Unit.  Our unit worked in conjunction with Hollenbeck Detectives and specifically targeted career criminals in the Division.  I provided ongoing mandated Department Training as well tactical, firearms, less than lethal and search warrant tactics training to the Officers and Detectives.  As a Unit, we prepared and served numerous search warrants.  I provided search warrant tactical briefing and de-briefing of each warrant at the conclusion of the service.  I completed audits, administrative projects, Use of Force Investigations, personnel complaints, and other administrative duties as deemed necessary by the Area Commanding Officer.

During this time, I was selected to be loaned to Internal Affairs, Headquarters Section.  I investigated personnel complaints that were too large in scope for a geographical Division.  At the conclusion of my loan, I was selected to Management Services

Division, Special Projects, and Office of the Chief of Police. I completed numerous in-depth staff projects for review by the Chief of Police. In addition, I was assigned to conduct research and edit the 2000 LAPD Department Manual.

Also, during this time, I earned my Master's Degree in Public Administration from California State University, Long Beach.

I applied and was selected as a Sergeant II at 77th Division Vice. I directly supervised ten undercover officers and four uniformed officers. I provided all facets of training to the officers assigned to Vice at that time to include: Use of Force Policy, Legal Updates, Department Directives, Training Bulletins, Standardized Roll Call Training, Tactics Training, Undercover Operations training, Surveillance training, and any other training deemed necessary by my Area Commanding Officer. I conducted audits, personnel investigations, administrative projects, Use of Force Investigations, and special projects.

During this time, I was selected by the Chief of Police to be loaned to the Rampart Corruption Task Force. I conducted Use of Force audits on Specialized Units in Central and South Bureaus. I reported directly to the Office of the Chief of Police.

In 2000, I applied and was selected to Metropolitan Division K9 Platoon as a Sergeant II+1. I directly supervised (18) K9 Handlers. Metro K9 conducted K9 Operations for the entire Department covering all Patrol Divisions and Specialized Units. I provided all facets of training to the K9 Officers to include: K9 Operations, tactics, search warrant services, Mobile Field Force Options, Less than Lethal Force Options, Lethal Force Options, Department Directives, Training Bulletins, and other training dictated by the Officer-in-Charge and Commanding Officer. In addition, I taught K9 Operations at in-service training, Watch Commander School, Field Training Officer (FTO) School, and Basic Detective School.  While at K9, I investigated and completed K9 contacts, personnel complaints, Use of Force Investigations. In addition, I directed and was directly involved in Use of Force incidents. I received the LAPD Medal of Valor and LAPD Police Star for two lethal use of force incidents while assigned to K9.

In 2005, I was selected as a Sergeant II+1 in Special Weapons and Tactics (SWAT). I directly supervised sixty SWAT Officers. I conducted and facilitated all facets of SWAT training to include Weapons Training (.45 caliber, MP-5, M-4, Benelli Shotgun, Remington 870 Bean Bag Shotgun, .40mm, SAGE, MX-26 Taser) on a monthly basis. In addition, I facilitated and conducted training in the following training Cadres: Breacher (Explosive), Crisis Negotiation-Mental Health, MEU, SMART, Suicide Prevention,

On-Scene Consulting

Counter-Terrorism Cadre, Climbing, Hostage Rescue, Sniper Training, Air Support Training (Fast rope, Aerial Platform Shooting). I directly supervised SWAT missions and High-Risk Search Warrant Services to include all facets (preparation, briefing, deployment, de-briefing). I was the Supervisor-in-Charge of the Crisis Negotiation Team. I provided on-going crisis negotiation training, mental health training, de-briefs, 40-hour POST Certified CNT School, and suicide prevention training. I worked in conjunctional with the mental health community to provide and facilitate training with LAPD SMART, LAPD Mental Evaluation Unit (MEU), Behavioral Science Services Section (BSS), and the Didi Hirsch Suicide Prevention Training. In addition, I was assisted the West Point Military Academy with the development of their crisis negotiation curriculum.

During this time, I was selected as the sole LAPD SWAT representative to respond to Mumbai India with Counterterrorism following the terrorist attack in November 2008. I taught use of force, tactics, and SWAT deployment to 250 Mumbai Special Tactical Police Officers. Upon my return, I assisted with the development of multiple venue/multiple attacker tactics.

In June 2010, I retired from the Los Angeles Police Department with 20 years in service to pursue an opportunity in the private sector. I held supervisory positions for the last 14 years of my career. During my tenure with the LAPD, I received over 100 Commendations to include: The Medal of Valor, Purple Heart, and the Police Star.

From June 2010 through April 2013, I was the Vice President of Security Operations at Caruso Affiliated in Los Angeles, CA. My responsibilities included: Identified and conducted Risk and Vulnerability Assessments for all Caruso Affiliated Developments, projected developments/investments, and residences. Utilized strategic-level analysis from the intelligence community, law enforcement and the private sector. Ensured a coordinated ability to identify and monitor potential or actual incidents among critical infrastructure domains and all personal and professional interests of Caruso Affiliated. Mitigated expected threats. Utilized preplanned, coordinated actions in response to infrastructure warnings or incidents. Responded to hostilities. Identified and eliminated the cause, or source, of an infrastructure event by the utilization of emergency response measures to include on-site security personnel, local law enforcement, medical and fire rescue, and relevant investigative agencies. Conducted all facets of security training for the company and employees. Formulated Business Continuity and CEO Succession Plans for the company and all affiliated business interests. Conducted ongoing audits and internal investigations.

On-Scene Consulting

From June 2013 to June 2014, I was hired as a Deputy Sheriff at the Riverside Sheriff's Department where I conducted all facets of patrol service to include calls for service, self-initiated field activity, arrests, citations, and court testimony. In addition, during my tenure with the Riverside County Sheriff's Department, I was assigned to Robert Presley Detention Center (RPDC). Processed and monitored inmate population from initial intake, housing, court, transportation, and release. Conducted searches of inmate population as well as the facility on an ongoing basis. I was a member of the Cell Extraction Team while assigned to Robert Presley Detention Center and was directly involved in over 20 cell extractions as a Team Leader and Team Member to include video-taping the cell extraction.  Utilized experience as a gang officer, Detective and Sergeant with LAPD to conduct interviews and interrogations of prisoners regarding a myriad of investigations. Provided information to gang detail. Functioned as a mentor to newly appointed Deputy Sheriffs as well as Supervisors. Attended and certified in RSO Supplemental Jail Operations Core Course prior to deployment at RPDC. Attended on-going training to include Use of Force (Lethal and Non-Lethal), Crisis Negotiation Training, Active Listening Skills Training, Report Writing, Response and Deployment to Critical Incidents, and Proper Protocols and Procedures when responding to a medical incident or suicide.

From June 2014 to March 2016, I was the Director of Security at Universal Protection Service where I supervised 84 Security Professionals at the City National Plaza. Conducted and facilitated all Bureau of Security and Investigative Services (BSIS) training to Security Professionals.  Ensured all Security Professionals were compliant with BSIS security training and licensing.  Conducted the following training to Security Professionals and Tenants on an ongoing basis: Fire Life Safety, Evacuation Drills, Active Shooter, Workplace Violence, Security Procedures and Protocols, Responding to Incidents Involving the Mentally Ill, Hazardous Materials and Internal Theft.  Conducted ongoing Risk and Vulnerability Assessments of the City National Plaza to include security staffing and deployment, Closed Circuit Television (CCTV), Crime Prevention through Environmental Design (CPTED), and protocols to respond and mitigate threats. Developed Security and Fire Life Safety Manuals for Security Professionals and Tenants. Coordinated all security efforts to ensure safety at Special Events.  Conducted internal investigations and worked in conjunction with the Los Angeles Police Department (LAPD) and the Los Angeles Fire Department (LAFD) on an ongoing basis.

From March 2016 to September 5, 2017, I was the Director of Security at L&R Group of Companies.  Identified and conducted Risk and Vulnerability Assessments for all L&R Group of Companies developments and projected developments throughout the United

States. Conducted and/or facilitated all Bureau of Security and Investigative Services (BSIS) training to Security Professionals.  Ensured all Security Professionals were compliant with BSIS security training and licensing.  Conducted the following training to Security Professionals and Tenants on an ongoing basis: Fire Life Safety, Evacuation Drills, Active Shooter, Workplace Violence, Security Procedures and Protocols, Responding to Incidents Involving the Mentally Ill, Hazardous Materials and Internal Theft.  Conducted ongoing Risk and Vulnerability Assessments to include security staffing and deployment, Closed Circuit Television (CCTV), Crime Prevention through Environmental Design (CPTED), and protocols to respond and mitigate threats. Developed Security and Fire Life Safety Manuals for Security Professionals and Tenants. Coordinated all security efforts to ensure safety at Special Events.  Conducted internal investigations and worked in conjunction with the Los Angeles Police Department (LAPD) and the Los Angeles Fire Department (LAFD) on an ongoing basis as well as respective law enforcement agencies throughout the United States on security matters.

Attached are my curriculum vitae, listing of testimony and fee schedule.

Scott A. DeFoe

EXHIBIT B

## Bennet Omalu
### P A T H O L O G Y

Phone: 279-345-1300
Fax: 866-402-6875
bennetomalu@bennetomalu.com

Autopsy and Anatomic Pathology
Clinical Pathology and Toxicology
Forensic Pathology

Neuropathology
Epidemiology
Medico-Legal Consultations

Dale Galipo, Esq.
The Law Offices of Dale K. Galipo
21800 Burbank Blvd., Suite 310
Woodland Hills, CA 91367

March 1, 2025

Dear Mr. Galipo,

**Re:    Anthony Silva, Deceased**
**        Medico-Legal Report**

**Summary of Education, Training and Experience**

I completed medical school in 1990 at the University of Nigeria, Enugu, Nigeria. Upon
graduating from medical school, I completed a one-year clinical housemanship at the University
of Nigeria Teaching Hospital in the fields of Pediatrics, Internal Medicine, General Surgery,
Obstetrics, and Gynecology. After housemanship, I worked as an emergency room physician at a
university hospital in Nigeria for approximately three years. I sat for and passed my United
States Medical Licensing Examinations [USMLE] while I worked as an emergency room
physician. I came to the United States in 1994 through a World Health Organization scholarship
to become a visiting research scholar for eight months at the Department of Epidemiology,
Graduate School of Public Health, University of Washington, Seattle, Washington.

In 1995, I proceeded to the College of Physicians and Surgeons of Columbia University, New
York, at Harlem Hospital Center, to complete residency training in Anatomic Pathology and
Clinical Pathology. In 1999 I proceeded to the University of Pittsburgh, Pittsburgh, Pennsylvania
to complete residency training in Forensic Pathology and Neuropathology. I hold four board-
certifications in Anatomic Pathology, Clinical Pathology, Forensic Pathology and
Neuropathology. I also hold a Master in Public Health [MPH] degree in Epidemiology from the
Graduate School of Public Health, University of Pittsburgh, Pittsburgh, Pennsylvania. I also hold
a Master in Business Administration [MBA] degree from the Tepper School of Business,
Carnegie Mellon University, Pittsburgh, Pennsylvania, one of the leading business schools in the
world. I am a Certified Physician Executive and an Honorary Fellow of the American Association
of Physician Leadership [AAPL]. I also hold a fifth board-certification in Medical Management
from the AAPL. I am currently licensed to practice Medicine and Surgery in the State of
California.

I am currently the President and Medical Director of Bennet Omalu Pathology [BOP], a
California medico-legal consulting firm, and a Clinical Professor at the Department of Medical

Anthony Silva, Deceased
Medico-Legal Report

Page 2 of 36

Pathology and Laboratory Medicine, University of California, Davis. In my capacity as the Medical Director of BOP, I am a consulting Forensic Pathologist and Neuropathologist to many hospitals in central California and to several counties in northern California. There are less than a few dozen practicing Forensic Pathologists-Neuropathologists in the United States who are board-certified in both Forensic Pathology and Neuropathology.

For over twenty years, I have been involved in over thirteen thousand death and injury investigations in my career as a Forensic Pathologist and Neuropathologist, which began in 1999. I have personally conducted and performed over twelve thousand autopsies and death investigations and examined over thirteen thousand brain tissue specimens. I also perform trauma pattern analysis in both living patients and deceased patients to determine causes and mechanisms of sustenance of injuries and death. I am also involved in the evaluation of living victims of all types of injuries and trauma, including but not limited to victims of assault, traumatic falls, industrial and accidental injuries, medical complications and misadventures, rape, child abuse and sports-related injuries. I have been consulted and retained as an expert witness in two to three thousand cases involving all types of medico-legal cases across all jurisdictions in the United States including federal, state, county and municipal courts and arbitration panels; in both civil and criminal cases, for the plaintiff, defense, district attorneys and public defenders. I have been involved as an expert witness in complex class action and industrial lawsuits involving thousands of individuals and major corporations.

My areas of interest and focus include brain patho-physiology, brain injuries and brain trauma, in both living and deceased patients. I identified Chronic Traumatic Encephalopathy [CTE] in a retired football player when I performed an autopsy and examined the brain of Mike Webster in 2002. Subsequently, I identified CTE in other high-impact, high-contact sports athletes and in military veterans suffering from Post-Traumatic Stress Disorder [PTSD]. Since 2002 CTE has received international attention from the sports industry, sports medicine, and neuroscience. My work has been featured extensively in all media platforms across the world. My work and life were featured in a major Hollywood film, "Concussion" released in December 2015 by Sony Motion Pictures, in which the renowned actor, Will Smith, played me as Dr. Omalu. Several New York Times best-selling books have also been published on my life and work including "The League of Denial" and "Concussion." I have published several books including my memoir, "Truth Doesn't Have a Side," which was published in August 2017. My latest book, "Brain Damage in Contact Sports" was published in February 2018. I have published extensively in the medical and scientific literature, authoring many scientific papers and book chapters.

I have received three honorary PhD degrees from two universities in the United States, and from the Royal College of Surgeons of Ireland in recognition of my work and expertise. I have also received numerous awards from across the world in recognition of my work and expertise in both living and deceased patients. I have received the "Distinguished Service Award" from the American Medical Association [AMA], which is the most prestigious award of the AMA. I have been honored by the United States Congress and I have appeared on multiple occasions before committees of the United States Congress and committees of State Legislatures across the Unites States advising them on matters relating to trauma. In 2019 and 2020 I was appointed to the Traumatic Brain Injury Board of the State of California to advise the State on matters relating to traumatic brain injuries.

Since 1999 I have testified as an expert witness in matters relating to all types of injuries and deaths in over 600 court proceedings across the United States. I have attached a copy of my curriculum vitae to this report as Appendix A, which enumerates my body of work and



experience in greater detail. The cases I have testified in, beginning in 2009, are enumerated at the end of my curriculum vitae.

