**PORTER | SCOTT**
A PROFESSIONAL CORPORATION
John R. Whitefleet, SBN 213301
jwhitefleet@porterscott.com
Colin J. Nystrom, SBN 354503
cnystrom@porterscott.com
2180 Harvard Street, Suite 500
Sacramento, California 95815
TEL: 916.929.1481
FAX: 916.927.3706

Attorneys for Defendants STANISLAUS COUNTY, JUSTIN CAMARA, ZA XIONG
*(Exempt from Filing Fees Pursuant to Government Code § 6103)*

UNITED STATES DISTRICT COURT EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| DOROTHEY HEIMBACH, individually and as successor in interest to Anthony Silva,<br><br>Plaintiff,<br><br>v.<br><br>STANISLAUS COUNTY; and JUSTIN CAMARA, ZA XIONG, and ERIC BAVARO, in their individual capacities,<br><br>Defendants. | Case No. 2:23-cv-01887-DJC-CSK<br><br>**DECLARATION OF JOHN R. WHITEFLEET IN SUPPORT OF DEFENDANTS' OPPOSITION TO PLAINTIFF'S MOTIONS IN LIMINE** |

I, John R. Whitefleet, declare as follows:

1. I am an attorney at law licensed to practice before all the courts of the State of California. I am a shareholder with the law firm of Porter Scott, attorney of record for Defendants ("Defendants") in the in the above-entitled matter

2. I make this Declaration on my own personal knowledge except to the facts stated on information and belief. As to such facts, I believe them to be true. If called upon to do so, I could and would competently testify about the matters asserted herein.

///

3. Attached hereto as Exhibit A is the excerpted testimony for Dr. Bux

4. Attached hereto as Exhibit B are excerpted medical records Plaintiff's 015643-015645

5. Attached hereto as Exhibit C are excerpted pages from the deputies' report DEF 00005-0008.

I declare under penalty of perjury under the laws of the State of California and the United States that the foregoing is true and correct, executed this December 15, 2025, at Sacramento, California.

Dated: December 15, 2025            By   /s/ John R. Whitefleet
                                            John R. Whitefleet

# EXHIBIT A

```
 1              UNITED STATES DISTRICT COURT
 2              EASTERN DISTRICT OF CALIFORNIA
 3
                                    )
 4   DOROTHEY HEIMBACH,              )
     individually and as             )
 5   successor in interest to        ) Case No.
     Anthony Silva,                  ) 2:23-CV-01887-DJC-CSK
 6                                   )
              Plaintiff,             )
 7                                   )
              vs.                    )
 8                                   )
     STANISLAUS COUNTY; and          )
 9   JUSTIN CAMARA, ZA XIONG,        )
     and ERIC BAVARO, in their       )
10   individual capacities,          )
                                     )
11           Defendants.             )
                                     )
12
13
14
15         DEPOSITION OF ROBERT CHARLES BUX, MD
16               Taken Remotely Via Zoom
17               Tuesday, March 25, 2025
18
19
20
21   Reported by:
22   SHANDA GABRIEL
23   CSR No. 10094
24   Job No. 145613
25   Pages 1-73
```

DOROTHEY HEIMBACH, ET AL. vs STANISLAUS COUNTY, ET AL.
Robert Charles Bux, M.D. on 03/25/2025

Page 22

1 He got substandard medical care, emergent care at
2 the Central Valley Specialty Hospital.
3    Q. And then on January 14, he was readmitted
4 where?
5    A. To the Central Valley Specialty Hospital.
6    Q. And they noted left-sided pneumonia?
7    A. Correct.
8    Q. And then he developed a urinary tract
9 infection?
10   A. Correct.
11   Q. And was there a related infection?
12   A. Yes. He had a respiratory culture and that
13 was positive and so that's an indication that he had
14 pneumonia.
15   Q. And what was your understanding -- given
16 his fracture at C6-C7, what was your understanding
17 of his ability to move voluntarily?
18       In other words, what was your understanding
19 of his status in terms of paraplegia, quadriplegia,
20 however you want to describe it.
21   A. Well, it was quadriplegia, but he was able
22 to move his head, neck, shoulders and arms.
23   Q. Is it generally the level of the fracture,
24 you can move above that but generally not below it?
25       MR. WHITEFLEET: Objection. Overly broad.

Page 23

1 Incomplete hypothetical. Calls for speculation.
2 Assumes facts.
3       THE WITNESS: Can you repeat that, because
4 that went over --
5 BY MR. GALIPO:
6    Q. Sure. I'm trying to keep it simple here.
7 So --
8    A. Good.
9    Q. -- if someone -- if someone has a fracture,
10 like in this case at C6-C7, if you know, is it
11 generally that there's a loss of movement below that
12 level but they can have movement above that level?
13   A. Correct.
14      MR. WHITEFLEET: Same -- same objections.
15 BY MR. GALIPO:
16   Q. So is that why sometimes someone that has a
17 fracture like, say, in the lower back, they might
18 have paralysis from that level down, but they may be
19 able to move most of their upper body?
20   A. Correct.
21      MR. WHITEFLEET: Same objections and vague.
22 Irrelevant.
23 BY MR. GALIPO:
24   Q. Okay. You have an entry at the bottom of
25 that page related to March 14.