Pursuant upon your request, I have reviewed the following materials in the case of Anthony Silva, Deceased:
1.  Bret Babbitt 9-20-2024_full.pdf
2.  David Hickman 10-02-2024
3.  Justin Camara 07-31-2024_full.pdf
4.  Za Xiong- Morning Depo 08-01-2024_full.pdf
5.  Axon Frames w Timecode.pdf
6.  Camara Frames w Timecode.pdf
7.  Xiong Frames w Timecode.pdf
8.  1823877856.jpg
9.  after incident.jpg
10. Anthony before incident.jpg
11. days before died of his Injuies.jpg
12. vlc-record-2024-08-06-16h09m53s-DEF 00029-Bavaro.mp4-.mp4
13. vlc-record-2024-08-06-16h09m41s-DEF 00028-Camara.mp4-.mp4
14. vlc-record-2024-08-0616h11m32s-DEF 00027-Xiong.mp4-.mp4
15. Camara 0957.png
16. Camara 1008.png
17. Camara 1010.png
18. Camara 1011.png
19. Camara 2244.png
20. DEF 00026-Babbit.mp4
21. DEF 0027-Xiong.mp4
22. DEF 00028-Camara.mp4
23. DEF00029-Bavaro.mp4
24. DEF00030-Hickman.mp4
25. DEF00031-Bavaro.mp4
26. After_surgery.png
27. All Videos Combined.mov
28. broken Spine.png
29. Screenshot-moment neck is broken.png
30. Slow Motion Clip.mov
31. 2024.10.08-American Medical Response Stanislaus Patient Care Report.pdf
32. Large medical file.pdf
33. Memorial initial records.pdf
34. PW-SILVAA091482.docx
35. SILVA STAY 1 RECORDS.PDF
36. SILVA STAY 2 RECORDS.PDF
37. SILVA STAY 3 RECORDS.PDF
38. SILVA STAY 4 RECORDS.PDF
39. SILVA STAY 5 RECORDS.PDF
40. SILVA STAY 6 RECORDS.PDF



In order to perform and apply a valid differential diagnosis method on this case, including but not limited to causation criteria[1] analysis, central limit theorem analysis, and clinico-pathologic correlation analysis, I had to review, document, and analyze the materials sent to me in considerable depth and detail. Such differential diagnosis and review would form the foundation for my case-specific and general causation opinions in this case.

**Brief Summary of Prevailing Forensic Scenario[2,3]**

At the time of his death on September 10, 2023, Anthony Silva was a 40-year-old white male who was born on September 14, 1982. He was assaulted by officers of the Riverside Police Department in August 2022 while he was in custody and sustained cervical spinal cord injury. The spinal cord injury resulted in quadriplegia and other chronic post-traumatic sequelae, which necessitated prolonged hospitalizations until his death.

At about 01:57 p.m. on 08/10/2022 police officers confronted Anthony Silva at a local park and event, brought him facedown to the ground and forcefully handcuffed him behind his lower back and buttocks while pressing him down on the ground. He was then rolled over supine while lying on the ground and was then brought up to stand on his feet at about 02:00 p.m. He was escorted to a shaded area and structure at the park with wooden seats and tables, and was made to sit down on one of the seats at about 02:01 p.m. With his hands still cuffed behind his back, officers began searching his clothing and his bag while he sat on the chair. His hands were then uncuffed for a backpack that he was carrying to be removed from his upper extremities and were cuffed back. At some point he knelt down on the concrete with his knees as he continued to speak with the officers in a conversational manner. At about 02:04 p.m. he was asked to stand up on his feet, which he did, and officers continued to search his clothing and pockets.

At about 02:06 p.m. an officer held Anthony Silva around his right arm and began to lead him away and suddenly officers initiated a violent contact and take down and Anthony Silva was forcefully thrown to the concrete floor head-on. He impacted his rostral face and head on the concrete and his neck forcefully hyper-flexed, bent and rotated laterally upon impact. Anthony Silva was then placed prone on the ground with officers pressing him down on the concrete floor with their body weights. At this time Anthony Silva was groaning and muttering words like "I can't breathe" and "Help." Officers continued to move him around while he was pressed down on the floor including moving his head and neck and flexing his neck. His voice progressively became weaker and softer.

Anthony Silva was left alone lying semi-prone on the concrete floor until about 02:09 p.m. when he was brought up to his feet by officers and moved back to the chair with his head and neck moving around freely as he was moved. At this time, Anthony Silva's body and extremities appeared flaccid. He was placed in a semi-recumbent position on the chair with his back resting on the attached table and his head and neck hanging freely without any support whatsoever, while his hands remained cuffed behind his lower back and buttocks. He remained in this

---

[1] Hill, AB. The Environment and Disease: Association or Causation? Proc R Soc Med. 1965 May;58(5):295-300. PMID: 14283879; PMCID: PMC1898525. [These are causation criteria that long existed prior to Sir Hill for the purposes of differentia diagnosis. However, he summarized them in a speech that he gave in 1965. Since then, these criteria applied in the method of differential diagnosis became known as the Bradford Hill criteria. However, they existed and were in use prior to Sir Hill's speech].

[2] This section of the report should not be used to establish the facts in this case and is not intended to be used to establish the facts in this case.

[3] There are submitted video clips that, in part, documented the prevailing terminal forensic scenario.



position until about 02:33 p.m. when paramedics from the Fire Department arrived, while his head and neck continued to move around and at some point his head was lying on the top of the table. Anthony Silva did not receive any medical aid during this entire time.

**Report from the American Medical Response- Stanislaus**
10/8/22:
Paramedics of the American Medical Response- Stanislaus were dispatched at 02:29:49 p.m. to a public area on Stanislaus Street and 6th Street, Riverbank CA, 95367 concerning an adult male with a presenting complaint of behavioral/psychiatric crisis. Upon arrival at 02:52:46 p.m. they found Anthony Silva in handcuffs sitting on a bench with police officers and personnel from the Fire Department. There were some abrasions on his shoulders. Anthony Silva was placed on a gurney and loaded in the ambulance for transport to Memorial Medical Center.

During transport, he was alert to voice. His vitals and blood sugar were monitored during transport. He did not talk when talked to and was allegedly not cooperating. His vital signs at 03:02 p.m. were: blood pressure 150/92; pulse 63; respiratory rate 14, SPO2 97%; Glasgow Coma Scale [GCS] 5 [eyes 3, verbal 1, motor 1]. At 03:12 p.m. his vital signs were: blood pressure 128/85; pulse 98; respiratory rate 14, SPO2 100%; GCS 6 [eyes 3, verbal 2, motor 1][4]. When they arrived at the Memorial Medical Center, 1700 Coffee Road, Modesto, CA 95355, his care was transferred to the emergency room [ER] staff at 03:26:03 p.m.

**Medical Records from Memorial Medical Center**
10/8/22:
Anthony Silva arrived at the ER at about 03:33 p.m. His GCS was initially 14 but improved to 15. He was awake, alert, and oriented to self but was unable to provide additional history. He muttered to himself and made irrational phrases. He seemed to be responding to internal stimuli. He had some movements in his upper extremities, flailing of his arms, and arching his back. He complained of pain in his upper extremities and neck, and was unable to walk. There were some scattered abrasions of the chest and shoulder.

His vital signs at 04:10 p.m. were the following: blood pressure 126/66; pulse 111; respiratory rate 18; temperature 36.9ºC. He was awake, alert and disheveled.

Anthony Silva weighed 155 pounds and measured 71 inches tall. His cranium was atraumatic. He endorsed numbness throughout his chest and abdomen. His right and left upper extremities showed limited range of motion, with strength of 2/5 and without sensation to light touch. The right and left lower extremities were flaccid, with strength of 0/5 and no sensation to light touch.
CT of the cervical, thoracic, and lumbar spines were performed on 10/8/22 at about 07:15 p.m. and revealed:
1.  Acute comminuted bilateral C6-7 anterior facet fracture dislocation with displaced fracture fragments, 1.7 cm anterolisthesis of C6 on C7 and bilateral locked facets.
2.  Additional acute bilateral C7 transverse process fractures and C7 anterior vertebral body fracture with ventrally displaced cortical fracture fragments.
3.  C6 and C7 bony contusions/ microtrabecular fractures.
4.  Intraspinal hemorrhages were seen, centered at the C6-7 vertebral body level with cranial and caudal extension in the cervical spine.

---

[4] In the same report, Anthony Silva was stated to have a GCS of 15.



5.   Bilateral listhesis of C6 on C7.
6.   Anterolisthesis of C6 on C7 resulted in severe central narrowing and compression of the cervical cord.
7.   Multilevel degenerative changes of the cervical spine.
8.   Prevertebral soft tissue edema and hemorrhage were seen centered at the C6-7 to T2 vertebral body levels.
9.   Anterior paraspinal soft tissue and intramuscular hemorrhages seen at C6-T2.
10.  2 mm retrolisthesis of L2 on L3.
11.  Age-indeterminate mild T2, T4 and T5 superior plate compression deformities without bony retropulsion into the spinal canal.
12.  Age-indeterminate mild T1 anterior wedge compression deformity without bony retropulsion into the spinal canal.
13.  Multilevel degenerative changes of the thoracic spine without severe central canal stenosis.
14.  Mild lumbar spondylosis without severe central canal stenosis.

A CT scan of the brain performed at the same time revealed no gross intracranial hemorrhage, mass, mass effect, midline shift or hydrocephalus. Gray-white matter interfaces were maintained. There were small frontal subgaleal hemorrhages near the vertex without any calvarial fracture. There were chronic fracture deformities of the nasal bones and left zygoma.

MRI of the cervical spine without contrast revealed the following findings:
1.   Bilateral C6-7 anterior facet fracture-dislocation with 1.5 cm anterolisthesis of C6 on C7 resulting in cord compression at the C6-7 vertebral body level.
2.   There was associated extensive ligamentous injury and cord edema at the C4-C7 vertebral body levels.
3.   There were ventral epidural hemorrhages in the cervical spine at the C5-C7 vertebral body levels.

Anthony Silva was diagnosed with the following:
1.   C7 cervical fracture
2.   C6 cervical fracture
3.   Anterolisthesis of cervical spine
4.   Spinal cord injury, C5-C7
5.   Neck pain
6.   Abnormal behavior
7.   Drug intoxication without complication

He was admitted into the intensive care unit [ICU] with strict C-spine precautions. His risk of complications were judged to be high.

Anthony Silva's clinical course was complicated by cardiac arrest, respiratory distress requiring intubation, blood product transfusion, deep vein thrombosis, MRSA bacteremia and a sacral decubitus ulcer. He remained cognitively intact to baseline and was a gross quadriplegic.

10/9/22:
After arriving in ICU, Anthony Silva became more agitated, disoriented, and attempted to remove his Airvo. He had complaints of "can't breathe" and moved his head from side to side even after several verbal instructions from a nurse. He could move his arms but was unable to grasp Airvo and remove himself. Available investigation results showed elevated white blood cell



count of 15.9 K/uL, AST of 52 u/L, and total bilirubin of 2.6 mmol/L. Urine drug screen was positive for Methamphetamine and Cannabis.

He had blood pressure of 96/75 mmHg and pulse rate of 62 beats/minute. He was diagnosed with acute respiratory failure. He was placed on Propofol, daily Dilaudid boluses for pain, was intubated and placed on ventilatory support. He was placed on nothing by mouth (NPO) and hepatic panel was ordered. A central line and Foley catheter were placed.

After a review by Dr. Mahato, a neurosurgeon, Anthony Silva was taken to the OR where he had anterior cervical diskectomy and fusion at C6-C7, posterior cervical fusion at C2-T2, and cervical laminectomy at C5-C7. Posterior hemovac drain was also put in place.

10/10/22:
Anthony Silva had a PICC line placed in the right upper extremity. He was certified for physical therapy/ occupational therapy evaluation with cervical collar and follow up with neurosurgical outpatient in 3 weeks for staple removal.

10/11/22:
Anthony Silva was able to follow commands in both upper extremities but no purposeful movement in both lower extremities. He had a failed attempt at weaning from ventilator so, he remained intubated. A CXR showed right infrahilar opacities.

10/12/22:
Anthony Silva had removal of the posterior hemovac drain and was certified for DVT prophylaxis. Neurosurgery also signed off after the review.

10/13/22:
Anthony Silva had low-grade fevers overnight and was commenced on empiric antibiotics with Vancomycin and Zosyn. His urine and blood cultures were negative. His hemoglobin decreased from 10.4 g/dL to 8.8 g/dL. There were no signs of obvious bleeding. He had low potassium of 3.2 mmol/L (which was replaced) and his liver function tests (LFTs) had normalized. He also had bronchoscopy for right-sided mucus plugging.

10/14/22:
Anthony Silva was planned for bronchoscopy the following day with anticipation for tracheostomy. His potassium had normalized at 3.6 mmol/L.

10/15/22:
Anthony Silva still required high fraction of inspired oxygen ($FiO_2$) needs. His CTA chest was negative for pulmonary embolism and he had a repeat bronchoscopy for mucus plugging.

10/16/22 - 10/17/22:
Anthony Silva continued to have fever and also developed a right-sided atelectasis due to mucus plugging. He was placed on Midodrine after he was weaned off pressors.

10/18/22:
Anthony Silva continued to have fever and Vancomycin was added. The need for tracheostomy was anticipated due to prolonged ventilator dependence.



10/19/22:
Anthony Silva continued to have fever and had an episode of cough with bradycardia. His blood pressure became low and Lasix was discontinued. Respiratory culture yielded preliminary gram positive cocci in pairs and rods. Vancomycin was discontinued by ICU team.

10/20/22:
Anthony Silva continued to have fever, bradycardia, hypotension, and desaturation episodes (usually triggered by cough and suctioning). Bronchoscopy was repeated with suctioning of copious mucoid purulent material from the bilateral lower lobes. Bronchoscopy washout (on 10/20/22) yielded moderate Staph aureus with pending susceptibility. AFB was negative. Mycobacterium and fungal studies were also pending. He had a repeat bronchoscopy on 10/21/22. He also had an episode of unresponsiveness and gaze deviation which gave concerns for new-onset seizure activity and neurology was consulted for further evaluation.

After a review by neurology, convulsive syncope was also considered, given concurrent bradycardia. MRI Brain was ordered and he was placed on Keppra (after MRI was completed). Seizure precaution was also advised and he was placed on continuous EEG and was also started on Ativan as needed. The bradycardia and hypotension were considered likely vasovagal and less likely neurogenic shock or cardiac.

10/21/22:
Anthony Silva developed right upper extremity DVT associated with PICC line. Consequently, the PICC line was removed and he was started on full anticoagulation. MRI of the brain was negative for acute pathology and Anthony Silva was loaded with Keppra.

10/22/22:
Anthony Silva had no further episodes of desaturation overnight and the ventilator was weaned down to 60%. Zosyn was discontinued and he was recommenced on Vancomycin. Bronchoscopy was positive for MRSA nares.

10/23/22:
Anthony Silva was still febrile but had some improvement in fever curve. The continuous EEG was completed and negative for seizures. His family (mother) was found and the history obtained revealed that Anthony Silva had a 10 year history of schizophrenia, hearing voices, and hallucinations. He believed in an evil identity known as "Anthony" and liked to be called "Tony". He had difficulty living with his family, lived on the streets, and reportedly assaulted his mother in the past. He had alcohol-induced pancreatitis and a history of Creon use. He was a resident of Stanislaus Behavioral Center, was on Seroquel and other treatments but later declined medication treatment. His close family and girlfriend died recently due to medical problems. He chose to use street drugs instead of prescribed psychiatric treatment.