Page 24

1    Do you see that?
2    A. Uh-huh. Yes.
3    Q. Was that related to another infection?
4    A. Well, it -- it -- it -- yeah, it was
5 another infection, but it was also pseudomonas. But
6 it turned out also to be a respiratory
7 carbapenem-resistant pseudomonas.
8       So the first pseudomonas would have been
9 treatable by multiple drugs, and this one that he
10 got on the 14th was drug resistant.
11   Q. So up to March 14, all of the medical
12 complications he had, do you think they were related
13 in some way either to his injury or his hospital
14 stay?
15      MR. WHITEFLEET: Objection. Compound.
16 Overly broad. Vague.
17      THE WITNESS: I think it was related to his
18 hospitalization, and I think it also, in terms of
19 the decubitus ulcer, it also resulted because of
20 poor medical care.
21 BY MR. GALIPO:
22   Q. Okay. You're not saying, for example, he
23 would have had decubitus ulcers if he wasn't in the
24 hospital, are you?
25   A. No, that's the whole -- yeah. I'm sorry.

Page 25

1 I'm sorry.
2    Q. I mean, if he hadn't had the injury at all,
3 you're not saying he necessarily would have had
4 decubitus ulcers, are you?
5    A. No.
6       MR. WHITEFLEET: Objection. Calls for
7 speculation. Vague. Incomplete hypothetical.
8       THE WITNESS: No, and he -- over the last
9 40-some years that I've been in the medical field,
10 the treatment of decubitus ulcers has gotten to the
11 point where if patients are turned properly, if they
12 receive the proper care from a wound team, if they
13 keep the wounds dried and packed and with all the
14 treating modalities, including debridement, you
15 should be able to cure the decubitus ulcers if they
16 occur, and they shouldn't occur.
17      As long as you're turning them every couple
18 of hours, you should not get decubitus ulcers. But
19 that requires the nurses to do that, and it also
20 requires patient permission.
21 BY MR. GALIPO:
22   Q. Right. I get all that and I, having looked
23 at a lot of medical records myself with people with
24 very serious injuries, like in this case, you would
25 agree that sometimes decubitus ulcers do occur

Page 34

1  MR. WHITEFLEET: Objection. Compound.
2  Overly broad. Vague. Assumes facts. Vague as to
3  time. Misstates testimony.
4  BY MR. GALIPO:
5  Q. You may answer.
6  A. I said that -- can you give me the question
7  one time more.
8  Q. Okay. Sure.
9  A. Yeah.
10  Q. The -- all these complications that we've
11  been talking about, and I don't have all of them,
12  but we've been -- we talked about a lot of
13  complications that he was having, and I think you
14  noted most of them in your report, including
15  decubitus ulcers.
16  A. Correct.
17  Q. And what I'm basically asking you, if you
18  would agree that to a reasonable medical
19  probability, had he not had the injury and had not
20  been hospitalized for this prolonged period of time,
21  than more likely than not, he wouldn't have had
22  those injuries and complications?
23  MR. WHITEFLEET: Same objections. And
24  vague as to "injuries." Vague as to
25  "complications."

Page 35

1  THE WITNESS: That would be true except for
2  the fact that he didn't get his decubitus ulcers
3  treated properly, and that resulted in his
4  malnutrition and set off the stream of events,
5  including osteomyelitis. So those are things that
6  are the result of poor medical care, period.
7  BY MR. GALIPO:
8  Q. Okay. So let's take the decubitus ulcers
9  out of it just for a moment, and then we'll get back
10  to it. Because I realize that you have strong
11  opinions about that, and I want you to be able to
12  voice that.
13  But all these other items we talked about,
14  you know, that he was having that are outlined in
15  your report, would you agree those were medical
16  complications that resulted from his injury and
17  extended hospitalization?
18  MR. WHITEFLEET: Objection. Compound.
19  Vague as to "complications." Overly broad as to
20  time. Misstates testimony.
21  THE WITNESS: I think that there were
22  certain of these that are the result of the
23  injuries, and there are certain of them that are due
24  to poor medical care.
25  And if he hadn't had poor medical care, he

Page 36

1  wouldn't have gotten malnutrition, he wouldn't have
2  gotten cachetic and weakened, he wouldn't have
3  gotten deconditioned, and he certainly wouldn't have
4  had all these decubitus ulcers that are absolute
5  wonderful spots to get invasion of organisms and
6  diffuse blood -- blood vessel penetration, and --
7  and then sepsis and -- and infections. So --
8  BY MR. GALIPO:
9  Q. Okay. That's fine.
10  Can you tell me, for example, and I don't
11  mind if you look at your report, some of the
12  complications that you believe he had that were
13  related to the injury and not the decubitus ulcers?
14  A. Well, I think the things --
15  MR. WHITEFLEET: Hold on. Hold on. It
16  misstates testimony. And it's argumentative.
17  BY MR. GALIPO:
18  Q. You may answer.
19  A. Well, I think the first things that
20  happened were because of -- you know, there are a
21  number of contributing things. One was his -- was
22  his lifestyle. And I don't think his nutrition was
23  particularly good, as he was living on the streets.
24  And -- and then I think the rest of it that
25  initially came on could have occurred and were