10/24/22:
Anthony Silva was transfused 1 unit PRBCs for hemoglobin of 6.6 g/dL (with an improvement to 7.9 g/dL). There were no signs of active bleeding. His fever also had resolved. CT and CTA studies of the trunk were recommended to evaluate for bleeding. A repeat CXR showed slightly improved opacities of the right lung base but increased opacities and possible effusion on left lung base. Dr. Swinney advised continuation of Keppra at discharge and considered tapering as outpatient.



10/25/22:
Anthony Silva had overnight episode of asystole /bradycardia during repositioning and intermittent fever. He had a repeat bronchoscopy by Dr. Kosuri and was planned for tracheostomy when stable with less ventilator support. CTA abdomen showed possible cystic pancreatic lesion. Dr. Degmetich advised clinical monitoring of pancreatic function and follow-up as outpatient.

10/26/22:
Anthony Silva had another episode of asystole/bradycardia as soon as he was placed on spontaneous breathing trial (SBT) without any suctioning or vagal provocation. However, he had a spontaneous resolution. A repeat of transthoracic echocardiography (TTE) was advised.

10/27/22:
Anthony Silva had an asystole/bradycardia when turning and recovered with chest compressions and atropine. Consequently, cardiology was consulted. His sputum culture yielded light Staph aureus with Methicillin resistance. CXR was consistent with atelectasis versus pneumonia.

10/28/22:
Anthony Silva continued to desaturate and was started on Cefepime. After a review by cardiology, a Pacer was recommended for backup pacing during pauses.

10/29/22:
Anthony Silva's mother was contacted through her friend and she consented for pacemaker, bronchoscopy, and tracheostomy /PEG when able. Bronchoscopy yielded thick white secretions, about 100 mL. CXR showed bilateral lower lobe pneumonia with positive MRSA on culture.

10/30/22:
Anthony Silva had accidental disconnection of the ventilator with resultant hypoxia and approximately 32 seconds asystolic episode followed by bradycardia. However, he had completely recovered at the time of cardiology review. He had a repeat bronchoscopy for mucus plugging.

10/31/22:
Anthony Silva continued to be hypoxic with higher ventilator settings that made performing a tracheostomy difficult. Vancomycin was switched to Linezolid (Zyvox) due to persistent fever which was considered unlikely due to persistent MRSA pneumonia. Drug fever and central fever were also considered.

11/1/22:
Anthony Silva reportedly had asystole/bradycardia when turning or suctioning. After cardiology review, a pacer was recommended for back up pacing during pauses. Dr. Shwee recommended MRSA nares swab before pacer insertion and advised to proceed with pacer insertion if MRSA of the nares and blood were negative. He added that if MRSA nares was positive, he should be treated with Bactroban and then re-swab. Dr. Shwee also advised the continuation of Zyvox for a week. CT CAP with IV contrast was considered if fevers continued.

11/2/22:
Anthony Silva responded well to ventilator changes. Scheduled Gabapentin and Acetaminophen were added for pain.



11/3/22:
Anthony Silva remained intubated and required higher $FiO_2$ on this day. MRSA was negative. His case was discussed with Dr. Moradkhan who planned for pacemaker placement the following day. Anthony Silva was made nothing by mouth (NPO) and was ordered to withhold anticoagulation after midnight. He was transfused with a unit of packed red blood cells due to hemoglobin of 6.4 g/dL. He was planned for tracheostomy when he tolerated less ventilator support.

11/4/22:
Anthony Silva intermittently developed mucus plugging that required deep suctioning and bagging. He was initially planned for pacemaker placement by Dr. Moradkhan but was later postponed. Foley catheter was removed and he had straight catheterization 4 hourly for neurogenic bladder.

11/5/22:
Anthony Silva failed void trial and Foley catheter was re-inserted. He continued to be agitated with pain medication-seeking behavior.

11/6/22:
Anthony Silva's white blood cell normalized to 9.7 K/uL and he was afebrile overnight. He was planned for pacemaker insertion the following day.

11/7/22:
Anthony Silva had Micra pacemaker placement and was re-admitted to the ICU. He had remained afebrile for more than 24 hours.

11/8/22:
Anthony Silva had recurrence of his fevers. Repeat CXR showed no significant findings. Respiratory culture yielded moderate Staphylococcus aureus.

11/9/22:
Anthony Silva continued to have fever. His white blood cell count was 12.2 k/uL.

11/10/22:
Anthony Silva had episodes of desaturation and mucous plugging overnight that responded to lavage. Leukocytosis had resolved but he remained febrile. Procalcitonin was negative. CXR showed persistent patchy consolidation.

11/11/22:
Anthony Silva had improvement in his fever. However, he continued to have episodes of desaturation and mucous plugging, and had a repeat bronchoscopy.

11/12/22:
Anthony Silva continued to have intermittent, low grade fevers. There was no leukocytosis. However, his alkaline phosphatase was trending up and was 317 u/L. Abdominal ultrasound showed biliary sludge and gall bladder wall thickening, possibly acute cholecystitis.

11/14/22:
HIDA was negative. Anthony Silva failed SBT because of apnea. He was on narcotics.



11/15/22:
Anthony Silva had bedside percutaneous tracheostomy and was planned for PEG in 48 hours.

11/17/22:
Anthony Silva had PEG placement.

11/20/22:
Anthony Silva was transfused with a unit of packed red blood cells due to hemoglobin of 6.0 g/dL. His white blood cell was 21.6 k/uL and cultures were still pending. Infectious disease (ID) was consulted and he was placed on Vancomycin for 6 weeks for bacteremia (till 12/31/22), considering the recent spinal fusion and pacemaker placement. He was to repeat blood cultures every two days till negative. Then, PICC line placement. Dr. Tam opined that he was okay to resume Lovenox.

11/21/22:
Anthony Silva had improvement in his fever. White blood cell count reduced to 13.3 k/uL. Cultures were repeated with no growth.

11/23/22:
Anthony Silva remained afebrile. He was cleared for PICC placement as blood culture from 11/21/22 reported negative. He was also weaned off IV medications and adjustments were made to anxiolytics and analgesia.

11/24/22:
Anthony Silva had image-guided PICC placement and was discharged to LTAC.

12/10/22:
Anthony Silva was brought in by ambulance to the ER from Central Valley Specialty Hospital [CVSH] with a history of cardiac arrest. While at CVSH, he received 10 mg of Oxycontin at 10:10 a.m. and at 10:58 a.m. He became unresponsive, gray, and lost his pulses. CPR was initiated and he achieved a return of spontaneous circulation (ROSC) after a round of Epinephrine and 0.4 mg of Narcan. At the time of review in the ER, he was awake and responsive. He complained of chest pain, nausea, and abdominal pain. His last blood pressure was 129/98 mmHg and his blood sugar was 141 mg/dL.

EKG showed sinus tachycardia without acute ischemic findings. Venous blood gas (VBG) showed significant respiratory acidosis with normal lactate. Troponin was negative. A complete metabolic panel showed stable LFT elevation (AST 43, ALT 99). He tested negative for SARS-CoV-2. There was elevated WBC of 16.6 k/uL. Hemoglobin was 7.8 g/dL. There were contractures on his four extremities.

CXR showed hyper-expansion suggesting underlying COPD. There was diffuse interstitial and airspace opacity with confluent bibasilar consolidation, and nodular consolidation versus parenchymal nodules, in the left upper lobe. Pleural fluid/thickening re-demonstrated in the left lung apex with bilateral pleural effusions. The findings had progressed bilaterally.

He was diagnosed with cardiac arrest, lung infiltrate, shortness of breath, chest pain, abdominal pain, quadriplegia, anemia, respiratory acidosis, and sepsis due to unspecified organism. An intensivist was consulted to evaluate him for admission.



After a review by Dr. Elias, an intensivist, he was diagnosed with cardiac arrest: asystole vs atrial fibrillation (Afib), most likely mucus plugging (given history and quick recovery), chronic respiratory failure, quadriplegia secondary to spine injury, history of MRSA bacteremia (on Vancomycin and PICC line), and severe lung disease (with multiple cavities on the left upper lung). He advised continuation of Vancomycin as planned until 12/31/22.

12/11/22:
Anthony Silva had fever and a large sacral decubitus ulcer. There was also a large amount of thick secretions. He was diagnosed with infection (unidentified source) likely due to PICC line, pneumonia, or the large sacral decubitus ulcer. Sputum and blood cultures were ordered and he was started on Cefepime. Dilaudid was discontinued. Wound care consult was also ordered.

12/14/22:
Anthony Silva, who was initially on chronic Foley catheter for neurogenic bladder was started on bladder training exercises to improve bladder control. Due to negative cultures, Cefepime was discontinued. PICC line was removed with a plan for a new line when fever was resolved. He continued to have pain and Fentanyl was added to his medications. He was to return to LTACH once fever resolved.

12/15/22:
Due to chronic malnutrition, there was non-healing of the tracheostomy site.

12/16/22:
Anthony Silva had resolution of his fevers. However, repeat sputum and respiratory cultures yielded MDR Klebsiella and he was started on Ertapenem. Interventional radiologist was consulted for PICC line placement.

12/17/22:
Bladder training failed and Foley catheter was re-inserted.

12/19/22:
Anthony Silva was transfused with a unit of packed red blood cells due to low hemoglobin of 6.9 g/dL. He was subsequently discharged to CVSH after PICC line placement.

12/30/22:
Anthony Silva was brought in by ambulance from CVSH due to a cardiopulmonary arrest just before arrival. A staff at the CVSH was reportedly cleaning his decubitus ulcer when he had a cardiac arrest at about 04:00 p.m. According to the EMS, they were called for low blood pressure and low $O_2$ saturation. However, while at CVHS, Anthony Silva had no pulses necessitating CPR by the staff at CVSH and a round of Epinephrine. A minute later, he achieved a ROSC. When EMS arrived, he was awake and on Levophed drip. He had a low blood pressure of 90/40 mmHg. He had a tracheostomy and gastrostomy tube in place and was ventilator dependent.

At the time of review, he was non-verbal. EKG showed sinus tachycardia and nonspecific ST/T wave changes. Available investigation results showed elevated serial troponin levels of 85 ng/ml, 202 ng/ml, and 249 ng/ml. There was elevated white blood cell count of 20.8 K/mm³, urea of 42 mg/dL, $PCO_2$ of 49.8 mmHg, AST of 62 u/L, ALT of 110 u/L, and ALP of 342 u/L. His CXR showed worsening infiltrates and some chronic infiltrates but worsened on the day of presentation.



His past medical history was significant for schizophrenia, aggressive behavior, drug abuse, quadriplegia following cervical spine injury in October 2022, multidrug resistant pneumonia including ESBL Klebsiella, and MRSA pneumonia. He had been on Ertapenem and Vancomycin at the outside hospital. He had a past surgical history of cardiac electrophysiology procedure (11/07/2022) and back surgery.

Physical examination revealed a low blood pressure of 82/56 mmHg and an elevated temperature of 38.2°C. He was alert and oriented in person, place, and time, and followed commands. He had coarse breath sounds and rhonchi bilaterally.

He was diagnosed with cardiac arrest (possibly related to hypoxia), acute on chronic respiratory failure with hypoxia, shock (possibly septic versus hypovolemic), prerenal azotemia, history of schizophrenia, drug abuse in the past, and quadriplegia secondary to cervical spine injury.

Dr. Zweig advised monitoring off sedation, Fentanyl boluses for pain, more broad spectrum antibiotics including Vancomycin and Meropenem pending cultures with likely de-escalation of Meropenem to Ertapenem after cultures and sensitivities were available, and strict intake and output. CT chest without contrast and blood culture were ordered with a trend on renal function. Blood culture came out positive. Dr. Zweig recommended a change of the right upper extremity PICC line (was sited since 12/19/2022). Eliquis was added for DVT prophylaxis and Pepcid for stress ulcer prophylaxis.

A re-evaluation showed an elevated blood pressure of 163/98 mmHg. Consequently, he was weaned off Levophed drip and the administration of Fentanyl was advised. Dr. Shah, an intensivist, was consulted who advised admission to the ICU for ventilator management and close monitoring.

12/31/22:
Anthony Silva had a drop in hemoglobin to 6.8 g/dL and received a unit of packed red blood cell (PRBC). His blood pressure was 117/71 mmHg. A CXR showed the following:
1.    Cavitation versus extensive bronchiectasis and bullous changes in the left upper lobe, suggestive of severe left lung pneumonia.
2.    Cardiomegaly was noted again.
3.    Consolidative changes throughout the right upper and mid-lung zones, worsened since the previous study.

Cardiothoracic surgery was consulted as he failed prolonged courses of Vancomycin.

1/2/23:
Urine culture yielded Candida. Anthony Silva had bronchoscopy at bedside for mucus plugging. A repeat duplex of bilateral upper extremity (BUE) was advised.

1/3/23:
Repeat duplex of BUE showed normal findings with no evidence of deep vein thrombosis. However, there was partial thrombus noted in the left cephalic vein, a superficial vein. The study was reportedly technically limited. Repeat CXR revealed effectively stable streaky bilateral airspace opacities either relating to bland atelectasis or alveolar edema or pneumonia. A small left pleural effusion was noted. Eliquis was restarted.


Bennet Omalu
P A T H O L O G Y

1/4/23:
Anthony Silva had frequent bowel movements and had a rectal tube placement. He tolerated tube feeding. Culture of the bronchoalveolar lavage (BAL) yielded Klebsiella.

1/5/23:
Overnight, Anthony Silva had hemoglobin of 6.5 g/dL and received a unit of packed red blood cells (PRBC). There was no active bleeding. Dr. Fung, a cardiothoracic surgeon was consulted for necrotic pneumonia/ empyema. Antibiotic therapy for pneumonia coverage was de-escalated to Ertapenem and Zyvox was discontinued (received 7 days of Meropenem in this admission).

1/6/23:
Anthony Silva had some improvement in bowel movement. His hemoglobin had improved to 7.8 g/dL. The stop date of antibiotics was to be decided after evaluation by the cardiothoracic surgeon. Case manager was consulted for discharge planning.

1/7/23:
Anthony Silva had hemoglobin of 8.2 g/dL. He complained of a constant dull pain (10/10) on the back of his neck. Oxycodone was increased to 10 mg as needed to help with pain management. A repeat CT chest with contrast was ordered.

1/8/23:
Anthony Silva reported better pain control with increased dose of Oxycodone. Septic shock and the pre-renal azotemia had resolved. The repeat CT Chest showed decreased pneumonia, small left effusion, a stable left upper lobe cavity, and left upper lobe loculated pneumothorax. Dr. Fung recommended no further surgical intervention and antibiotic therapy with Ertapenem for Klebsiella pneumonia coverage was extended till 01/12/2023, for a total of 14 days. Anthony Silva was medically cleared for discharge to LTAC vs Subacute.

1/9/23:
Anthony Silva was accepted for discharge to CVSH and case manager arranged for his transport.