Page 37

1  things that can typically occur in people with
2  fractured necks.
3  But when you start talking about his
4  decubitus ulcers, his malnutrition, and his weight
5  loss, which -- which then depends on how he can heal
6  and how he reacts to invasion of -- potentially of
7  bacteria that can cause infections, that goes away
8  and he has a tremendous problem. So he gets in a
9  trap where -- where the -- he's continually or has a
10  significant time where he's septic, where he gets
11  repeated pneumonias, and he still has trouble with
12  these -- with these decubitus ulcers.
13  And then on top of all of that, he -- he
14  requires periodic blood transfusions. And all of
15  that, all of those things that I've talked about
16  connect back to those decubitus ulcers. You can't
17  get rid of them. I mean, that's -- that's the
18  problem. And -- and it shouldn't have happened. If
19  he had them, they should have been minor and could
20  have been cured. But that's not what happened.
21  Q. Okay. So the blood transfusions, do you
22  have an opinion as to why he needed those?
23  A. Well, I think it may well have been that he
24  wasn't -- he didn't have the nutritional things that
25  he needed in order to form red blood cells.

DOROTHEY HEIMBACH, ET AL. vs STANISLAUS COUNTY, ET AL.
Robert Charles   Bux, M.D. on 03/25/2025

Page 58

1  coroner's office or a medical examiner's office and
2  they're going to be calling the doctor and they're
3  going to be getting medical records to find out why
4  the patient died.
5  BY MR. GALIPO:
6     Q.  Right.
7     A.  Okay?
8     Q.  Yes.  And obviously in this case, as we
9  discussed previously, he died shortly after the
10 ventilator was removed.
11        Is that your understanding?
12    A.  That's correct.
13        MR. WHITEFLEET:  Objection.  Asked and
14 answered.
15 BY MR. GALIPO:
16    Q.  Do you have any opinion as to how long he
17 would have continued to live if the life support had
18 not been taken off?
19    A.  No, I don't offer opinions like that but
20 let me see if I've got --
21    Q.  So based on your review of the records, he
22 would have had pneumonia at the time that the life
23 support was taken off?
24    A.  Right.  He had pneumonia, he was septic and
25 he had osteomyelitis, as well as his malnutrition

Page 59

1  that we've talked about before.
2     Q.  And the septic shock, that's slightly
3  different than just being septic, isn't it?
4     A.  Well, that's what you try to prevent when
5  you get somebody that gets septic is to keep them
6  out of septic shock.  Because they get into septic
7  shock, then they have a significant mortality rate.
8     Q.  Right.  But did you note in the records
9  that he was said to be in septic shock before they
10 took him off life support?
11    A.  No.  This is what -- this is what the
12 treating physician said who must have been there.
13    Q.  I see.
14    A.  So he realized that the guy was in septic
15 shock with extreme lower blood pressure, maybe fast
16 heart rate, all that kind of stuff, and -- and felt
17 that he clinically had septic shock and so that's
18 what he put down.
19    Q.  Okay.  That's fine.  Let's go to the last
20 page.  You have a last section that says "Medical
21 Opinions."
22    A.  Yes.
23    Q.  Is that where you're basically summarizing
24 your opinions in this case?
25    A.  Yes.

Page 60

1     Q.  So your first opinion is:
2            "Moving him from the ground
3         to the picnic table did not
4         appear to cause exacerbation of
5         his neck injuries."
6         Do you see that sentence?
7     A.  Yes.
8     Q.  And is it your opinion, before they moved
9  him, his neck was already fractured?
10    A.  Oh, yes.
11    Q.  Is it generally taught to medical students
12 that if you can avoid moving someone that has a
13 fractured neck, it's a good idea?
14        MR. WHITEFLEET:  Objection.  Overly broad.
15 Calls for speculation.  Outside the scope.
16        THE WITNESS:  Individuals are taught to
17 keep people in one position until you can get a
18 collar on them and stabilize them.
19 BY MR. GALIPO:
20    Q.  Okay.  Are you giving any opinions as to
21 whether moving him caused him pain at the time?
22    A.  No.
23    Q.  Then your second opinion is you agree with
24 the doctor on the cause of death.
25        Does that include the part about the cardio

Page 61

1  pulmonary arrest?
2     A.  That shouldn't even be on the death
3  certificate.  But he's like everybody else.  I
4  haven't seen everybody else that's died that didn't
5  eventually have a cardiac pulmonary arrest.  Okay?
6  And I've looked at a lot of dead people.
7     Q.  I believe you have.  What state are you
8  currently in?
9     A.  I live in Colorado and I'm licensed in
10 Colorado and in Texas.
11    Q.  Nice.  Just curious because you mentioned
12 that one-hour time difference and I -- I never asked
13 you where you were at.
14    A.  We're mountain time here.
15    Q.  Okay.  It's beautiful country.
16        So I think I asked you this earlier, but it
17 sounds like you believe he died from complications
18 that occurred during his hospitalization, including
19 the decubitus ulcers?
20        MR. WHITEFLEET:  Objection.  Asked and
21 answered.
22        THE WITNESS:  I believe that the reason why
23 he died when he died is because of the decubitus
24 ulcers, the osteomyelitis, the sepsis, and the fact
25 that he prohibited adequate wound care and that he