**Medical Records from Central Valley Specialty Hospital (Advantage Surgical and Wound care)**

12/2/22:
Anthony Silva was seen for the wound on his sacrum and right buttock. Physical examination revealed a stage IV 7.7 x 7.2 x 0.7 cm sacral pressure injury that involved an area of 55.4 cm² and a volume of 38.808 cm³. There was a heavy amount of drainage noted with no odor. There was 70% slough and 30% granulation. There was a 2 x 1 x 0.1 cm stage 2 pressure ulcer on the right buttock with an area of 2 cm² and a volume of 0.2 cm³. There was a light amount of drainage with no odor. The peri-wound demonstrated maceration.

Anthony Silva was considered to be at increased risk of wound incidence due to smoking, impaired mobility, and reduced functional ability. He had debridement of his sacral wound and was advised on wound dressing with 0.125% Dakins solution, Santyl and Alginate ointments, foam dressing, and daily change of wound dressing. The right buttock wound was dressed with Dakins solution, application of barrier cream, and foam dressing. Daily change of wound dressing was also recommended.



12/11/22:
Anthony Silva was seen by Dr. Kubala for the evaluation of his sacral wound. He was initially seen on 12/2/22 and required suturing. He reported insensitivity below T3-T4 and was on ventilator and tube feeds.

12/30/22:
Anthony Silva had developed wounds on the right and left ischium and the left hip. He had a medical history of schizophrenia, drug use, quadriplegia, aggressive behavior, ventilator dependence, and MRSA pneumonia. Physical examination was remarkable for a stage IV 10 x 9.8 x 1.9 cm sacral pressure injury that involved an area of 98 cm² and a volume of 186.2 cm³.

There was a moderate amount of drainage and 10% of slough. There was an unstageable 5.1 x 5.7 cm pressure injury on the right ischium which covered an area of 29.07 cm². There was a light amount of drainage and 60% eschar. There was a traumatic wound on the hip with 100% granulation and erythema around the skin.

Dr. Kubala advised cleaning the sacral wound with Dakin's followed by the application of Medihoney, Alginate, and foam dressing. The right ischial wound was cleaned with wound cleaner followed by the application of Santyl and foam dressing. The left hip wound was cleaned with wound cleaner followed by the application of Honey, Alginate, and dry dressing. Dr. Kubala also recommended repositioning (every 2 hours while awake), pressure offload, and dietician consult.

1/17/23:
Anthony Silva returned from the hospital after respiratory code. He had additional stage 2 pressure injury on his left trochanter, deep tissue pressure injuries in his right scapular and right posterior thigh.

Dr. Kubala performed re-debridement of the sacral wound and debridement of the right ischial wound. He advised normal saline irrigation of all the wounds and the application of VAC therapy on the sacral wound with 2-3 times weekly dressing. He also recommended the application of Hydrogel and foam dressing on the right ischium and honey based ointment on the left ischium.

1/24/23:
Anthony Silva developed a stage 3 pressure wound on his right superior scapular. It had a 100% slough. There was difficult debridement of the right superior scapula wound due to agitation and right shoulder pain. Dr. Kubala advised Hydrogel and foam dressing, and opined a likely increase in the size of the wound due to sharp debridement.

1/31/23:
Medihoney and Alginate were ineffective in wound dressing due to copious loose stools. A diverting colostomy was considered.

2/21/23:
Anthony Silva developed new deep tissue injuries on the spine. There was also stage 2 pressure injury on the left proximal posterior femur. He refused care and repositioning, and requested pain medications every 4 hours against the 6 hours prescription. He was counseled on the risk of life threatening wound infections if he continued to refuse care.



2/28/23:
Anthony Silva developed multiple new deep tissue injuries. He had multiple soft bowel movements and all his wounds had worsened. Due to his multiple large wounds, emaciated state, and refusal to care, he was at risk of imminent wound infection. His overall prognosis was determined to be grave.

3/14/23:
Anthony Silva had refused 14 of 19 dressings since the previous week.

3/21/23:
Anthony Silva still refused dressing changes and was counseled on the risk of osteomyelitis and sepsis. He had changed his mind multiple times on diverting colostomy but agreed during the current encounter.

3/28/23:
Anthony Silva still refused dressing changes.

5/23/23:
Anthony Silva was noted to be desaturating and responded to a dose of Narcan and ventilation via Ambu bag at 15 liters per minute. There was a new concern of a percutaneous fistula on his left chest wall at what appeared to be an old thoracostomy site. Air was first noticed to be hissing from the site in the previous week. It appeared that the incision had dehisced due to cachexia and severe malnutrition. A CXR was ordered to rule out a possible pneumothorax. Dr. Tiedeken advised transfer to the hospital for a pleural catheter.


**Medical Records from Central Valley Specialty Hospital:**

11/25/22:
Anthony Silva was reviewed by a nephrologist due to a low sodium level of 133 mmol/l. After a review, Dr. Sidhu opined that the hyponatremia was due to hypovolemia and advised commencement of tube feeding.

11/26/22:
Anthony Silva had a resolution of the hyponatremia and tube feeding was continued at the current rate.

11/28/22:
Anthony Silva had leukocytosis with a significant CXR finding of consolidation and infiltrate in the left lung. Respiratory culture was ordered for further evaluation.

12/5/22:
Anthony Silva had a rapid drop in hemoglobin from 9.5 g/dL to 7.2 g/dL in less than a week. Iron studies were ordered. He was placed on proton pump inhibitors and a gastrointestinal consultation was requested. He was also placed on Scopolamine due to excessive respiratory secretions.

12/6/22:
Anthony Silva developed fever and was placed on Cefepime for gram negative coverage.



12/10/22:
Anthony Silva was found unresponsive and pulseless. He had a large amount of secretions which were considered the likely reason for his arrest. However, he achieved a ROSC after a round of Epinephrine, Narcan, and CPR, and was subsequently transferred to MMC ER.

12/19/22 – 12/25/22:
Due to the consideration for MRSA/extended spectrum beta-lactamase (ESBL) Klebsiella pneumonia, Anthony Silva was continued on Vancomycin/Ertapenem till 12/30/22 with aggressive pulmonary hygiene. His white blood cell count was monitored with a plan for broadening his antibiotics to Meropenem if further increase.

12/26/22:
At 1:25 a.m., Anthony Silva reportedly became unresponsive after he received 5 mg of Oxycontin at 9:00 p.m. and 1 mg of Clonipine at midnight. His systolic blood pressure was in the 80s for which he got Midodrine. For his unresponsiveness, he received Narcan and Flumazenil with minimal response. There was a suspicion for $CO_2$ narcosis. His arterial blood gas showed pH of 6.92 and elevated $CO_2$ of greater than 130 mmHg. His initial CXR showed LUL infiltrate. He was then transferred to DMC emergency room for a stat CXR and evaluation of the worsening hypercapnic respiratory failure. He was given 2 ampoules of sodium bicarbonate before the transfer at 3:00 a.m. At 6:00 p.m. on the same day, he was transferred back from DMC ER in a state of more alertness. He continued to ask for more pain medications.

12/28/22:
Anthony Silva was diagnosed with AKI of unclear etiology, likely due to sepsis with hypotension. He was treated with Vancomycin and intravenous fluids. He also had hyperkalemia due to AKI and was placed on Lokelma.

12/30/22:
Anthony Silva remained on the ventilator and was noted to be poorly responsive. At the time of review, creatinine had improved and hyperkalemia had resolved. Consequently, Lokelma was discontinued.

Later on, the same day, he was noticed to have a PEA and achieved a ROSC after a round of Epinephrine and CPR. Thereafter, he was noticed to be hypotensive and hypoxic. He was diagnosed with cardiac arrest and was transferred to MMC ER for further management.

1/9/23:
Anthony Silva was transferred back to CVSH for further management. He was ventilator dependent and had multiple decubitus ulcers. He was advised to continue Eliquis for the right upper extremity DVT and left upper extremity superficial thrombosis. Wound care services were also consulted.

1/11/23:
Anthony Silva was seen by a pulmonologist to assist with tracheostomy and ventilator management after he was transferred back from Sutter Memorial. CXR from 1/10/23 showed some haziness on the left side with small pleural effusion. Dr. Chong advised full ventilator support, aggressive pulmonary hygiene, continuation of antibiotics prescribed by infectious diseases, and ordered physical and occupational therapy consults.



1/18/23:
Due to extreme somnolence, Anthony Silva received a dose of Narcan and the dose of his narcotics and benzodiazepines were decreased.

1/20/23:
Anthony Silva had increased secretions and respiratory culture was ordered.

1/21/23:
Anthony Silva had respiratory issues overnight and had his ventilator settings adjusted. Afterward, he had a resolution of his accessory muscle use and abdominal distension. CXR on 1/20/23 showed worsened infiltrates and features of COPD. There was up-trending white blood cell counts with intermittent respiratory decompensation. There was an increase in blood urea nitrogen of 90 mg/dl. There was also hypernatremia. Abdominal X-ray showed mass/fluid collection.

Dr. Munjal prescribed an inhaler and Doxycycline and ordered nephrology and cardiology consultations for the elevated blood urea nitrogen, hypernatremia, and resolved cardiac arrest. He also advised close monitoring for the resolved septic shock and cardiac arrest. CT abdomen was recommended for further evaluation.

1/23/23:
Anthony Silva was reviewed by a nephrologist for hypernatremia, hypokalemia, elevated blood urea nitrogen and creatinine, and metabolic alkalosis levels. He was diagnosed with kidney injury secondary to volume depletion and was started on D5W. He advised potassium supplement per protocol, increase in tube feed to 25%, daily monitoring of renal function and electrolytes.

1/28/23:
Sputum culture on 1/27/23 yielded Klebsiella pneumoniae, sensitive to Cefepime. Consequently, Cefepime was prescribed for treatment.

2/6/23:
Dr. Kunadhajratu advised attempt at weaning off ventilator support as needed and continuation of tracheostomy care, pulmonary toileting, and suction clearance. He recommended CXR and ABG as needed.

2/7/23:
Anthony Silva had no overnight events but started to refuse care.

2/11/23:
Anthony Silva complained of pain in the neck area. He was using 2-3 doses of Oxycodone daily. After a review, he was placed on 2 doses of Oxycodone to continue as needed for breakthrough pain. His COPD had come under control with nebulizers.
2/12/23:
Anthony Silva reported some improvement in his neck pain.

2/15/23:
Anthony Silva remained ventilator dependent.



2/17/23:
Anthony Silva was off fluids and had improvement in electrolytes.

2/24/23:
Anthony Silva had leukocytosis and sacral decubitus ulcers. There was deterioration of the left ischium ulcer. Further workup was considered if fever developed or further increase in white blood cell count.

3/2/23 – 3/5/23:
Anthony Silva refused turning and wound care. He was counseled that the wounds were not only failing to heal due to poor protein status, but were advancing, and could lead to sepsis and probably a fatal event. Dr. Bahia offered him the option of palliative care or diverting colostomy but he declined palliative care and opted for diverting colostomy. However, he was advised that even with the diversion and less contamination of wounds, the prognosis would remain poor and even worse as he was refusing turning and wound care from nursing staff. He understood that refusing care would hasten disease process from bad to worse.

3/14/23:
Anthony Silva continued to refuse multiple modalities of care despite the understanding of potential complications including death. His refusal was reported by the house supervisor, nursing, and wound care teams. Code status was discussed with him and he wished to remain a full code.

3/15/23:
Anthony Silva was diagnosed with an unclear source of sepsis with the suspicion of wound infection. Pan-cultures were ordered and he was advised to continue empiric antibiotics.

3/16/23:
Wound culture yielded Carbapenem resistant Pseudomonas and he was advised to continue Cefepime. He was also transfused with a unit if packed red blood cells due to hemoglobin less than 7 g/dl.

3/29/23:
Anthony Silva had his sodium level and azotemia improved but alkalosis slightly worsened. He was advised to continue tube feeding and free water at present dose.

3/31/23
Anthony Silva remained afebrile and had achieved a stable renal function. However, metabolic alkalosis persisted. Leukocytosis was also noted and cultures were ordered.

4/1/23:
Anthony Silva had elevated potassium level and was given a dose of Lokelma. The metabolic alkalosis was also stabilizing.

4/4/23:
Dr. Dhillon opined that Anthony Silva had a left lung infiltrate/effusion that required interventional drainage. Anthony Silva was subsequently transferred via ALS ambulance to Memorial Medical Center emergency room for further management.



4/27/23:
Anthony Silva was continued on steroid tapering.

5/2/23 – 5/8/23:
Anthony Silva developed hematuria, blood in colostomy, and worsening renal function. The deteriorating renal function was considered likely due to urinary tract obstruction from blood clots. He had continuous bowel irrigation and normal saline infusion. Vancomycin trough level was monitored to avoid supra-therapeutic levels.

5/11/23:
Urine culture yielded yeast. Anthony Silva was diagnosed with yeast urinary tract infection and placed on Fluconazole.

5/13/23:
Hematuria resolved and sodium normalized.

5/18/23:
Lower respiratory tract culture yielded Carbapenem-resistant Pseudomonas aeruginosa.

5/22/23:
Anthony Silva was afebrile and leukocytosis had resolved. His blood and urine cultures were negative and his antibiotics were changed to Ciprofloxacin for Carbapenem-resistant Pseudomonas aeruginosa.

5/24/23:
There was a call to Anthony Silva's bedside for a rapid response where he was found unresponsive, hypotensive, and bradycardic. He had a pulse and poor breath sounds on the left. He responded after 3 doses of Narcan. Intraosseous access was secured in his right shoulder and an intravenous fluid bolus was administered. He also had a suspected ST elevation. After a review, he was diagnosed with a suspected left pneumothorax and was discharged to Memorial Medical Center emergency room for further management as there was no available X-ray at CVSH to confirm the diagnosis.

6/7/23 – 6/10/23:
Anthony Silva was noted with sacral osteomyelitis. He was considered to need a colostomy to heal. However, it was determined that he had been seen by multiple services at different hospitals and was deemed not to be a candidate for colostomy due to compliance issues. On 6/10/23, he became tachycardic and hypotensive with no response to intravenous fluids and Midodrine. Consequently, he was transferred to MMC ER for further management.

7/26/23:
Anthony Silva was significantly malnourished and had a J-tube and a diverting colostomy. His albumin was low at 1.8 g/dL. He had worsening leukocytosis with no fevers and cultures were ordered.

7/27/23:
Anthony Silva had hypotension overnight and in the morning of review necessitating a hold on Dilaudid. He was started on Midodrine and resumed pain medication after blood pressure was controlled. Due to the worsening leukocytosis, he was considered high risk for recurrent PNA. He was monitored closely off antibiotics unless in the presence of fever or signs of sepsis.



7/29/23:
Anthony Silva had frequent episodes of hypotension that was controlled with Midodrine.

7/30/23:
Sputum culture yielded ESBL Pseudomonas and Anthony Silva was started on Levaquin.

7/31/23:
Anthony Silva had another episode of hypotension and was controlled with Midodrine.

8/5/23:
Anthony Silva had some improvement in leukocytosis.

8/10/23:
Anthony Silva started to refuse wound care again.

8/11/23:
Anthony Silva developed fever, tachycardia, and worsening leukocytosis despite being on Levaquin. He was considered to have a new infection and his antibiotics spectrum was expanded with the addition of Vancomycin and Zosyn. Infectious workup was ordered.