DOROTHEY HEIMBACH, ET AL. vs STANISLAUS COUNTY, ET AL.
Robert Charles   Bux, M.D. on 03/25/2025

Page 62

1  also didn't do activities of daily living, which
2  also deconditioned him and contributed to his death.
3  BY MR. GALIPO:
4      Q. Well, what activities did you expect him to
5  do if he was a quadriplegic?
6      A. Well, I'm not -- I'm not an occupational
7  therapist, but I know that there was a note fairly
8  early on when they asked him, "Why don't you help us
9  here and -- a little bit with your back."
10         "Oh, no, I'm not doing that."
11         So it's kind of to get him so that they can
12 do -- with whatever their disability is, that they
13 can do certain things to help themselves. That's
14 what -- that's what OT does.
15         And the same thing physical therapy was --
16 I know -- I saw it a couple of times where they
17 would kind of run off and he didn't want anything to
18 do with physical therapy.
19         So those are the things that were
20 happening, and then he didn't want to be moved and
21 have his wounds taken care of.
22     Q. Well, there were some entries in that
23 regard. There was other entries that he was
24 compliant.
25     A. Right. But his -- his decubitus ulcers

Page 63

1  kept getting worse. Okay? They didn't get a whole
2  lot better. And that was -- and then that was --
3  some of them were there nine -- nine months or so.
4  So, you know.
5      Q. Do you think that the decubitus ulcers were
6  caused by him being more or less in stationary
7  positions in the bed?
8         MR. WHITEFLEET: Objection.
9      A. Well, based --
10        MR. WHITEFLEET: Compound. Vague as to
11 time. Overbroad.
12        THE WITNESS: Yeah. I'm sorry, John.
13        Based -- yeah, I mean that's how -- that's
14 how they start. Okay? But on top of not being
15 turned, when they tried to turn him, he didn't want
16 to be turned and they couldn't turn him.
17        So he contributed to that decubitus ulcer
18 problem and having more length of time on -- in a
19 given position that would cause the ulcers to get
20 worse.
21 BY MR. GALIPO:
22     Q. It seems like he died shortly after they
23 took him off the breathing machine?
24     A. That's my impression as well, but I didn't
25 check the times.

Page 64

1      Q. Right. And I think you told me earlier,
2  but your understanding is he could not breathe on
3  his own?
4         MR. WHITEFLEET: Objection. Misstates
5  testimony --
6         THE WITNESS: I said he couldn't support
7  his breathing --
8         MR. WHITEFLEET: Vague. Asked and
9  answered.
10        THE WITNESS: -- he couldn't support his
11 breathing over time. He couldn't -- he couldn't
12 support adequate oxygenation over a given period of
13 time. I don't know what that period was.
14 BY MR. GALIPO:
15     Q. Okay. But what you're saying is that you
16 need a certain oxygen -- to sustain a certain oxygen
17 level over a period of time to survive, and whether
18 he could breathe a little bit or not, it's your
19 opinion he couldn't breathe enough for a long enough
20 period of time to have sufficient oxygen to survive?
21        MR. WHITEFLEET: Objection. Misstates
22 testimony. Outside the scope. Argumentative.
23        THE WITNESS: That isn't exactly what I
24 said. What I said was, they tried to get him off a
25 ventilator and that didn't work.

Page 65

1         How much time it took before he couldn't go
2  on, I don't know. That's a pulmonary --
3  pulmonologist question. And so the point is that
4  whatever that time is, it is. And I don't know
5  whether it was short or over hours or longer.
6  BY MR. GALIPO:
7      Q. The point I'm -- simple point I'm trying to
8  make, it seems chronologically that he died on the
9  same day they took him off the breathing machine.
10     A. Right, because he had underlying pneumonia,
11 sepsis, hypoxia from that and he -- and he also had
12 osteomyelitis.
13        So, I mean, yeah, I mean, he had a number
14 of things going on for diseases that got him -- that
15 pushed him over the line for the -- for the -- the
16 hypoxia and the effect of the bacterias in terms of
17 putting him into septic shock.
18     Q. Right. But that's -- but was there any
19 note in the medical records that he was in septic
20 shock on the night before they stopped the breathing
21 on the 10th?
22     A. Yeah, he was -- he was septic on the 9th
23 and he got hypotensive. So that could be the
24 beginning of septic shock. I mean, I don't know
25 what his other conditions were to account -- to see

DOROTHEY HEIMBACH, ET AL. vs STANISLAUS COUNTY, ET AL.
Robert Charles Bux, M.D. on 03/25/2025

Page 70

1  DECLARATION
2
3
4
5
6       I hereby declare I am the deponent in the
7  within matter; that I have read the foregoing
8  deposition and know the contents thereof, and I
9  declare that the same is true of my knowledge except
10 as to the matters which are therein stated upon my
11 information or belief, and as to those matters, I
12 believe it to be true.
13      I declare under the penalties of perjury of
14 the State of _____ that the foregoing is
15 true and correct.
16      Executed on the _____ day of
17 _____ 2025, at
18 _____.
19
20
21
22
23      _____
24           SIGNATURE OF WITNESS
25