8/13/23:
Anthony Silva still had worsening leukocytosis despite Vancomycin and Zosyn which necessitated addition of an antifungal (Capsofungin). He was also transfused a unit of packed red blood cells due to low hemoglobin of 6.9 g/dL. There was no evidence of active bleeding. Occult stool was ordered with a plan for GI consult if positive. Iron studies were also ordered.

8/14/23:
Anthony Silva was transfused another unit of packed red blood cells due to low hemoglobin of 6.7 g/dL.

8/15/23:
Anthony Silva complained of cold. The room temperature was increased and blankets applied. He continued to refuse tracheostomy care. There was a history of right leg swelling with a suspicion for right lower extremity DVT. He also developed hematuria and blood in colostomy and was transfused due to a suspected GI bleed.

8/16/23:
Respiratory cultures yielded Carbapenem-resistant Pseudomonas aeruginosa and multidrug resistant organisms, which necessitated the commencement of Gentamycin and Meropenem. The goals of care were discussed with him but Anthony Silva stated that he did not want any surgical intervention at the time. He continued to refuse multiple aspects of care despite counseling that he had a poor prognosis if he continued to refuse care and potentially significant interventions. At the time of review, he remained alert and oriented in time, place, and person.

8/19/23:
Blood culture yielded no growth.



9/8/23:
Anthony Silva had another episode of hypotension. He was clinically dehydrated and
intravenous fluids were started.

9/9/23:
Anthony Silva stated that he wanted comfort care and desired to be made a "DNR" status.

9/10/23:
Anthony Silva's family decided to make him comfort care and withdrawal of all life support. The
ventilator was disconnected and tube feeding was stopped. Subsequently, he was noted to be
asystole on telemetry with no pulse, spontaneous breathing, and pain response. He was
pronounced dead at 9:26 p.m. by Dr. Komari on 9/10/23.



Bennet Omalu
PATHOLOGY

**Medico-Legal Questions**

1. **What were the underlying cause of death, mechanism of death, contributory factor to death and manner of death of Anthony Silva?**

Medicine is a life science, which is evidence based. The practice of medicine is guided by established standards and generally accepted principles, which certified physicians must adhere to. The specialties and the categories of physicians who are proficiently trained, specialized, and competent in the accurate determination of the cause, mechanism and manner of death are the forensic pathologists, especially for deaths involving all types of trauma and bodily injury. The death of Anthony Silva involved serious bodily injury.

The College of American Pathologists [CAP] describes the specialty of forensic pathology as follows: "Forensic pathology is the subspecialty of pathology that directs its efforts to the examination of living or dead persons in order to provide an opinion concerning the cause, mechanism, and manner of disease, injury or death; the identification of persons; the significance of biological and physical evidence; the correlation and/or reconstruction of wounds, wound patterns, and sequences; and conducting comprehensive medico-legal death investigations. Forensic pathology applies techniques of pathology to the needs and protection of public health, public safety, quality assurance, education in medicine, research, jurisprudence, and the administration of justice. Its highest goal is the development of strategies to prevent injury, disease, and death."[5]

The CAP also describes a forensic pathologist as follows: "A forensic pathologist is a pathologist with special training and experience in forensic pathology who is actively engaged in medico-legal autopsies and death investigations. Forensic pathologists shall be board-certified by the American Board of Pathology or American Osteopathic Board of Pathology after appropriate training and passing a rigorous examination, or a non-USA based pathologist with equivalent certification. The practicing forensic pathologist is licensed in one or more states; he/she is skilled in conducting death investigations, interpreting injuries in both fatal and non-fatal cases, performing medico-legal examinations, determining disease/injury causation to an appropriate degree of medical certainty, and determining cause and manner of death."[6]

Trauma pattern recognition, interpretation and analyses are the fundamental methodologies the forensic pathologist adopts in the differential diagnoses of causes and mechanisms of injuries and/or death. Trauma pattern recognition, translation and analysis are commonly applied to forensic differential diagnoses, opinions, and conclusions. It is a generally accepted principle and common knowledge in medicine and forensic pathology, that specific traumatic events generate predictable, reproducible, and specific patterns of injuries, outcomes, and death.

The practice of forensic pathology is guided by very well-established and generally accepted principles, which board-certified forensic pathologists must adhere to while they routinely perform differential diagnoses and determine causes, mechanisms, and manners of death. Objective decisions, conclusions and opinions should be made in all types of trauma case analyses strictly based on objective interpretations of patterns of injuries, prevailing forensic scenarios, and trauma pathophysiology. The prevailing global forensic scenarios, the patterns of

---

[5] www.cap.com
[6] www.cap.com



trauma and the expected outcomes of trauma exhibited by Anthony Silva are vividly consistent with fatal and homicidal trauma as prescribed by the well-established and generally accepted patho-physiology of trauma and disease.

The determination of cause and manner of death are guided by and must adhere to very well-established and generally accepted principles and concepts, standards of practice and common knowledge of science and medicine. In order to determine the cause of death of Anthony Silva accurately and competently, we may have to review these generally accepted principles and concepts, standards of practice and common knowledge. Forensic pathologists cannot determine cause and manner of death at whim outside these principles, concepts, and standards when they perform differential diagnoses to determine causes, mechanisms, and manners of death. Objective decisions, conclusions and opinions should be made in all types of trauma case analysis strictly based on objective interpretations of patterns of injuries and prevailing forensic scenarios, which should be based on these well-established and generally accepted principles and concepts, standards of practice and common knowledge of science and medicine.

There are four components of cause of death, viz: underlying cause of death, contributory factor to death, mechanism of death and manner of death.

<u>What is an underlying cause of death?</u>
The underlying cause of death is defined as the single factor, event, or disease, which instigates or initiates a terminal chain of events that finally culminates in death. It must not be a single disease. An event like compression of the body, a gunshot wound of the head, an assault or a fall can be a cause of death, when it initiates the terminal chain of events. The chain of events, which occurs between the underlying cause of death and death itself, encompasses the mechanisms of death. Mechanisms of death are typically not written on the death certificate.

An illustration is when an individual is shot in the spine causing quadriplegia. Assuming the individual survives for fifteen years after he was shot and develops the known sequelae of quadriplegia like recurrent bronchopneumonia, recurrent aspiration pneumonia, recurrent urinary tract infections, and decubitus ulcers, and finally develops an overwhelming sepsis and dies from sepsis. The underlying cause of death will be the event, gunshot wound of the spine. The terminal chain of events and the mechanisms of death would include the recurrent infections and the sepsis, which finally preceded death. Although the immediate causes of death in this instance are natural diseases, the traumatic gunshot wound of the spine precipitated the natural diseases and would supersede the natural diseases. The cause of death on the death certificate may be completed as "Gunshot Wound of the Spine."

When unnatural events or diseases, like falls from any height, compression of the body or fractures, co-occur with natural events or diseases, like cancer or heart disease in the cascade of events that precipitate death, the unnatural events or diseases supersede the natural events or diseases and assume the cause and manner of death.

An illustration is a 60-year-old woman who is dying from end-stage cancer and has only several months to live. She is admitted into a hospice care center for comfort care only. She got up from bed one morning to go to the bathroom, slipped, fell on the ground, and impacted her head on the floor. She sustained subdural hemorrhages inside her skull and died several weeks later from complications of surgery to evacuate the subdural hemorrhage. The cause of death in this instance would be the traumatic brain injury she suffered because it was an unnatural disease or



event, although she had suffered advanced cancer for several years and was dying from terminal cancer, which is a natural disease. The manner of death therefore would be an accident.

For a factor or disease to assume the underlying cause of death, there has to be a contiguous chain of events between the initial occurrence of that factor or disease and the occurrence of death, without any significant breach. The interval between the initiating factor and final demise is immaterial and non-contributory to the determination of an underlying cause of death as far as a contiguous chain of events can be established and competently linked to the initiating factor without any significant breach. Time intervals between the initiating factor and final demise can range from seconds to minutes, to hours, to days, weeks, months, years and decades.

When there is a pre-existing lethal chain of events from any factor or disease, and a novel factor or disease arises, either dependent on, or independent of the pre-existing factor or disease, and successfully disrupts and breaches the contiguity of the chain of events of the pre-existing factor or disease, while initiating a novel lethal chain of events, which culminates in death, the novel factor or disease would assume the underlying cause of death.

An illustration is the instance of a 55-year-old obese man with severe coronary atherosclerotic disease, who has had multiple myocardial infarctions and a triple coronary artery by-pass surgery and has developed and is dying from end-stage congestive cardiac failure from ischemic cardiomyopathy. If this same man falls backwards at home while opening a chest of drawers, which falls on top of him, entraps him and compresses his trunk for about 5 minutes before his 26-year-old son finds him and moves the chest of drawers off him. Unfortunately, by this time he was beginning to lose consciousness. The wife calls 911, paramedics arrive and emergently take him to the hospital where he is successfully resuscitated but had suffered asphyxial brain injury. He is admitted into the intensive care unit where he dies two days later from complications of compression of the trunk and asphyxial brain injury. Although he was suffering and dying from severe and advanced heart disease, the compression of his trunk, which he suffered was a novel and independent factor which instigated a novel chain of events, which successfully interrupted the previously existing chain of events, which culminated in his death. Compression of the trunk would therefore assume the underlying cause of death and determine the manner of death, which in this instance would be an accident. The asphyxial injury of the brain is an unnatural disease and would supersede the natural diseases and assume the cause and manner of death.

For every disease, there are extenuating and aggravating factors, which can either decrease or increase the risk of suffering from or dying from a disease. A contemporaneous or co-morbid disease or factor that increases the risk of a second disease or factor does not denote causation, rather it denotes co-morbidity. Disease or event "A" that is co-morbid with disease or event "B" does not mean disease "A" causes disease "B" and vice versa.

<u>What is a contributory factor to death?</u>
A heading in the death certificate states the following: "Other Conditions Contributing to Death." A contributory factor to death is defined as any factor, disease, or event, which occurs contemporaneously with the underlying cause of death, possesses an independent capacity to cause death, however the lethality of this capacity is inferior to the lethality of that of the underlying cause of death. The contributory factor may accentuate or accelerate the lethality of the underlying cause of death.



An illustration is the instance of a man who suffers from end-stage metastatic lung cancer and sustains a fracture of his humerus when he fell in his living room. He is taken to the hospital, and he undergoes open reduction and internal fixation with intramedullary rods. He unfortunately suffers a post-traumatic fat embolism following his surgery and dies from acute respiratory failure six days after he sustained his fracture. The underlying cause of death would be acute respiratory failure due to traumatic fat embolism due to fracture of the humerus. The contributory factor to death will be the metastatic lung cancer. The manner of death would be an accident. The lethal capacity of the traumatic fat emboli caused by his fractured humerus is far more superior to the lethal capacity of his lung cancer. This is why the fractured bone killed him within six days while he had survived lung cancer for three years. Traumatic fat embolism from a fractured long bone and metastatic lung cancer independently possesses potent lethal capacities, however the lethal capacity of traumatic fat embolism is superior to that of lung cancer; and traumatic fat embolism is an unnatural disease, while lung cancer is a natural disease. Traumatic fat embolism caused by a fracture would therefore become the underlying cause of death and assume the manner of death, which will be an accident. The lung cancer will become the contributory factor to death.

A contributory factor to death may become an underlying cause of death, if and when it instigates a chain of events, which successfully interrupts the pre-existing chain of events of the underlying cause, which has been discussed above. In this instance, the underlying cause of death would become the contributory factor.

<u>What is a manner of death?</u>
The manner of death is a medico-legal terminology, which categorizes the circumstances, which surround death sometimes referred to as "the prevailing terminal forensic scenario." There are two broad categories of manners of deaths:
1. Natural
2. Un-natural

Natural deaths are deaths caused by known natural diseases as have been published in the International Classification of Diseases. Un-natural deaths are classified into four manners of death:
1. Homicide
2. Suicide
3. Accident
4. Undetermined

For this report, only the homicide manner of death will be defined. A death is classified as a medical homicide when a person intentionally, knowingly, recklessly, or negligently causes the death of another human being. A medical homicide may be deemed as a death that occurs, directly or indirectly, as a result of another person's actions.

In the determination of manner of death, whenever an un-natural factor plays a role in the causation and mechanism of death, no matter how infinitesimal, the unnatural factor supersedes the natural factors and assumes the manner of death.



The Case of Anthony Silva

As his medical history above has shown, and as has been illustrated in Figure 1, Anthony Silva was a relatively healthy 40-year-old man who was neither expected to die nor was going to die on August 10, 2022. Prior to his encounter with the police, he was engaging in his normal activities of daily living.

As a United States resident his life expectancy at 40-years-old was 36.58 years, meaning that without the neck fracture and cervical spinal cord injury he suffered on 08/10/22, he was expected to live up to, and die at the age of 76.58 years old[7]. Having died within about one year of his sustenance of cervical spinal cord injury, it can be reasonably deduced that spinal cord injury reduced Mr. Silva's life expectancy by about 35 years.

It has been confirmed by epidemiological studies that people with traumatic spinal cord injuries have significantly reduced life expectancies. The most significant increases in mortality following cervical spinal cord injuries are seen in patients like Mr. Silva with quadriplegia[1,2]. In a study cohort, about 30% of patients with C5-C7 spinal cord injuries die within the first 12 months of spinal cord injury, as we have in this case. Mr. Silva sustained his trauma on 08/10/22, and died on 09/10/23, in the 13th month of his injury sustenance. A higher level of the spinal level of the injury, and a more complete spinal injury both increase the mortality risk, like we have in this case. Mr. Silva's injury level was high in the cervical spine, and the spinal cord injury was segmental with contusional hemorrhages and necrosis, causing quadriplegia[3-5] but without transection.

As the video clips have shown, on 08/10/22, at about 02:06 p.m. police officers forcefully took down Anthony Silva to the concrete floor head-on, and he impacted his rostral face and head on the concrete floor, with forceful hyperflexion and left lateral rotation and bending of his neck. These types of blunt force impacts, hyperflexion, lateral rotation and bending are causally associated with the types of cervical spinal fractures, which Mr. Silva sustained as have been enumerated on page 5 of this report[8,9,10,11].

Fractures of the cervical spine can cause devastating long-term effects on patients. Spinal cord injuries can occur in up to 50% of cases in association with cervical spine fractures due to compromise of the spinal canal, compression of the spinal medulla and contusions or lacerations of the spinal medulla. Therefore, it is vital and of utmost importance to recognize cervical spinal injuries early to avoid the exacerbation of an existing injury and more detrimental effects on the patients. However, associated neurological injuries can improve dramatically following surgical fixation and rehabilitation. Unfortunately, the absence of prompt recognition and intervention increases the risks of injury aggravation and long-term neurological insults rather than regain of normal function[12]. "Early detection of a cervical spine

[7] https://www.ssa.gov/oact/STATS/table4c6.html

[8] McMordie JH, Viswanathan VK, Gillis CC. Cervical Spine Fractures Overview. [Updated 2023 Apr 3]. In: StatPearls [Internet]. Treasure Island (FL): StatPearls Publishing; 2025 Jan-. Available from: https://www.ncbi.nlm.nih.gov/books/NBK448129/

[9] Torlincasi AM, Waseem M. Cervical Injury. [Updated 2022 Aug 22]. In: StatPearls [Internet]. Treasure Island (FL): StatPearls Publishing; 2025 Jan-. Available from: https://www.ncbi.nlm.nih.gov/books/NBK448146/

[10] Dowdell J, Kim J, Overley S, Hecht A. Biomechanics and common mechanisms of injury of the cervical spine. Handb Clin Neurol. 2018;158:337-344. doi: 10.1016/B978-0-444-63954-7.00031-8. PMID: 30482361.