Page 71

1       I, the undersigned, a Certified Shorthand
2  Reporter of the State of California, do hereby
3  certify:
4       That the foregoing proceedings were taken
5  before me at the time and place herein set forth;
6  that any witnesses in the foregoing proceedings,
7  prior to testifying, were administered an oath; that
8  a record of the proceedings was made by me using
9  machine shorthand which was thereafter transcribed
10 under my direction; that the foregoing transcript is
11 a true record of the testimony given.
12      Further, that if the foregoing pertains to
13 the original transcript of a deposition in a Federal
14 Case, before completion of the proceedings, review
15 of the transcript [ ] was [x] was not requested.
16      I further certify I am neither financially
17 interested in the action nor a relative or employee
18 of any attorney or any party to this action.
19      IN WITNESS WHEREOF, I have this date
20 subscribed my name.
21
22 Dated: April 8, 2025.
23           _Shanda Gabriel_ (signature)
24           _____
              Shanda Gabriel
25                CSR 10094

Page 72

1  DEPOSITION ERRATA SHEET
2  CASE NAME: Heimbach vs. Stanislaus County, et al.
   NAME OF WITNESS: Robert Charles Bux, MD
3  DATE OF DEPOSITION: Tuesday, March 25, 2025
   Job No.: 145613
4  REASON CODES: 1. To clarify the Record
                 2. To conform to the facts
5                3. To correct transcription errors
6
7
8  Page____Line____Reason____
9  From_____ to_____
10 Page____Line____Reason____
11 From_____ to_____
12 Page____Line____Reason____
13 From_____ to_____
14 Page____Line____Reason____
15 From_____ to_____
16 Page____Line____Reason____
17 From_____ to_____
18 Page____Line____Reason____
19 From_____ to_____
20 Page____Line____Reason____
21 From_____ to_____
22 Page____Line____Reason____
23 From_____ to_____
24 Page____Line____Reason____
25 From_____ to_____

Page 73

1  DEPOSITION ERRATA SHEET
2  Page____Line____Reason____
3  From_____ to_____
4  Page____Line____Reason____
5  From_____ to_____
6  Page____Line____Reason____
7  From_____ to_____
8  Page____Line____Reason____
9  From_____ to_____
10 Page____Line____Reason____
11 From_____ to_____
12 Page____Line____Reason____
13 From_____ to_____
14 Page____Line____Reason____
15 From_____ to_____
16 Page____Line____Reason____
17 From_____ to_____
18 Page____Line____Reason____
19 From_____ to_____
20 Page____Line____Reason____
21 From_____ to_____
22 Page____Line____Reason____
23 From_____ to_____
24 Page____Line____Reason____
25 From_____ to_____

# EXHIBIT B



**CENTRAL VALLEY SPECIALTY HOSP**
730 17TH STREET, MODESTO, CA 953541209 -

**Patient Name:** ANTHONY SILVA

**Note Type:** Discharge Summary

| All Demographics | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| Patient Name | DOB | Age | Sex | Visit Number | Admission Date/Time | Attending Physician | Date of Service | Room and Bed | Emergency Contact |
| SILVA, ANTHONY | 0 | 41 years | Male | 10009122 | 07/25/2023 19:57 | RAJWINDER BAHIA | 07/25/2023 | 278 | |

09/14/2023   06:04

**Discharge Date: date of death- 9/10/23**

## Hospital Course

per HPI
**Patient is returning from Memorial after having been here previously. Last DC Summary as follows:**

*Patient is a 40-year-old male with past medical history of schizophrenia, quadriplegia (from C-spine injury in October of 2022), status post tracheostomy and ventilator dependence for chronic respiratory failure, PEG dependent, history of DVT/PE on full dose anticoagulation. He also has history of left-sided empyema with multidrug resistant pseudomonas (status post left thoracotomy and decortication on April 10, 2023) status post multiple bronchoscopies for mucous plugging. He also has a recent history of thrombocytopenia of unknown etiology with questionable ITP for which he was placed on steroids in April and given IV IgG with improvement in platelet count. In addition he had C. diff colitis status post treatment. He was sent from Central Valley Specialty Hospital to Memorial Medical Center for unresponsiveness and diaphoresis. Patient was admitted again with acute on chronic respiratory failure with recurrent bacterial pneumonia and recurrent mucus plugging. CT done on May 24 showed overall decrease in the size of left lower consolidation and layering of air-fluid level within the airway which may have represented aspirated material aspiration material. Patient was also found to have possible pneumothorax. thoracic surgery was consulted. ID service was also consulted and antibiotic regimen was changed. Patient was found to have left femoral vein thrombosis on May 31 for which he was started on heparin drip. Patient hemoglobin dropped subsequently and he received 2 units packed RBCs. At this time patient had completed antibiotics for multidrug resistant pseudomonas. No active source of bleeding was found at outside hospital and patient was transferred to Central Valley Specialty Hospital for further management on 6/8/23. On 6/10/23, patient began having hypotension and tachycardia which were not responsive to recurrent 1L IV NS boluses nor to midodrine. Dr. Komari transferred patient to Memorial Medical Center ER with concerns of severe septic shock. See 6/10/23 note by Dr. Komari for further details.*

Electronically signed by: RAJWINDER BAHIA, INTERNAL MEDICINE, 09/14/2023 06:06 PDT

015643

Page 1 of 20

# CENTRAL VALLEY SPECIALTY HOSPITAL

**CENTRAL VALLEY SPECIALTY HOSP**
730 17TH STREET, MODESTO, CA 953541209 -

**Patient Name:** ANTHONY SILVA

**Note Type:** Discharge Summary

---

Upon arrival to Memorial pt was found to Methicillin resistant Staph epidermidis. Further w/u showed S4 osteo. Pt also had abd wall cellulitis and abscess. He underwent G tube repair and J-tube placement on 6/23/23. ID had been following him for MDR pseudomonas pneumonia. Penrose drains were removed on 7/24. Of note last WBC was 15.3.