[11] Davenport M. Cervical Spine Fracture Evaluation. Medscape. https://emedicine.medscape.com/article/824380-overview#:~:text=Cervical%20spine%20injuries%20occur%20in,craniocervical%20junction%20C1%20or%20C2.

[12] Altwaijri NA, Barakat R, Alharbi H, Romaih N, Aldhafeeri A. Fracture Dislocation at the Level of C6-C7: A Case Report and Literature Review. Cureus. 2023 Feb 6;15(2):e34675. doi: 10.7759/cureus.34675. PMID: 36909042; PMCID: PMC9993803.



injury is critical in preventing secondary cord injuries and planning appropriate and timely management. A delay in diagnosis can lead to extension of injuries, resulting in tragic consequences to the patients, ranging from neurologic function deterioration to death"[13].

Following head-on impact, hyperflexion and lateral rotation and bending, and following sustenance of his cervical spinal fractures and medullary injuries, Mr. Silva was left on the ground unaided, his head and neck were moved around, further flexed and rotated, he was lifted from the ground and placed in a semi-recumbent position on a seat and table, with his head and neck moving freely and eventually resting on the table. He was left in this position for over 20 minutes. All these activities resulted in delayed identification of his cervical fracture, aggravation of the resultant cervical spinal cord injury, and probably caused the cervical spinal cord injury since not every cervical spinal fracture results in cervical spinal cord injury. About 46% of cervical spinal cord injuries occur at the C6-C7 cervical spinal fractures, the types of fractures that Mr. Silva suffered. The second commonest causes of these fractures are head and neck trauma from falls[14].

Neck movement must be minimized following any suspicion of a neck fracture. The head and neck must not be moved freely, and a semirigid immobilizing neck collar should be placed as soon as possible. If the patient must be moved, the head and neck must be stabilized. The patient must not be made to sit up or stand up[15]. All these measures were grossly absent after Mr. Silva sustained his trauma, and after his body became flaccid. Therefore, it can be reasonably concluded that the actions of the police after Mr. Silva sustained his neck fracture, aggravated or caused his cervical spinal injury and increased the risk of long-term, devastating and debilitating adverse outcomes and death as we have in this case.

As a result of his cervical spinal fractures and continued mobilization of his head and neck after his fractures, Mr. Silva sustained severe cervical spinal cord injury with segmental contusional hemorrhages and necrosis of the cervical spinal medulla at the C6-C7 levels with cranial and caudal extensions. Such a serious injury resulted in quadriplegia. The neurons and axons, and tissues of the human central nervous system are post-mitotic cells, meaning that the human brain and spinal cord do not have any reasonable capacity to divide by mitosis, regenerate and replace damaged brain or spinal cord tissues and cells with normal tissues and cells. Any significant injury is permanent, incurable and irreversible. The brain and spinal cord are not like other tissues and organs like the liver, which have the capacity for the tissues and cells to divide, regenerate and replace damaged tissues and cells with normal tissues and cells. If one-quarter of the liver is damaged or removed, the liver regrows to replace the damaged or removed part. Therefore, the extensive segmental cervical spinal cord injury Mr. Silva sustained on 08/10/22 was permanent, incurable and irreversible. His injuries and the sequelae of his injuries remained and lasted until the time of his death and caused his death.

Since Anthony Silva's spinal cord injury was permanent, the sequelae of his injuries were permanent and progressive and were present in a contiguous fashion from the time he sustained

[13] Agabe Emmy Nkusi, Séverien Muneza, David Hakizimana, Steven Nshuti, Paulin Munyemana, Missed or Delayed Cervical Spine or Spinal Cord Injuries Treated at a Tertiary Referral Hospital in Rwanda, World Neurosurgery, Volume 87, 2016, Pages 269-276, ISSN 1878-8750, https://doi.org/10.1016/j.wneu.2015.11.092.
[14] Mukherjee S, Abhinav K, Revington PJ. A review of cervical spine injury associated with maxillofacial trauma at a UK tertiary referral centre. Ann R Coll Surg Engl. 2015 Jan;97(1):66-72. doi: 10.1308/003588414X14055925059633. PMID: 25519271; PMCID: PMC4473904.
[15] Davenport M. Cervical Spine Fracture Evaluation. Medscape. https://emedicine.medscape.com/article/824380-overview#:~:text=Cervical%20spine%20injuries%20occur%20in,craniocervical%20junction%20C1%20or%20C2.



his trauma on 08/10/22 until the time he died on 09/10/23. A review of his medical records confirm that he suffered from the very well-established and commonly known continuum of contiguous complications and sequelae of cervical spinal cord injury including but not limited to quadriplegia, cardiovascular complications, neurogenic, psychiatric and behavioral complications, respiratory complications, urinary complications, sepsis complications, decubitus ulcer complications, pain complications, tolerance and reliance on pain medications etc. He remained hospitalized from the time of sustenance of his trauma until his death. There was no breach in the contiguity of the sequelae, complications and post-traumatic pathophysiological outcomes and events of cervical spinal cord injuries[6-8],[9-25]. All the cascades of pathophysiological events that were initiated by the cervical spinal cord injury and continued until his death would encompass the mechanisms of death over a one year interval as has been described above. The long time interval of one year is immaterial and of no forensic consequence as long as we can establish an unbreeched contiguity of pathophysiological events between his spinal cord injury and death.

Anthony Silva's injuries were generated and caused by the actions of police officers, who were agents of the state, who had placed Mr. Silva under arrest and in custody as a ward of the state. Mr. Silva sustained his injuries from the direct or indirect actions of other persons as has been stated above. His injuries were not self-inflicted, but were inflicted by other persons. The injuries he sustained in the hands of other persons generated a novel cascade of events, which successfully breached the contiguity of any pre-existing factors, events or diseases, and generated a novel cascade of events, which culminated in death. The manner of death therefore would be a homicide and the underlying cause of death would be Traumatic Cervical Spinal Cord Injury due to Blunt Force Trauma of the Head, Face and Neck due to Assault by the Police. The sequelae of his spinal injury until death would encompass the mechanisms of death and would not be reported on the death certificate. Therefore, whether he died from sepsis, pneumonia, cardiovascular complications or other complications is immaterial, non-contributory and of no forensic consequence since these complications were mechanisms of death. The underlying cause of death, therefore, would be the single event, factor or disease, which instigated the novel chain of events and mechanisms at death, which eventually culminated in death. And in this instance of pre-mature death at the young age of 40-years-old, the single factor, event or disease that instigated the novel chain of events was assault by the police on 08/10/22, which caused blunt force trauma of the head, face and neck, which caused cervical spinal fractures, which caused cervical spinal cord injuries, which resulted in commonly known and established contiguous continuum of complications and sequelae, which resulted in pre-mature post-traumatic death on 09/10/23.

More likely than not, if Anthony Silva had not encountered the police on 08/10/22, and if he had not be forcefully thrown head-on to the concrete floor by the police, he would not have sustained his traumatic cervical spinal fractures and traumatic cervical spinal cord injury. Without these spinal fractures and spinal cord injuries, Mr. Silva would not have died one year after he sustained his injuries on 09/10/23 from the very well-established sequelae and complications of cervical spinal cord injury.



**2.    Did Anthony Silva experience pain and suffering, and for how long, when he sustained blunt force trauma of the head and face and neck, cervical spinal fractures and cervical spinal cord injuries on 08/10/22, developed quadriplegia and other well-established sequelae of spinal cord injuries and died on 09/10/23?**

It is a generally accepted principle and common knowledge in medicine and forensic pathology, that specific traumatic events generate predictable, reproducible, and specific patterns of traumas and injuries and outcomes of traumas and injuries. The patterns of injuries generated by blunt force trauma and the mechanisms of sustenance of these patterns of injuries are very well-established in the medical literature and are common knowledge.

Anthony Silva sustained blunt force trauma of his head, face and neck, cervical spinal fractures and cervical spinal cord injuries in the hands of the police on 08/10/22. Based on the prevailing forensic scenario, and on the generally accepted principles and common knowledge of medicine and science, and based on the global constellation, configurations, and anatomic conformations of the trauma sustained by Anthony Silva, he experienced pain and suffering when he sustained his traumas on 08/10/22, and continued to experience pain and suffering from his trauma, the treatment of his trauma, and the complications and sequelae of his trauma for thirteen months until he died on 09/10/23.

**Pathophysiology of conscious pain and suffering**
Conscious pain and suffering are initiated by widespread free nerve endings situated in the skin, soft tissues, and organs. Pain can be elicited by multiple types of stimuli classified into three broad categories: mechanical, thermal, and chemical pain stimuli. Nerve endings for pain sensations generate electrical action potentials following all forms of tissue damage caused by all types of energies including, but not limited to, kinetic and mechanical energy from blunt force impacts, and chemical energy from inflammatory responses of the human body to all forms of trauma and disease. Action potentials are the sub-cellular physiologic basis for noxious conscious sensations and originate from voltage gated sodium and potassium electrolyte membrane pumps in the cell membranes of nerve cells, fibers, and synapses.

It takes few 10,000[th's] of a second to generate action potentials. Action potentials are transmitted through nerve fibers to the brain. They are transmitted in peripheral nerves in the Aδ and C fibers for fast and slow pain respectively at impulse rates of 5-30 meters per second and 0.5-2 meters per second, respectively. There is therefore a double pain sensation, a fast-sharp pain, and a slow pain. The sharp pain apprises the person rapidly of imminent danger and prompts the person to react immediately and remove himself from the painful stimulus or imminent danger. The slow pain becomes greater as time passes resulting in continued intolerable pain and suffering prompting the person to continue to try to relieve the cause of the pain and flee from the imminent danger.

As a 40-year-old adequately developed male, Anthony Silva felt all types of blunt force trauma induced pain within milliseconds of contact with the skin and body. One millisecond is one second divided into 1000 parts. For the slowest nervous mechanisms of pain sensation and consciousness, a man, like Anthony Silva, felt pain within 100 milliseconds.

Nerve pathways transmitting pain, terminate in the spinal cord. Secondary pathways transmit the pain from the spinal cord to the brainstem and thalamus, especially to the reticular activating system of the brainstem. From the thalamus, tertiary pathways transmit pain to other basal



ganglia, limbic cortex, and neocortex of the brain. Pain stimuli are transmitted to the reticular nuclei of the midbrain, pons, and medulla; to the tectal midbrain and the periaqueductal gray matter. These lower regions of the brain, i.e., brainstem, are vital for the appreciation of the suffering types of pain. Action potentials and noxious stimuli associated with pain are also sent to the limbic lobe and system of the brain to cause mental responses to pain and suffering accounting for mental pain and suffering that accompany somatic and chemical pain and suffering.

Animals with their brains sectioned above the midbrain, to block any impulse reaching the neocortex and cerebral hemispheres, still experience suffering from pain caused by all types of trauma. Complete removal of the somatosensory regions of the cerebral hemispheres does not preclude an animal's ability to perceive and experience pain. Pain impulses entering the brainstem and lower centers of the human brain can cause conscious perception of pain. Pain perception is principally a function of the lower centers of the brain, the spinal cord, and spinal reflexes; however, the upper centers and cerebral hemispheres are responsible for the interpretation of the quality of pain and cognitive aspects of pain, which are not necessary for the perception of pain and suffering.

Blunt force trauma elicits both the fast and slow pain types. Fast pain is felt within milliseconds while slow pain is felt within about one second. Following mechanical tissue damages, biochemical tissue reactants like bradykinin, serotonin, histamine, prostaglandins, leukotrienes, potassium ions, substance P, acetylcholine, acids, proteolytic enzymes and other inflammatory reactants, peptides and enzymes are expressed to elicit sustained secondary chemical pain in addition to the primary fast pain directly caused by tissue damages. The chemical pain elicited by these chemical reactants is a slow type of suffering pain. The intensity of pain is closely correlated with the rate of tissue damage. Serious bodily injuries are more likely to generate serious and high levels of pain and suffering.

The brain is responsible for and sustains consciousness in human beings. The region of the brain responsible for consciousness is the brainstem. The center in the brainstem, which is responsible for consciousness, is the reticular activating system, which is deeply located in the central regions of the brainstem. As long as the reticular activating system remains anatomically and electrochemically intact, an individual like Anthony Silva will remain conscious and will feel pain and experience suffering. The sensation of pain induces conscious suffering since pain is a noxious sensation, which stimulates the neocortex, limbic cortex, and forebrain to cause mental pain and suffering. All these neural processes occur in 1000th's of a second [milliseconds]. The human nervous system is one of the most efficient, effective, and optimal operating systems ever known to mankind. After centuries of empirical research mankind has not been able to fully decipher and reproduce the operating systems of the human brain and nervous system.

**Anthony Silva's conscious pain and suffering**
A review of Mr. Silva's medical records and other materials confirm that he constantly complained and acknowledged that he was experiencing high levels of pain and suffering and requested for assistance and medical help for his pain and suffering beginning from 08/10/22 until his death on 09/10/23 for thirteen months.

Anthony Silva's conscious pain and suffering sustenance began moments prior to impact when he first encountered the police who epitomize authoritative symbols, figures and persons. The documentation of the events in this case, including the medical records, confirmed that Anthony



Silva was not suffering from any disease, impairment or drug intoxication that would have precluded him from experiencing pain and suffering.

Anthony Silva was fully conscious and aware of his surroundings moments prior to his first encounter with the police on 08/10/22. His reticular activating system was completely intact and functional. As a 40-year-old male, he had the mental capacity to identify and classify the encounters with the police as imminent dangers and perceived threats to his safety and life. At this moment, the brainstem nuclei, the frontal cortex, pre-frontal cortex, basal forebrain, and limbic cortex of Anthony Silva's brain initiated, within 10,000th of a second, action potentials, which initiated within milliseconds, the primitive and autonomic human reflexes of fleeing from imminent danger.

This mental awareness of imminent danger initiated the nor-adrenergic and adrenergic biochemical neural responses of fright, flight, and fight, when the locus ceruleus of the brainstem released large amounts of nor-adrenalin to the cerebral hemispheres. This fright, flight and fight adrenergic response caused high levels of mental pain and suffering. His heart started pumping faster [chronotropic effect] and stronger [ionotropic effect] due to the nor-adrenergic/adrenergic response. His respiratory rate and general muscle tonicity increased as well due to the nor-adrenergic/adrenergic response. All these patho-physiologic processes culminated in high levels of conscious mental pain and suffering, accompanied by the somatic and chemical pain caused by the somatic and biochemical responses of his body to the mental pain and suffering. Anthony Silva suffered high levels of mental, somatic and chemical pain and suffering, when he identified the imminent danger and perceived threat to his life prior to, and during forceful physical contacts initiated by the police.