Hypotension patient is clinically dehydrated - started IV fluids.

**CRE Pseudomonas PNA and Sepsis (8/11-):** appears to have new infection. despite patient being on levaquin, patient still became febrile and WBCs going up and now > 14K. is febrile with tmax 100.6 deg F. persistently tachycardic. antibiotic spectrum expanded at this time and infectious workup ordered. ID also on board. as of 8/13, WBC still trending up 2 days in a row despite vanco/zosyn. will expand antibiotic spectrum (change zosyn to merrem) and add anti-fungal coverage for the time being while cultures pending.

**Anemia:** 8/13 hgb 6.9 - 1 prbc ordered. PPI q6h x 4 days, then q12h from then on. occult stool ordered. no active bleeding or hematochezia/melena reported.

**MDR Pseudomonas PNA (7/30):** organism sensitive to levaquin which has been started for now. further antibiotic adjustments as per ID.

**Hypotension and Tachycardia resistant to IVF boluses and midodrine:** concerns for severe septic shock and recurrent MDR pneumonia. patient sent by Dr. Komari on 6/10/23 to Memorial MC ER for further diagnostics and management. Methicillin resistant Staph epidermidis. Further w/u showed S4 osteo. Pt also had abd wall cellulitis and abscess. He underwent G tube repair and J-tube placement on 6/23/23.

**Acute on chronic respiratory failure:** multifactorial. Patient is ventilator dependent. Has got history of recurrent MRSA/MDRO pneumonias. Does get mucus plugging on a regular basis. Patient was sent out to Memorial Medical Center. Again was found to have a recurrent pneumonia. He completed antibiotic course. Patient eventually grew multi-drug resistant pseudomonas. In the past he has had a left-sided thoracotomy with de-cortication done. Patient consistently continues to have pneumonia. ciprofloxacin rx'd. ID services see patient. At this time transferred back to Central Valley Specialty Hospital

**Quadriplegia:** Patient at baseline. has C-spine injury. continue to monitor closely. neurosurgery consulted. turn q2h. special mattress. wound care as appropriate.

**Decubitus ulcer:** Multiple ulcers. wound care services to see patient. There is definite bone/osteo involvement in the past. At this time ideally patient needs colostomy to heal, but patient been seen by multiple services at different hospitals and was deemed not to be a candidate due to compliance issues.

**History of bradycardia:** status post pacemaker placement: relatively stable. cardiology consulted.

**History of schizophrenia:** drug abuse in the past. at this time stable. continue to monitor closely

**upper extremity DVT:** Eliquis was DC'd at outside hospital due to severe thrombocytopenia. at this time continue to monitor. aspirin for now. if platelets continue to be stable, consider re-initiating full AC.

**Polypharmacy:** Patient continues to want IV pain meds. last time patient went into acute respiratory failure and

---

Electronically signed by: RAJWINDER BAHIA, INTERNAL MEDICINE, 09/14/2023 06:06 PDT

015644

Page 2 of 20

# CENTRAL VALLEY SPECIALTY HOSPITAL

**CENTRAL VALLEY SPECIALTY HOSP**
730 17TH STREET, MODESTO, CA 953541209 -

**Patient Name:** ANTHONY SILVA

**Note Type:** Discharge Summary

needed to be transferred out. At this time he has been told that we only are going to give him meds through the PEG due to risks of respiratory decompensation

**Medical Non Compliance:** Pt consistently refuses turning and wound care. This has been reported by both nursing and wound care team as well as house supervisor. PT reports pt. refuses RNA service. Pt. has been advised that a consequence of not receiving and refusing medical care includes further deterioration and eventual death --especially related to potential sepsis that will be caused by untreated wounds due to noncompliance. patient verbalized understanding.