Anthony Silva could not flee from the perceived threat, but he apparently exhibited some autonomic behavioral responses to the perceived threat. He was easily overcome and overwhelmed by the police who assaulted him and forcefully brought him to the ground, arrested him and hand-cuffed him. There were at least two episodes of violent physical contacts and takedown to the ground. During this time Mr. Silva sustained multiple blunt force impacts of his head, face, neck, trunk and extremities. Each impact he sustained was a noxious stimulus, which generated novel action potentials, which traveled to the spinal cord and brain to cause novel mental, somatic and chemical pain, and suffering. Forensically significant levels of kinetic energy were transferred to his body to cause blunt force trauma, contusions and abrasions of the skin and soft tissues, fractures of the cervical spine, contusional soft tissue hemorrhages, paravertebral soft tissue hemorrhages, cervical spinal meningeal hemorrhages and cervical spinal medullary contusional hemorrhages, necrosis and lacerations.

The blunt force injuries his body suffered, and every biochemical tissue response he endured from the composite injuries precipitated biochemical, anatomic, and pathophysiological noxious stimuli, which generated action potentials within 10,000ths of a second, which were transmitted to the spinal cord and to the brain to precipitate cumulative conscious mental, somatic and chemical pain, and suffering. The multimodal nature of the noxious stimuli resulted in synergistic and cumulative conscious experience of very high levels of mental, somatic and chemical pain and suffering. Action potentials from noxious stimuli eventually reach the limbic system to generate mental and psychological aspects of somatic pain and suffering. The primary injuries initiated secondary tissue injuries, systemic and tissue reactant responses, which elicited novel chemical pain and accentuated the conscious mental and somatic pain and suffering.



Following his trauma and serious bodily injury, his primary and secondary injuries progressed, more nerve endings in his body, soft tissues and viscerae were recruited, many more action potentials were elicited and caused increasingly higher levels of mental, somatic, and chemical pain and suffering.

Primary spinal injuries caused secondary spinal injuries and responses, which elicited the expression and activation of more types of ions, peptides, proteins, and enzymes, which enhanced his chemical pain and suffering, which synergized with his pre-existing pain and suffering to cause higher, and progressive mental, somatic and chemical pain, and suffering.

As has been stated above, the brain is responsible for and sustains consciousness in human beings. The region of the brain responsible for consciousness is the brainstem. The center in the brainstem, which is responsible for consciousness, is the reticular activating system, which is deeply located in the central regions of the brainstem. As long as the reticular activating system remains anatomically and electrochemically intact, an individual like Anthony Silva will remain conscious and will experience pain and suffering. Anthony Silva's reticular activating system did not suffer any catastrophic trauma; therefore, it remained intact, and he remained conscious until his death. He suffered several episodes of traumatic and post-traumatic shock, impaired sensorium and loss of consciousness but he was immediately and successfully resuscitated.

As time progressed, Anthony Silva continued to experience increasingly higher levels of mental, somatic, and chemical pain and suffering due to his secondary tissue injury cascades induced by the primary traumatic injuries. His pain and suffering persisted as he received emergency medical care and was transferred to the hospital. At the hospital he received a myriad of pharmacologic, medical and surgical treatments and interventions to alleviate and palliate his complications, pain and suffering. His complications, pain and suffering could not be cured or reversed because his spinal cord injury was permanent and irreversible. Every pharmacologic, medical and surgical treatment he received caused novel mental, somatic and chemical pain and suffering, which contributed to the cumulative and global pain and suffering he was experiencing.

Anthony Silva developed very well-established and commonly known serious complications and sequelae of spinal cord injuries, which have been clearly stated above. He was chronically debilitated by his cervical spinal cord injury and quadriplegia. Each and every complication he developed initiated action potentials and noxious stimuli, which initiated novel mental, somatic and chemical pain and suffering. He developed sepsis, systemic inflammatory responses, quadriplegia, advanced decubitus ulcers and contractures. These are very serious injury complications which are known to cause some of the highest levels of mental, somatic and chemical pain and suffering any living human being may experience. He received complex therapies and interventions for his serious complications like surgeries under general anesthesia, and wound dressings and was placed on a broad myriad of complex drugs and medications. The medical and surgical procedures he underwent, and the medications he received generated independent mental, somatic and chemical pain and suffering from the side effects, and mechanisms of actions of the procedures and drugs. He survived for thirteen months, and he progressively developed a broad variety and spectrum of complications of cervical spinal cord injuries, which combined to cause the highest levels of debilitating mental, somatic and chemical pain and suffering human beings can suffer.

Anthony Silva was prescribed medications for his pain and suffering. His injury was permanent, his pain and suffering were permanent, but actions and presence of the drugs in his body lasted for only short periods of time based on the individual half-life of each drug. So, the drugs he took



for his pain only alleviated his pain for a short while but did not eliminate or cure his mental, somatic and chemical pain and suffering. The pain medications he took did not alleviate, reverse or cure his cervical spinal cord injury and progressive post-traumatic debilitation, which caused high levels of multifaceted and multidomain pain and suffering no single drug or drugs can eradicate.

The spinal reflex is a foundation of pain and suffering. For a patient with a cervical spinal cord injury, the spinal cord is not dead. The spinal cord above and below the level of injury remains alive and functional. Therefore, spinal reflexes remain intact, above and below the level of the injury and will enable the patient to continue to experience pain and suffering both below and above the level of injury. All pathophysiological modalities of pain and suffering remain intact and fully functional above the level of the injury. It is a very well-established and commonly known principle that the paraplegic or quadriplegic patient experiences pain and suffering in the body above and below the level of the spinal cord injury based upon a variety of established pathophysiological mechanisms[26-36]. Therefore, the cervical spinal cord injury Mr. Silva sustained did not preclude him from experiencing pain and suffering throughout his body after he developed quadriplegia.

Spinal cord injury pain, some of the types of pain Anthony Silva suffered following his quadriplegia, may include the following classification of pain[30]:
1. Nociceptive pain
   a. Musculoskeletal pain
   b. Visceral pain
   c. Other nociceptive pain
2. Neuropathic pain
   a. At-level spinal cord injury pain
   b. Below-level spinal cord injury pain
3. Other pain
4. Unknown pain

In summary therefore, Anthony Silva experienced the highest levels of debilitating mental, somatic and chemical pain and suffering as a result of his serious bodily injuries, blunt force trauma of the head, face and neck, comminuted fractures of the cervical spine, contusional hemorrhages and necrosis, and lacerations of his cervical spinal medulla, quadriplegia and other serious complications and sequelae of cervical spinal cord injuries thereof, from the time of sustenance of his injuries on 08/10/22 to the time of his death on 09/10/23 for thirteen months.

I have provided my opinions and conclusions with a reasonable degree of medical and scientific certainty.

I reserve the right to amend, supplement, revise and/or modify my opinions and report, up and to the time of trial, should additional information become available

Thank you.

Very truly yours,



Anthony Silva, Deceased
Medico-Legal Report

Page 35 of 36



Bennet I. Omalu, MD, MBA, MPH, CPE, DABP-AP,CP,FP,NP
Clinical Pathologist, Anatomic Pathologist, Forensic Pathologist, Neuropathologist, Epidemiologist
President and Medical Director, Bennet Omalu Pathology
Clinical Professor of Medical Pathology and Laboratory Medicine, University of California, Davis

### ENDNOTE REFERENCES:

1. Zadra A, Bruni S, A DET, et al. Life expectancy and long-term survival after traumatic spinal cord injury: a systematic review. Eur J Phys Rehabil Med. Oct 2024;60(5):822-831. doi:10.23736/S1973-9087.24.08462-4

2. Middleton JW, Dayton A, Walsh J, Rutkowski SB, Leong G, Duong S. Life expectancy after spinal cord injury: a 50-year study. Spinal Cord. Nov 2012;50(11):803-11. doi:10.1038/sc.2012.55

3. Barbiellini Amidei C, Salmaso L, Bellio S, Saia M. Epidemiology of traumatic spinal cord injury: a large population-based study. Spinal Cord. Sep 2022;60(9):812-819. doi:10.1038/s41393-022-00795-w

4. Frankel HL, Coll JR, Charlifue SW, et al. Long-term survival in spinal cord injury: a fifty year investigation. Spinal Cord. Apr 1998;36(4):266-74. doi:10.1038/sj.sc.3100638

5. Yeo JD, Walsh J, Rutkowski S, Soden R, Craven M, Middleton J. Mortality following spinal cord injury. Spinal Cord. May 1998;36(5):329-36. doi:10.1038/sj.sc.3100628

6. Raab AM, Mueller G, Elsig S, et al. Systematic Review of Incidence Studies of Pneumonia in Persons with Spinal Cord Injury. J Clin Med. Dec 31 2021;11(1)doi:10.3390/jcm11010211

7. Raab AM, Krebs J, Perret C, Michel F, Hopman MT, Mueller G. Maximum Inspiratory Pressure is a Discriminator of Pneumonia in Individuals With Spinal-Cord Injury. Respir Care. Dec 2016;61(12):1636-1643. doi:10.4187/respcare.04818

8. Burns SP. Acute respiratory infections in persons with spinal cord injury. Phys Med Rehabil Clin N Am. May 2007;18(2):203-16, v-vi. doi:10.1016/j.pmr.2007.02.001

9. Grigorian A, Sugimoto M, Joe V, et al. Pressure Ulcer in Trauma Patients: A Higher Spinal Cord Injury Level Leads to Higher Risk. J Am Coll Clin Wound Spec. 2017;9(1-3):24-31 e1. doi:10.1016/j.jccw.2018.06.001

10. Gelis A, Dupeyron A, Legros P, Benaim C, Pelissier J, Fattal C. Pressure ulcer risk factors in persons with SCI: Part I: Acute and rehabilitation stages. Spinal Cord. Feb 2009;47(2):99-107. doi:10.1038/sc.2008.107

11. Gelis A, Dupeyron A, Legros P, Benaim C, Pelissier J, Fattal C. Pressure ulcer risk factors in persons with spinal cord injury part 2: the chronic stage. Spinal Cord. Sep 2009;47(9):651-61. doi:10.1038/sc.2009.32

12. Hoffman SE, Hauser BM, Zaki MM, et al. Spinal level and cord involvement in the prediction of sepsis development after vertebral fracture repair for traumatic spinal injury. J Neurosurg Spine. Aug 1 2022;37(2):292-298. doi:10.3171/2021.12.SPINE21423

13. Jaja BNR, Jiang F, Badhiwala JH, et al. Association of Pneumonia, Wound Infection, and Sepsis with Clinical Outcomes after Acute Traumatic Spinal Cord Injury. J Neurotrauma. Nov 1 2019;36(21):3044-3050. doi:10.1089/neu.2018.6245

14. Kang Y, Ding H, Zhou H, et al. Epidemiology of worldwide spinal cord injury: a literature review. Journal of Neurorestoratology. 2018;6(1):1-9. doi:10.2147/JN.S143236

15. Bauman WA, Spungen AM. Metabolic changes in persons after spinal cord injury. Phys Med Rehabil Clin N Am. Feb 2000;11(1):109-40.



16. Lim SW, Shiue YL, Ho CH, et al. Anxiety and Depression in Patients with Traumatic Spinal Cord Injury: A Nationwide Population-Based Cohort Study. PLoS One. 2017;12(1):e0169623. doi:10.1371/journal.pone.0169623

17. Saunders LL, Krause JS, Focht KL. A longitudinal study of depression in survivors of spinal cord injury. Spinal Cord. Jan 2012;50(1):72-7. doi:10.1038/sc.2011.83

18. Migliorini C, Tonge B, Taleporos G. Spinal cord injury and mental health. Aust N Z J Psychiatry. Apr 2008;42(4):309-14. doi:10.1080/00048670801886080

19. Wan FJ, Chien WC, Chung CH, Yang YJ, Tzeng NS. Association between traumatic spinal cord injury and affective and other psychiatric disorders-A nationwide cohort study and effects of rehabilitation therapies. J Affect Disord. Mar 15 2020;265:381-388. doi:10.1016/j.jad.2020.01.063

20. Wu JC, Chen YC, Liu L, et al. Increased risk of stroke after spinal cord injury: a nationwide 4-year follow-up cohort study. Neurology. Apr 3 2012;78(14):1051-7. doi:10.1212/WNL.0b013e31824e8eaa

21. Aidinoff E, Bluvshtein V, Bierman U, Gelernter I, Front L, Catz A. Coronary artery disease and hypertension in a non-selected spinal cord injury patient population. Spinal Cord. Mar 2017;55(3):321-326. doi:10.1038/sc.2016.109

22. Sezer N, Akkuş S, Uğurlu FG. Chronic complications of spinal cord injury. World J Orthop. Jan 18 2015;6(1):24-33. doi:10.5312/wjo.v6.i1.24

23. Liu Y, Yang X, He Z, et al. Spinal cord injury: global burden from 1990 to 2019 and projections up to 2030 using Bayesian age-period-cohort analysis. Front Neurol. 2023;14:1304153. doi:10.3389/fneur.2023.1304153

24. Charlifue SW, Weitzenkamp DA, Whiteneck GG. Longitudinal outcomes in spinal cord injury: aging, secondary conditions, and well-being. Arch Phys Med Rehabil. Nov 1999;80(11):1429-34. doi:10.1016/s0003-9993(99)90254-x

25. Myers J, Lee M, Kiratli J. Cardiovascular disease in spinal cord injury: an overview of prevalence, risk, evaluation, and management. Am J Phys Med Rehabil. Feb 2007;86(2):142-52. doi:10.1097/PHM.0b013e31802f0247

26. Burke DC. Pain in paraplegia. Paraplegia. Feb 1973;10(4):297-313. doi:10.1038/sc.1973.54

27. de Oliveira RC, de Freitas LB, Gomes RR, Cliquet A. Orthopedic Related Comorbidities in Spinal Cord-Injured Individuals. Acta Ortop Bras. Jul-Aug 2020;28(4):199-203. doi:10.1590/1413-785220202804224403

28. Cragg JJ, Haefeli J, Jutzeler CR, et al. Effects of Pain and Pain Management on Motor Recovery of Spinal Cord-Injured Patients: A Longitudinal Study. Neurorehabil Neural Repair. Sep 2016;30(8):753-61. doi:10.1177/1545968315624777

29. D'Angelo R, Morreale A, Donadio V, et al. Neuropathic pain following spinal cord injury: what we know about mechanisms, assessment and management. Eur Rev Med Pharmacol Sci. Dec 2013;17(23):3257-61.

30. Finnerup NB, Baastrup C. Spinal cord injury pain: mechanisms and management. Curr Pain Headache Rep. Jun 2012;16(3):207-16. doi:10.1007/s11916-012-0259-x

31. Hagen EM. Acute complications of spinal cord injuries. World J Orthop. Jan 18 2015;6(1):17-23. doi:10.5312/wjo.v6.i1.17

32. Masri R, Keller A. Chronic pain following spinal cord injury. Adv Exp Med Biol. 2012;760:74-88. doi:10.1007/978-1-4614-4090-1_5

33. Yasko JR, Mains RE. Chronic pain following spinal cord injury: Current approaches to cellular and molecular mechanisms. Trends Cell Mol Biol. 2018;13:67-84.