Case discussed with patient in great detail. Patient now wants to be DNR. Is thinking about comfort care at this point also. pt just wants his pain meds- Finally patient's mother was able to come and see her son. After she saw him she made comfort care. Patient was taken off the vent and expired in peace

Electronically signed by: RAJWINDER BAHIA, INTERNAL MEDICINE, 09/14/2023 06:06 PDT

015645
Page 9 of 20

# EXHIBIT C

```
RIVERBANK  Telephone: 209-869-7162
STANISLAUS COUNTY SHERIFF'S DEPARTMENT - Controlled Document
Dec 07, 2023       Duplication or Reissuance Controlled by Law (PC13302)       Case No
6727 3rd Street                                                                R22008565
Riverbank, CA 95367                                                            Followup [ ]
Printed by: S00554   Released Date: 12/07/2023 To: John Whitefleet-Porter Scott Attorneys
```

| Victim's Name | Location of Occurrence |
|---|---|
| CAMARA, JUSTIN | 3600 SANTA FE ST   RIVERBANK CA 95367 |

------------------------------ NARRATIVE ------------------------------

**SYNOPSIS:**

The following report is regarding the issuing of a Ramey Warrant for the arrest of Anthony Michael Silva (09/14/82). Deputies were dispatched to Veterans Park located at 3600 Sierra Street inside the City of Riverbank after Silva was seen by a mounted unit Deputy chasing after subject and attempting to fight them. Silva was displaying erratic behavior and was believed to be under the influence of a stimulant narcotic. Upon contact, I attempted to detain Silva. Silva actively resisted, was taken to the ground and detained.

While walking Silva to a patrol vehicle, he tried to pull away from Deputies. I was standing approximately two to three feet. Silva lowered his shoulder and struck me in the chest. It was apparent that this was an intentional act by Silva. Silva was taken to the ground again and sustained an injury to his neck. Silva was transported to Memorial Medical Center. Due to the lack of staff available to transport Silva, a Ramey warrant was authored for 69(a) PC.

Forward this report to the District Attorney for complaint.

**NARRATIVE:**

On 10/08/2022 I, Deputy Camara was assigned to uniformed bicycle patrol for the Riverbank wine and cheese event. During this event I was wearing a Stanislaus County Sheriff's Office approved class B uniform complete with shoulder patches and a visible badge clearly identifying myself as a peace officer.

At approximately 1400 hours, Deputy B. Babbitt was on mounted patrol in the area of Veterans Park. While in the park, he observed a white male adult in a white tank top and jeans acting erratic. He observed the subject chasing after a Hispanic male and saw the subject trying to hit the Hispanic male with a closed fist. He continued to observe the subject run up to other civilians in the park and act in an aggressive nature. Deputy Babbitt put out over the radio that the subject was in the park chasing after people. Deputy Babbitt also stated the subject appeared to be under the influence of drugs.

Based off prior calls for service, I knew the WMA was Anthony Silva. Silva is transient and usually makes camp in the park. I also know that Silva has a history of trying to chase and attack people when he is under the influence of narcatics. There have been several calls for service where city employees have called in stating Silva was chasing them and they felt threatened. Silva is also known to be combative when intoxicated.

Detective Xiong and I responded on our department bicycles from the Riverbank Police substation. Upon arrival, I observed Silva running around the north side of the park. I noticed that there was a large number of civilians waiting to enter the wine tasting venue. Having Silva's violent behavior in mind and given the large number of innocent civilians, I decided that Silva needed to be detained fearing he could injure civilians or Deputies. I approached Silva and informed him to turn around and place his hands behind his

S02800    CAMARA, JUSTIN    S00554    4 of 7

```
                    RIVERBANK  Telephone: 209-869-7162
         STANISLAUS COUNTY SHERIFF'S DEPARTMENT - Controlled Document
    Dec 07, 2023         Duplication or Reissuance Controlled by Law (PC13302)    Case No
    6727 3rd Street                                                               R22008565
    Riverbank, CA 95367                                                           Followup [ ]
    Printed by: S00554   Released Date: 12/07/2023 To: John Whitefleet-Porter Scott Attorneys
```

| Victim's Name | Location of Occurrence |
|---|---|
| CAMARA, JUSTIN | 3600 SANTA FE ST  RIVERBANK CA 95367 |

------------------------------ NARRATIVE ------------------------------

back. Silva turned and faced me not complying with my order. Silva raised both arms out to his sides and showed me the palms of his hands. I reached for his left arm and when I grabbed his wrist, Silva began to pull away in an attempt to flee. In fear that if he were to break my grasp, he would become more combative I utilized an arm bar take down and took Silva to the ground.

Once Silva was in a prone position, he began to pull his arms tighter to his body to prevent us from handcuffing him. Detective Xiong gave several verbal commands to Silva to put his hands behind his back. Silva continued to physically resist by pulling his arms from our control. At this point, Silva had not been searched. Based on my training and experience I know subjects conceal weapons in their front waist band for quick access.

I was able to gain control of Silva's left arm and placed a single handcuff on and secured it. Detective Xiong was able to gain control of Silva's right arm and brought it behind his back. After securing a second handcuff and gaining full control of Silva, we rolled him onto his back. Silva immediately crossed his legs and did not appear to be injured from the incident.

While Silva was on his back, he was making incoherent statements. It appeared Silva was under the influence of a stimulant narcotic. I spoke in a calm and slow voice in order to de-escalate the situation.

After a few moments went by, I asked Silva if he needed medical attention, and he did not state he was not in need of an ambulance. Knowing Silva was in a use of force, Detective Xiong and I decided to relocate Silva to the pavilion area and out of the sun to wait for supervisor arrival. While waiting for Sgt. Hickman to arrive, Detective Xiong and I conducted a search incident to arrest of Silva. In his front right pants pocket, I located a black cloth bag. I opened the bag and located two individually packaged plastic baggies of a white crystal-like substance. Based off my training and experience, I knew the substance was consistent with crystalized methamphetamine.