34. Rosner J, Negraeff M, Belanger LM, et al. Characterization of Hyperacute Neuropathic Pain after Spinal Cord Injury: A Prospective Study. J Pain. Jan 2022;23(1):89-97. doi:10.1016/j.jpain.2021.06.013

35. Vierck C. Mechanisms of Below-Level Pain Following Spinal Cord Injury (SCI). J Pain. Mar-Apr 2020;21(3-4):262-280. doi:10.1016/j.jpain.2019.08.007

36. Waring WP, Maynard FM. Shoulder pain in acute traumatic quadriplegia. Paraplegia. Jan 1991;29(1):37-42. doi:10.1038/sc.1991.5





**Figure 1:** Illustration for the underlying cause of death of Anthony Silva: a novel, independent and mutually exclusive event occurred on 08/10/22, which successfully breached the contiguity of any pre-existing disease, event or factor, and instigated a novel chain of contiguous pathophysiological events, which culminated in premature death on 09/10/23. The event of 08/10/22 would therefore assume the underlying cause of death and manner of death.

EXHIBIT C

**LAW OFFICES OF DALE K. GALIPO**
Dale K. Galipo, Esq. (SBN 144074)
dalekgalipo@yahoo.com
Cooper Alison-Mayne (SBN 343169)
cmayne@galipolaw.com
21800 Burbank Boulevard, Suite 310
Woodland Hills, CA 91367
Phone: (818) 347-3333

**LAW OFFICES OF DEAN PETRULAKIS**
Dean Petrulakis, Esq. (Bar No. 192185)
1600 G Street, Suite 202
Modesto, CA 95354
Tel: (209) 522-6600

# UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| DOROTHEY HEIMBACH, individually and as successor in interest to Anthony Silva,<br><br>        Plaintiff,<br><br>    vs.<br><br>STANISLAUS COUNTY; and JUSTIN CAMARA, ZA XIONG, and ERIC BAVARO, in their individual capacities,<br><br>        Defendants. | Case No. 2:23-cv-01887-DJC-KJN<br><br>**PLAINTIFF'S THIRD SUPPLEMENTAL RULE 26(A) DISCLOSURES**<br><br>Judge: Hon. Daniel J. Calabretta<br>Magistrate Judge: Kendall J. Newman |

## A.   WITNESSES

Plaintiff states that, based on the information currently known to her, at least the following persons (excluding expert witnesses, attorneys, and their support staff) have knowledge of facts that Plaintiff may use to support her allegations.  The subjects of information specified are those of which Plaintiff are currently aware of or Plaintiff reasonably believes are within the knowledge of the identified individuals.

| | **Name** | **Subject Matter(s)** |
|---|---|---|
| 1. | Dorothey Heimbach, c/o Plaintiff's counsel | Damages |
| 2. | Deputy Camara | The circumstances and events which led to and comprise the incident from which this action arises, including the use of excessive force |
| 3. | Deputy Xiong | The circumstances and events which led to and comprise the incident from which this action arises, including the use of excessive force |
| 4. | Deputy Bavaro | The circumstances and events which led to and comprise the incident from which this action arises, including the use of excessive force |
| 5. | Deputy Bret Babbit | Witness; County's *Monell* liability for deficient training |
| 6. | Deputy Lauren Romero | Witness; County's *Monell* liability for deficient training |
| 7. | Chief Mike Parker | Witness; County's *Monell* liability for deficient training and ratification |
| 8. | Chief Ed Ridenour | Witness; County's *Monell* liability for deficient training and ratification |

PLAINTIFF'S THIRD SUPPLEMENTAL RULE 26(A) DISCLOSURES

| 9. | Sergeant David Hickman | Witness; County's *Monell* liability for deficient training and ratification |
|---|---|---|
| 10. | Sheriff Jeff Dirkse | County's *Monell* liability for deficient training and ratification |
| 11. | Adam Padilla | Events preceding the use of force; Liability |
| 12. | Dr. Bryan James Beattie | Treated Decedent after the Incident; May testify to facts that may be relevant to damages and causation |
| 13. | Dr. Jahoon Koo | Treated Decedent after the Incident; May testify to facts that may be relevant to damages and causation |
| 14. | Dr. Deependra Mahato | Treated Decedent after the Incident; May testify to facts that may be relevant to damages and causation |
| 15. | Christina Marie Haro | Treated Decedent after the Incident; May testify to facts that may be relevant to damages and causation |
| 16. | Sandra Ann Richhart | Treated Decedent after the Incident; May testify to facts that may be relevant to damages and causation |
| 17. | Joshua Caleb Edwards | Treated Decedent after the Incident; May testify to facts that may be relevant to damages and causation |
| 18. | Javier Ramirez | Treated Decedent after the Incident; May testify to facts that may be relevant to damages and causation |
| 19. | ICU Nurses (names unknown at this time) | Treated Decedent after the Incident; May testify to facts that may be relevant to damages and causation |

PLAINTIFF'S THIRD SUPPLEMENTAL RULE 26(A) DISCLOSURES

| 20. | Dr. Raman Moradkhan | Treated Decedent after the Incident; May testify to facts that may be relevant to damages and causation |
| 21. | Dr. Henry M Andoh | Treated Decedent after the Incident; May testify to facts that may be relevant to damages and causation |
| 22. | Brandon Jewett | Damages |
| 23. | Lee Sparks | Witness to latter portion of events; Damages |

Plaintiff also incorporates by reference all witnesses identified in Plaintiff's and Defendants' Initial and Supplemental Disclosures.

Plaintiff's investigation of this matter is not yet complete, and Plaintiff has not concluded her discovery in this matter. Plaintiff reserves the right to supplement this list if she learns it is incomplete or incorrect, pursuant to Rule 26(e).

## B. **DOCUMENTS**

Plaintiff produces concurrently the following documents:

1. Claims for Damages on behalf of Plaintiff and Anthony Silva (PLT 000001–PLT 000021);

2. Death Certificate (PLT 000022);

3. Photographs of Decedent (PLT 000023–PLT 000031);

4. Hospital records and photographs (PLT 000032–PLT 000186).

5. Still Shot From Camara Body Cam PLT000187

6. Hospital Records, PLT000188–PLT014285;

7. Medical records related to Decedent's treatment after the incident, including x-ray imagery and MRI imagery. PLT014286–PLT016541;

8. Photos and Cards. PLT 016542–016584.

Plaintiff also incorporates by reference all documents identified in Defendants'

Initial Disclosures and all documents already disclosed in Plaintiff's Initial

Disclosures and Supplemental Disclosures.

Plaintiff's investigation of this matter is not yet complete, and Plaintiff has not

concluded her discovery in this matter.  Plaintiff reserves the right to identify

additional documents and categories of documents as they become known to Plaintiff

or they become relevant to the claims or defenses of any party, pursuant to Rule

26(e).

The above records have been produced today to Plaintiff' counsel via

Dropbox: https://www.dropbox.com/scl/fo/wuf80jbo9w7ircaw0y0mh/AEX-

FRnQFQaAfC6pqzIzC70?rlkey=0x2npez4son6dgpj3ttmqn2u8&st=7wbzkh24&dl=0

Please notify Plaintiff's counsel if you have any trouble downloading the files.

## C. **COMPUTATION OF DAMAGES**

Plaintiff seeks compensatory damages, both survival and wrongful death

damages under federal and state law, in an amount to be proven at trial, for the

violation of Anthony Silva's and Plaintiff's rights. Plaintiff also seeks punitive

damages in an amount to be proven at trial from each of the individual defendants.

Plaintiff also seeks attorneys' fees pursuant to 42 U.S.C. § 1988 and the Bane Act.

Plaintiff also seeks interest and other costs associated with the litigation, including

funeral and burial expenses. Plaintiff reserves the right to supplement or amend her

computation of damages, pursuant to Rule 26(e).

DATED: January 23, 2025          LAW OFFICES OF DALE K. GALIPO

By: _____
Cooper Alison-Mayne
Dale K. Galipo
*Attorneys for Plaintiff*

<u>PROOF OF SERVICE</u>

STATE OF CALIFORNIA, COUNTY OF LOS ANGELES

I, Santiago G. Laurel, am employed in the County of Los Angeles, State of California and am over the age of eighteen years and not a party to the within action. My business address is 21800 Burbank Boulevard, Suite 310, Woodland Hills, California 91367.

On January 23, 2025, I served the foregoing document described as:

**PLAINTIFF'S THIRD SUPPLEMENTAL RULE 26(A) DISCLOSURES**

on all interested parties, through their respective attorneys of record in this action by placing a true copy thereof enclosed in a sealed envelope addressed as indicated on the attached service list.

<u>METHOD OF SERVICE</u>

☐ (BY MAIL)  I enclosed the documents in a sealed envelope or package and addressed to the parties at the addresses as indicated on the attached service list.

☐ I deposited the sealed envelope or package with the United States Postal Service, with the postage fully prepaid thereon.

☐ I placed the envelope or package for collection and mailing, following our ordinary business practices.  I am readily familiar with the practice of this office for the collection, processing and mailing of documents.  On the same day that documents are placed for collection and mailing, it is deposited in the ordinary course of business with the United States Postal Service, in a sealed envelope with postage fully prepaid.

☒ (BY ELECTRONIC SERVICE)  I caused the foregoing document(s) to be sent via electronic transmittal to the notification addresses listed below as registered with this court's case management/electronic court filing system.

☐ (BY FEDERAL EXPRESS)  I enclosed the documents in an envelope or package provided by an overnight delivery carrier and addressed to the persons at the addresses as indicated on the attached service list.  I placed the envelope or package for collection and overnight delivery at an office or regularly utilized drop box of the overnight delivery carrier.

I declare that I am employed in the office of a member of the bar of this Court at whose direction the service was made.

Executed on January 23, 2025, at Woodland Hills, California.

_____
Santiago G. Laurel

1

## **SERVICE LIST**

2

John Robert Whitefleet
Porter Scott
2180 Harvard Suite 500
Sacramento, CA 95815
Fax: (916) 927-3706
*Email:* *Service@porterscott.com; jwhitefleet@porterscott.com*

3

4

5

6

Law Offices of Dean Petrulakis
1600 G Street, Suite 202
Modesto, CA 95354
Facsimile:(209) 522-6604
*Email:* *dean@deanpetrulakislaw.com*

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

PLAINTIFF'S THIRD SUPPLEMENTAL RULE 26(A) DISCLOSURES

EXHIBIT D

1  **LAW OFFICES OF DALE K. GALIPO**
Dale K. Galipo, Esq. (SBN 144074)
2  dalekgalipo@yahoo.com
Cooper Alison-Mayne (SBN 343169)
3  cmayne@galipolaw.com
21800 Burbank Boulevard, Suite 310
4  Woodland Hills, CA 91367
Phone: (818) 347-3333

5  **LAW OFFICES OF DEAN PETRULAKIS**
Dean Petrulakis, Esq. (Bar No. 192185)
6  1600 G Street, Suite 202
Modesto, CA 95354
7  Tel: (209) 522-6600

8                    **UNITED STATES DISTRICT COURT**

9                    **EASTERN DISTRICT OF CALIFORNIA**

10  DOROTHEY HEIMBACH,                    Case No. 2:23-cv-01887-DJC-KJN
11  individually and as successor in
interest to Anthony Silva,             **PLAINTIFF'S FOURTH**
12                                         **SUPPLEMENTAL RULE 26(A)**
                                          **DISCLOSURES**
13            Plaintiff,

14     vs.                                 Judge: Hon. Daniel J. Calabretta
15                                         Magistrate Judge: Kendall J. Newman
   STANISLAUS COUNTY; and
16  JUSTIN CAMARA, ZA XIONG,
and ERIC BAVARO, in their
17  individual capacities,

18            Defendants.

19

20

21

22

23

24

25

26

27

28

─────────────────────────────────────────────
PLAINTIFF'S FOURTH SUPPLEMENTAL RULE 26(A) DISCLOSURES

Plaintiff submits the following supplemental disclosures pursuant to Federal Rule of Civil Procedure 26(a) and (e).

**A.    WITNESSES**

Plaintiff discloses the following witness that Plaintiff may use to support her contentions.

| **Name** | **Subject Matter(s)** |
|---|---|
| 1. David Ray Glenn (209) 985-8574 | Damages |

DATED: January 24, 2025                LAW OFFICES OF DALE K. GALIPO

By: _____
Cooper Alison-Mayne
Dale K. Galipo

*Attorneys for Plaintiff*

1
2
## PROOF OF SERVICE
3
### STATE OF CALIFORNIA, COUNTY OF LOS ANGELES
4
     I, Santiago G. Laurel, am employed in the County of Los Angeles, State of California and am over the age of eighteen years and not a party to the within action. My business address is 21800 Burbank Boulevard, Suite 310, Woodland Hills, California 91367.
5
6
     On January 24, 2025, I served the foregoing document described as:
7
**PLAINTIFF'S FOUTH SUPPLEMENTAL RULE 26(A) DISCLOSURES**
8
on all interested parties, through their respective attorneys of record in this action by placing a true copy thereof enclosed in a sealed envelope addressed as indicated on the attached service list.
9
10
### METHOD OF SERVICE
11
☐     (BY MAIL)  I enclosed the documents in a sealed envelope or package and addressed to the parties at the addresses as indicated on the attached service list.
12
13
          ☐     I deposited the sealed envelope or package with the United States Postal Service, with the postage fully prepaid thereon.
14
15          ☐     I placed the envelope or package for collection and mailing, following our ordinary business practices.  I am readily familiar with the practice of this office for the collection, processing and mailing of documents.  On the same day that documents are placed for collection and mailing, it is deposited in the ordinary course of business with the United States Postal Service, in a sealed envelope with postage fully prepaid.
16
17
18
19 ☒     (BY ELECTRONIC SERVICE)  I caused the foregoing document(s) to be sent via electronic transmittal to the notification addresses listed below as registered with this court's case management/electronic court filing system.
20
21 ☐     (BY FEDERAL EXPRESS)  I enclosed the documents in an envelope or package provided by an overnight delivery carrier and addressed to the persons at the addresses as indicated on the attached service list.  I placed the envelope or package for collection and overnight delivery at an office or regularly utilized drop box of the overnight delivery carrier.
22
23
24     I declare that I am employed in the office of a member of the bar of this Court at whose direction the service was made.
25     Executed on January 24, 2025, at Woodland Hills, California.
26
27
     _____
28                    Santiago G. Laurel

-2-

1

2

## **SERVICE LIST**

3

4

John Robert Whitefleet
Porter Scott
2180 Harvard Suite 500
Sacramento, CA 95815
Fax: (916) 927-3706
*Email: Service@porterscott.com; jwhitefleet@porterscott.com*

5

6

7

8

Law Offices of Dean Petrulakis
1600 G Street, Suite 202
Modesto, CA 95354
Facsimile:(209) 522-6604
*Email: dean@deanpetrulakislaw.com*

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

PLAINTIFF'S FOURTH SUPPLEMENTAL RULE 26(A) DISCLOSURES