After conducting a search of Silva, Detective Xiong began to ask Silva where we could take his items for safe keeping. Silva was making incoherent statements and asked why he was in handcuffs. Recognizing that Silva was upset I attempted to de-escalate the situation by talking to Silva in a calm voice and explained to him that he was under arrest.

My intended plan was to escort Silva to the back of Deputy Bavaro's patrol vehicle to place him in an air conditioned area to await transport to the Public Safety Center. A reasonable person would have complied with our orders and would have walked to the vehicle.

As Detective Xiong was walking Silva to a patrol vehicle, Silva turned and faced me and started to pull away from Detective Xiong. Silva made a statement similar to he wasn't going anywhere without his money which was located on the bench. As Silva was pulling away from Detective Xiong, I reached out to grab his left arm to attempt to control his movements and safely walk him to the patrol vehicle. Silva lowered his body and lunged at me. Silva struck me in my left chest area, with his left shoulder, at such a

```
RIVERBANK Telephone: 209-869-7162
STANISLAUS COUNTY SHERIFF'S DEPARTMENT - Controlled Document
Dec 07, 2023        Duplication or Reissuance Controlled by Law (PC13302)     Case No
6727 3rd Street                                                               R22008565
Riverbank, CA 95367                                                           Followup [ ]
Printed by: S00554   Released Date: 12/07/2023 To: John Whitefleet-Porter Scott Attorneys
```

| Victim's Name | Location of Occurrence |
|---|---|
| CAMARA, JUSTIN | 3600 SANTA FE ST   RIVERBANK CA 95367 |

------------------------------ NARRATIVE ------------------------------

force that it knocked me off balance. Due to Silva attacking me, I was forced to take action.

Based on Silva's combative behavior and out of fear that he was going kick, bite, or strike other deputies, Detective Xiong and I attempted to regain control of Silva by trying to place him on his knees. My plan was to place Silva on the ground and then in a WRAP restraint device.

Silva continued to push against us with his legs and actively resist. We turned Silva away from us to place him on his knees away from the benches. Based on Silva's actions, I had to make a split-second decision because I feared myself or another deputy would be injured. I believed Silva would continue to be combative if we did not take swift action. In order to de-escalate and stop the fight, Detective Xiong conducted a leg sweep to take Silva to the ground. Due to Silva actively resisting and squirming around, when we laid him down on the ground, his head struck the pavement.

After noticing Silva had struck his head, I radioed to Dispatch to start an ambulance. I asked Silva if he was hurt, and he instantly stated something to the effect of "ow, ow, I'm paralyzed". Due to a busy Saturday afternoon, AMR's response was delayed.

We placed Silva back on the bench after he asked to sit up. Sgt. Hickman arrived on scene and was notified of the use of force. I tried several times to ask Silva what was hurting, and he would only mouth words but would not speak. I observed a red abrasion above Silva's right eyebrow along with scrapes on his left and right arms. I took photographs of his injuries on my department issued smartphone. I used a standard ballpoint pen for scale and reference.

American Medical Response and Modesto Fire arrived on scene and Silva was transported to Memorial Medical Center for medical attention. Due to lack of staff for both patrol and the Riverbank wine and cheese, I was instructed to have ambulance transport Silva and a Ramey warrant will be authored for his arrest after being released from the hospital.

Silva's belongings were transported to the Riverbank Police Substation to be booked for safe keeping. The two baggies were weighed individually and had a gross weight of .30 and .33 grams. They were labeled as JC1 and JC2 and packaged to be sent to the Department of Justice for further testing.

On 10/08/22 at approximately 1950 hours, Judge Ameral signed a Ramey warrant for the arrest of Silva with a bail set at $25,000. The warrant was sent to the SOC records division to be entered.

On 10/09/2022 via my department phone, I contacted the charge nurse at Memorial Medical Center ER and was informed Silva was in the Intensive Care Unit (ICU) awaiting surgery for a severe neck fracture. I immediately notified Sgt. Hickman of my findings. I was instructed by Sgt. Hickman to contact MMC labs and place Silva's admission blood on hold for the purposes of a search warrant.

EVIDENCE:

S02800    CAMARA, JUSTIN                                    S00554    6 of 7

DEF 00007

```
                RIVERBANK  Telephone: 209-869-7162
     STANISLAUS COUNTY SHERIFF'S DEPARTMENT - Controlled Document
   Dec 07, 2023       Duplication or Reissuance Controlled by Law (PC13302)       Case No
   6727 3rd Street                                                                R22008565
   Riverbank, CA 95367                                                            Followup [ ]
   Printed by: S00554   Released Date: 12/07/2023 To: John Whitefleet-Porter Scott Attorneys
```

| Victim's Name | Location of Occurrence |
|---|---|
| CAMARA, JUSTIN | 3600 SANTA FE ST   RIVERBANK CA 95367 |

--------------------------------- NARRATIVE ---------------------------------

BWC and photos uploaded to evidence .com

JC1 – 0.30 grams of a white crystal substance

JC2 – 0.33 grams of a white crystal substance

RECOMMENDATION:

Forward to the district attorney's office for review of case.


S02800   CAMARA, JUSTIN                                    S00554    7 of 7

DEF 00008